IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROQUETTE FRÈRES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-540 (***) |
| | ) | |
| SPI PHARMA, INC. and DRYTEC LTD., | ) | **REDACTED VERSION** |
| | ) | |
| Defendants. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

**PLAINTIFF ROQUETTE FRÈRES' ANSWERING BRIEF
IN OPPOSITION TO DEFENDANT DRYTEC LTD.'S
<u>MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
Julia Heaney (#3052)
Benjamin J. Schladweiler (#4601)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658.9200
*Attorneys for Plaintiff Roquette Frères*

OF COUNSEL:

Douglas. V. Rigler
Andrew J. Patch
YOUNG & THOMPSON
745 South 23rd Street, Suite 200
Arlington, VA 22202
(703) 521.2297

Original Filing Date: February 9, 2007
Redacted Filing Date: February 16, 2007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

NATURE AND STAGE OF THE PROCEEDING ........................................................... 1

SUMMARY OF ARGUMENT ......................................................................................... 2

STATEMENT OF FACTS ................................................................................................ 3

ARGUMENT ................................................................................................................... 4

    I.    THE DELAWARE LONG-ARM STATUTE AUTHORIZES EXERCISING
        PERSONAL JURISDICTION OVER DRYTEC ........................................................... 4

        A.   Drytec Transacts Business With And Receives Revenue For Mannitol
           Production Equipment From Spi ................................................................. 6

        B.   Drytec Sold MANNOGEM Directly to SPI ............................................... 9

        C.   Drytec and Drytec Contract Processing Are, Essentially, the Same Company ....... 13

    II.   EXERCISING JURISDICTION COMPORTS WITH DUE PROCESS ........................ 17

CONCLUSION ................................................................................................................ 18

## TABLE OF AUTHORITIES

CASES

Applied Biosystems, Inc. v. Cruachem, Ltd.,
    772 F. Supp. 1458 (D. Del. 1991)......................................................................6, 14

Asahi Metal Indus. v. Superior Court of California,
    480 U.S. 102 (1987)..........................................................................................17

Boone v. Oy Partek Ab,
    724 A.2d 1150 (Del. Super. 1997)........................................................................4

Burger King Corp. v. Rudzewicz,
    471 U.S. 462 (1985)..........................................................................................17

Hanson v. Denckla,
    357 U.S. 235 (1958)..........................................................................................17

ICT Pharm. v. Boehringer Ingelheim Pharm.,
    147 F. Supp. 2d 268 (D. Del. 2001).....................................................................4

Int'l Shoe Co. v. Washington,
    326 U.S. 310 (1945)..........................................................................................17

Milliken v. Meyer,
    311 U.S. 457 (1940)..........................................................................................17

Moore v. Little Giant Indus., Inc.,
    513 F. Supp. 1043 (D. Del. 1981)........................................................................5

Philips Elec. N. Am. Corp. v. Contec Corp.,
    Civ. A. 02-123-KAJ, 2004 WL 503602 (D. Del. March 11, 2004)............................5

Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.,
    863 F. Supp. 186 (D. Del. 1993)....................................................................5, 14

World-Wide Volkswagen Corp. v. Woodson,
    444 U.S. 286 (1980)..........................................................................................17

STATUTES

10 Del. C. § 3104(c)....................................................................................2, 4, 14

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff Roquette Frères ("Roquette") has sued SPI Pharma, Inc. ("SPI"), a corporation chartered and headquartered in the State of Delaware, and Drytec Ltd. ("Drytec"), a UK corporation, for infringement of Roquette's U.S. Patent No. 5,573,777 ("the '777 patent"). The '777 patent covers pulverulent Mannitol of moderate friability and processes for its preparation. Roquette's patented Mannitol is a key ingredient of many food products and pharmaceuticals. In its First Amended Complaint, Roquette alleges that SPI infringes the '777 patent through the importation, sale, and offer for sale of MANNOGEM™ EZ Spray Dried Mannitol ("MANNOGEM") and that defendant Drytec has been importing MANNOGEM into the United States.

In lieu of answering the Complaint, defendant Drytec filed a motion to dismiss based on alleged lack of personal jurisdiction by this Court. All of Drytec's arguments flow from Drytec's contention that it simply has no contacts with the State of Delaware.

Contrary to Drytec's assertions, documentary evidence reveals that Drytec itself, as well as through its commonly controlled affiliated corporate entity, has persistently and directly imported significant quantities of accused Mannitol products into the United States to its contracted U.S. customer, SPI. Drytec has also supplied a system and key components of a system for the spray-drying of Mannitol directly to SPI.

Drytec's substantial and persistent business dealings with SPI, and hence with the State of Delaware, including acts of infringement from which this case arises, are sufficient to subject Drytec to this Court's jurisdiction. Accordingly, Drytec's motion should be denied.

This is Roquette's Answering Brief in opposition to Drytec's motion.

1

SUMMARY OF ARGUMENT

Drytec has in its own name purposefully shipped accused Mannitol to its Delaware based customer and co-defendant SPI. In concert with its commonly controlled affiliate Drytec Contract Processing Ltd ("Drytec Processing"), Drytec has *persistently* shipped Mannitol to SPI, amounting to more than 50 tons of accused Mannitol product entering the United States to the account of SPI in Delaware. In fact, co-defendant SPI has explicitly stated that the accused MANNOGEM is manufactured by Drytec *exclusively* for SPI.

Drytec's independent import of accused product to the account of SPI in Delaware constitutes transacting business in Delaware. Also, Drytec's exclusive agreement with SPI to manufacture and provide accused product for SPI constitutes a contract to supply services or things in Delaware. Moreover, Drytec, which in agency with its affiliate Drytec Processing engaged in a persistent course of conduct in Delaware and derived substantial revenue from services and things in Delaware, infringed the '777 patent in Delaware by importing accused product to SPI.

Accordingly, Drytec's actions satisfy each of three separate bases for this Court's jurisdiction under Delaware's long-arm statute. See 10 Del. C. § 3104(c)(1), (2) and (4).

Subjecting Drytec to the jurisdiction of this Court also comports with due process. Drytec's multiple shipments and sales to the account of SPI in Delaware constitute purposeful minimum contacts with the State of Delaware. Drytec could well have expected being haled into the Delaware courts to answer for any of its contractual obligations with its co-defendant SPI.

2

<u>STATEMENT OF FACTS</u>

The sole support for Drytec's motion is the Declaration of Paul C. Kennet, the managing director of Drytec. (D.I. 21, "Dec."). In his Declaration, Mr. Kennet recites Drytec's lack of an office, employees, real property, and mailing or telephone listing in the State of Delaware (Dec. ¶¶ 7-9, 11), allegations which are not challenged for purposes of this opposition.

Mr. Kennet's declaration goes on, however, to assert that Drytec has never transacted business or performed any character of work or service in Delaware (Dec. ¶ 12); that it derives no revenue from any customers or any other business in Delaware (Dec. ¶ 14); that it has never contracted to do any business related to Mannitol products with SPI (Dec. ¶ 15); and that Drytec has never made, offered to sell or sold any Mannitol product in the United States nor has it imported any Mannitol product into the United States (Dec. ¶¶ 16-17). These statements are demonstrably inaccurate.

In fact, and contrary to Mr. Kennet's declaration, Drytec has admittedly supplied a system and key components of a system for the spray-drying of Mannitol directly to SPI. (Kennet Dep. p. 11, line 20 - p. 12, line 4) (Exhibit 1). More importantly, documentary evidence reveals that Drytec, itself and through its commonly controlled affiliated corporate entity, has directly imported significant quantities of infringing Mannitol products into the United States for its Delaware customer, SPI. (Exhibit 2). In fact, documentary evidence identifies SPI as Drytec's *exclusive* customer for the accused MANNOGEM product. (Exhibit 3).

As set forth in greater detail herein, the undocumented assertions of a lack of contact with Delaware in Mr. Kennet's declaration are repeatedly inconsistent with the

written evidence, and there is more than sufficient cause to maintain jurisdiction over Drytec for its purposeful acts of infringement.

ARGUMENT

This Court determines its own jurisdictional reach under a two-part test. E.g., ICT Pharm. v. Boehringer Ingelheim Pharm., 147 F. Supp. 2d 268, 271 (D. Del. 2001). First, the Court determines whether any part of Delaware's long-arm statute reaches the defendant. Id. Delaware Courts construe the long-arm statute "liberally so as to provide jurisdiction to the maximum extent possible." Id. (quoting Boone v. Oy Partek Ab, 724 A.2d 1150, 1156-57 (Del. Super. 1997)). Then, the Court determines whether imposing jurisdiction comports with constitutional notions of due process. Id.

This Court's jurisdiction over Drytec satisfies both prongs of that two-part test.

I. THE DELAWARE LONG-ARM STATUTE AUTHORIZES EXERCISING PERSONAL JURISDICTION OVER DRYTEC

This Court has three independent bases for exercising jurisdiction over Drytec under Delaware's long-arm statute, 10 Del. C. § 3104(c). Section 3104(c) provides:

> As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or his personal representative, who in person or through an agent:
>
> > (1) Transacts any business or performs any character of work or service in the State;
> >
> > (2) Contracts to supply services or things in this State; …
> >
> > (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in

4

> any other persistent course of conduct in the State
> or derives substantial revenue from services, or
> things used or consumed in the State . . .

Under the "transacting business" provision of § 3104(c)(1), Drytec's direct sale and importation of infringing MANNOGEM product to the account of SPI in Delaware is sufficient to invoke this Court's specific jurisdiction. See Philips Elec. N. Am. Corp. v. Contec Corp., Civ. A. 02-123-KAJ, 2004 WL 503602, at *5 (D. Del. March 11, 2004) (finding specific personal jurisdiction under § 3104(c)(1) over nonresident manufacturer of imported infringing products).[1]

Under the "contracts" provision of § 3104(c)(2), Drytec's agreement with SPI to act as SPI's exclusive source of the accused MANNOGEM, as well as Drytec's agreements underlying each documented import, are also sufficient to invoke this Court's specific jurisdiction. See Moore v. Little Giant Indus., Inc., 513 F. Supp. 1043, 1048 (D. Del. 1981) (finding specific jurisdiction § 3104(c)(2) over nonresident manufacturer based on contract with resident for sale of allegedly defective product).

Under the "tortious injury" provision of § 3104(c)(4), Drytec's numerous imports of infringing MANNOGEM to SPI, contractual agreements with SPI, derivation of substantial revenue from its business dealings with SPI, and provision of services and drying equipment to SPI, all performed itself or in conjunction with its co-owned and commonly controlled sister corporation Drytec Processing, are sufficient to invoke this Court's *general* jurisdiction. See Wesley-Jessen Corp. v. Pilkington Visioncare, Inc., 863 F. Supp. 186, 188-89 (D. Del. 1993) (attributing to defendant corporation the acts of its commonly owned affiliate corporation for purpose of determining jurisdiction where the

---

[1]     This unreported case is appended hereto as Exhibit 8.

affiliates divided business tasks but otherwise operated "in lockstep as part of a larger . . . business group"); <u>Applied Biosystems, Inc. v. Cruachem, Ltd.</u>, 772 F. Supp. 1458, 1464 (D. Del. 1991) (attributing to defendant corporation the acts of its commonly owned affiliate corporation for purpose of determining jurisdiction based on "the extent of overlap of officers, directors, and personnel, as well as the joint advertising, shared finances, and general intercorporate structure . . .").

A.    Drytec Transacts Business With And Receives Revenue
      For Mannitol Production Equipment From SPI

As admitted by Mr. Kennet during his deposition, Drytec was the supplier of a "key" component (Mr. Kennet's choice of term) for a SPI spray fluid bed drying plant for Mannitol H.S. and EZ.  (Dep. at p. 11, line 20 - p. 12, line 4).  Moreover, after additional questioning, Mr. Kennet admitted that Drytec had received and recorded revenue from the sale of the key component of SPI's U.S. spray drying plant.  (Dep. at p. 32, lines 2-21).

Drytec apparently hoped to rely upon a contention that the installation physically was accomplished by Drytec North America, Inc., another commonly owned sister corporation of Drytec. ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████  Drytec's counsel proposed that prior to the jurisdictional discovery deposition of Mr. Kennet, Drytec would produce the documents upon which it would rely

6

to contest jurisdiction and Roquette would produce its documents that support the allegation of jurisdiction over Drytec.

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████

When asked what the quotation document produced by Drytec was, Mr. Kennet replied:

> A    It is a quotation submitted through **OUR** <u>North American office</u> for equipment supply, key parts and engineering equipment supply for spray dryer system.
> Q    And who was the intended customer?
> A    SPI were, Pharma.[2]

(Dep. p. 11, lines 3-9)(emphasis added).

Under any reading of the quotation, installation, and payment to Drytec, the statements in Mr. Kennet's declaration that "Drytec derives no revenue from any client, consumers, customers or any other business in Delaware" (Dec. ¶ 14) and "Drytec has never contracted to do any business related to mannitol products with SPI Pharma, Inc." (Dec. ¶ 15) are clearly incorrect.

---

[2]    Mr. Kennet noted that the facility where the equipment was installed was an SPI Pharma plant in Michigan.  This, of course, does not overcome the fact that the negotiations underlying the contract and the source of funds to Drytec Ltd. for supplying equipment under the contract, all were performed by Pharma SPI Inc. of Delaware.

Later in his deposition, after again confirming that the installation was made by "**OUR** American Company" (emphasis added) (Dep. p. 12, line 9), Mr. Kennet asserted that the contract was not between Drytec Ltd. and SPI Pharma. (Dep. p. 13, lines 1-3). Later however, after considerable fencing regarding the identity of the contracting partner, (Dep. p. 31, line 3 through p. 32, line 21), Mr. Kennet finally conceded his understanding that Drytec Ltd. recorded income for its supply of an atomizer which it understood was for SPI Pharma, Inc.'s plant in the United States.

Curiously, during the preliminary verbal fencing, Mr. Kennet tried to disassociate Drytec from its role in the transaction by stating that "as a contracted business, there needs to be a piece of paper, presumably, there needs to be a formal contract to do business ... ." (Dep. p. 31, lines 18-20). A few moments later, however, when pressed for details of the sale of Mannitol drying equipment manufactured by Drytec, Mr. Kennet rebuffed his own prior contention.

> Q    Was there any kind of a contract between Drytec Limited and Drytec North America with respect to the sale of the spray drying equipment, the Mannitol spray drying equipment?
>
> A    I'm not sure if there was anything formally written. Certainly there would have been an understanding.

(Dep. p. 35, lines 5-11).

Thus, Drytec knowingly manufactured key components of an infringing Mannitol spray drying installation for delivery to SPI in the United States. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

Furthermore, any pretense that Drytec through its managing director Mr. Kennet and SPI of Delaware were not directly involved is refuted by Mr. Kennet's testimony that he met with SPI executives.  (Dep. p. 33, line 17 through p. 34, line 5). One of those persons was Colleen N. Blackney, who is the marketing manager of SPI, whose office is in New Castle, Delaware, and who authored SPI's statement that Drytec manufactures the accused MANNOGEM *exclusively* for SPI.

It is difficult to understand how Drytec Ltd. can contend that it does no business with SPI and that SPI has never been one of its customers.

B.    Drytec Sold MANNOGEM Directly to SPI

As previously noted, Mr. Kennet's Declaration was adamant that Drytec derives no revenues from customers in Delaware (Dec. ¶ 14); that Drytec has never contracted to do any business with mannitol products with SPI Pharma Inc. (Dec. ¶ 15); that Drytec has never made, used, offered to sell, or sold any mannitol product in the United States, nor has it imported any mannitol product into the United States (Dec. ¶ 16); and that Drytec has never made, used, offered to sell, or sold any MANNOGEM product in the United States, nor has it imported any MANNOGEM product into the United States.  The statements are inaccurate.

As noted, the parties agreed to exchange the documents which they intended to use in support of their respective contentions regarding jurisdiction. █████

_____

████████████████████████████████████████████
████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

Moreover, initially Mr. Kennet flatly denied that Drytec has any Mannitol drying facilities.

> Q      Does Drytec Limited have any drying facilities?
> A      No.

(Dep. p. 20, lines 12-14).

However, when asked if Drytec holds itself out as willing to do drying projects in support of sales, Mr. Kennet corrected his prior answer and admitted to the existence of Drytec's Mannitol product drying facilities. (Dep. p. 20, lines 15-22). The belated concession that Drytec does indeed dry Mannitol products in England for sale to its customers is consistent with information which Drytec itself promulgates on its own website (Exhibit 5), in which Drytec identifies itself as providing "Contract Drying" services.

Notwithstanding the belated concession of capability, Mr. Kennet continued to deny that Drytec dried Mannitol products for customers in the United States. He attempted to disassociate Drytec from this activity by suggesting that it was carried out by Drytec Processing.[4]

---

[4]      In trying to make this distinction, Mr. Kennet further confirmed the relationship between Drytec and SPI Pharma that the contract drying operation was "under strict instructions of the clients, clients prescribing every aspect of the process." (Dep. Page 23, lines 7-10). Thus, according to Mr. Kennet's testimony, Delaware based and chartered SPI gave Drytec strict instructions which prescribed every aspect of Drytec's contract drying of Mannitol for SPI's import and account. As noted, SPI states that it is Drytec Ltd.'s "exclusive" customer for MANNOGEM. (Exhibit 3).

Mr. Kennet then was shown Exhibit 2 which is a series of import recordations made by PIERS Imports (U.S. Ports). The PIERS database, published by the Dialog Corporation, a Thompson Company, is comprised of information obtained by vessel manifests and U.S. Customs Automated Manifest Systems (AMS) from all U.S. ports. (Exhibit 2, p. 1).

The first import record shown to Mr. Kennet during his deposition disclosed the import by SPI of more than 30,000 pounds of Mannitol powder from "Drytec" in April of 2006. (Exhibit 2, pp. 2-3). Mr. Kennet said that this material was exported by Drytec Contract Processing. He said that that was "[b]ecause Drytec Contract Processing is the only company with any Mannitol association, with any client in the United States that produced Mannitol."[5]  (Dep. p. 26, lines 20-22).

Questioned further with respect to the origin of the shipment, Mr. Kennet took the position that the legal name of the company identified in its documents as responsible for the export governed and was binding on the identifying party. He insisted that that party had to be Drytec Contract Processing. (Dep. page 27, lines 7-18).

Unfortunately for Drytec's argument, Mr. Kennet next was shown the next PIERS import recordation which showed that 300 drums (35,540 pounds) of Mannitol were exported by Drytec Ltd. to SPI Pharma. (Exhibit 2, p. 4).

Next Mr. Kennet was shown a third PIERS import recordation showing the import by SPI Pharma of an additional 298 kegs (35,301 pounds) of Mannitol powder in November of 2004, from Drytec Contract Processing. (Exhibit 2, p. 5).

---

[5]    This testimony is obviously inconsistent with Mr. Kennet's admission of Drytec Ltd.'s manufacture and sale of Mannitol drying equipment to SPI.

11

Thus, there are three examples of the sale and export of Mannitol products from Drytec's location in Tonbridge, England, a location which is coextensive with the facilities of Drytec Contract Processing. Mr. Kennet grudgingly admitted that Drytec does indeed have facilities for drying Mannitol, an admission which is consistent with the advertised capabilities of Drytec as publicized on its own website.

Exhibit 2 indicates that at least one very significant recent shipment was made by Drytec Ltd. Mr. Kennet's testimony of unawareness does not overcome the unquestioned documentary evidence as to who the exporter was. Moreover, the presence of another recordation of import by Drytec Contract Processing establishes quite clearly that the companies under Mr. Kennet's common supervision as the Managing Director can, indeed, distinguish between and determine the identity of the exporting company.

A document supplied by Roquette to Drytec's counsel as part of the agreed exchange of the documents upon which the parties would rely, but a document not utilized at Mr. Kennet's deposition adds further weight to the conclusion that, contrary to its opposition papers, Drytec is SPI's exclusive MANNOGEM supplier. The document, (Exhibit 3), is a 2005 letter from Colleen Blackney, Marketing Manager, SPI Pharma, Inc. re **Manufacture of Mannogem ™ EZ Spray Dried Mannitol** (emphasis in original). It states:

> The above product is manufactured exclusively for SPI Pharma Inc. in the U.K. at the following location:
> Drytec Ltd.
> Morley Road
> Tonbridge
> Kent, TN9 1RA
> England

12

Despite Mr. Kennet's lack of recollection or disclaimer of awareness, it appears indisputable that SPI, the U.S. Customs Service, and presumably Drytec itself since it would have been party to fill in the shipping and import documents, all believe that Drytec is importing the products in suit into the United States for the account of SPI. SPI further states that SPI is Drytec's exclusive MANNOGEM customer.

C.    Drytec and Drytec Contract Processing Are, Essentially, the Same Company

As evidenced by the PIERS Import data, both Drytec and Drytec Contract Processing, as well as an entity identified only as Drytec, all have imported accused infringing product into the United States. In fact, they are the same company.

**Drytec Holdings Ltd.**
DUNS No. 23-861-1607

42-46 Morley Rd., Tonbridge, Kent UK

Directors:
        Paul Charles Kennet/Sales
        Mette Kjaer Odgaard/CFO
        Allan Jorgensen/CEO

Managing
Director:    Paul Charles Kennet

Secretary:    Philip John O'Brien

---

**Drytec Ltd.**
DUNS No. 22-621-2488

46 Morley Rd., Tonbridge, Kent UK

Directors:
        Paul Charles Kennet/Sales
        Mette Kjaer Odgaard/CFO
        Allan Jorgensen/CEO

Managing
Director:    Paul Charles Kennet

Secretary: Philip John O'Brien

---

**Drytec Contract Processing**
DUNS No. 29-668-5993

44-46 Morley Rd., Tonbridge, Kent UK

Directors:
        Paul Charles Kennet/Sales
        Mette Kjaer Odgaard/CFO
        Allan Jorgensen/CEO

Managing
Director:    Paul Charles Kennet

Secretary: Philip John O'Brien

13

The above chart describes the interrelationship in 2006, among Drytec Holdings Ltd., Drytec Ltd. and Drytec Contract Processing, as reflected in their respective Dunn & Bradstreet Reports. Central to the analysis is the fact that each of these entities shares an identical address and each of them had identical overlap in the key executive positions.

For purposes of satisfying the Delaware long-arm statute, the actions of Drytec Processing are attributable to Drytec. The statute explicitly encompasses actions that the defendant performed "in person or through an agent." 10 Del. C. § 3104(c). This Court has consistently held that sufficiently affiliated sister companies act as agents for each other for purposes of determining jurisdiction under Delaware's long-arm statute. Wessley-Jessen Corp., 863 F. Supp. at 188-189; Applied Biosystems, Inc., 772 F. Supp. at 1463-64. The factors relevant to determining such an agency relationship between sister companies include "the extent of overlap of officers and directors, methods of financing, the division of responsibility for day-to-day management, and the process by which each corporation obtains its business." Applied Biosystems, Inc., 772 F. Supp. at 1463. Thus, even where manufacturing and distribution tasks are divided between the sister companies, they are considered agents of each other if they are wholly owned subsidiaries of a common parent, operating in "lockstep as part of a larger . . . business group." Wessley-Jessen Corp., 863 F. Supp. at 188.

Here, the directorship of Drytec and Drytec Processing not only overlap; they are identical. Moreover, Mr. Kennet identified himself as "managing director responsible for all commercial and fiscal matters of Drytec Limited," as well as "managing Director" of all three Drytec Companies in the U.K. (Dep. p. 16, lines 14-21).

14

The Drytec group of companies in the U.K. present themselves as a single entity for the purpose of soliciting and conducting business. Mr. Kennet admitted that Drytec's parent corporation affirmatively seeks to "unify the world market or world representation" of the Drytec U.K. companies. (Dep. p. 17, line 20 through p. 18, line 2). Even Mr. Kennet failed to recognize any distinction between the Drytec companies when, in his deposition, he stated that he has no employment "other than with Drytec," despite the fact that Mr. Kennet is the managing Director of all three Drytec companies in the U.K. (Dep. p. 8, lines 10-12).

Mr. Kennet similarly acknowledged the unified operations of Drytec and its U.S. affiliate, Drytec North America. Specifically, Mr. Kennet stated that the "key parts and engineering" for SPI's mannitol spray-drying facility were supplied "through **our** Drytec North America." (Dep. p. 11, line 20 through p. 12, line 20). Moreover, Mr. Kennet admitted that in fulfilling its quotation to SPI, Drytec and its North American company apparently operated under an informal understanding, (Dep. p. 35, lines 5-21), despite Mr. Kennet's earlier assertion that for different companies to do business [t]here needs to be a formal contract." (Dep. p. 31, lines 18-22).

The affiliated companies apparently obtain their business of contract drying through advertisement on the webpage of Drytec Ltd. (See Exhibit 5). Exhibit 5 is a printed version of Drytec's webpage, www.drytecdryers.com, as it existed on December 14, 2006, identifying a U.K. office and a North American office. Notably, Drytec Processing is not mentioned. Despite the complete absence of any reference to Drytec Processing, Drytec's webpage advertised CONTRACT DRYING." (Exhibit 5, p. 2). Drytec promoted its Contract Drying business by proclaiming, "[t]he Drytec Contract

Drying operation is one that is in constant demand from the company's many customers who do not wish to invest unnecessarily in expensive capital equipment." (Exhibit 5, p. 3). Finally, potential customers interested in Drytec's contract drying services are directed to contact either John Betts at Drytec North America or Paul Kennet at Drytec Ltd. (Exhibit 5, p. 4).

Drytec's parent, Anhydro, confirms and reiterates Drytec's promotions on its own website. (Exhibit 6). Exhibit 6 is a printed page taken from Anhydro's webpage, www.anhydrogroup.com, as it existed on December 22, 2006, which describes its wholly owned Drytec Ltd. as comprising a U.K. office and a North American office. Anhydro further proclaims that at its Drytec Ltd. company, "[c]ontract spray drying facilities [are] available." (Exhibit 6).

Recently, Anhydro announced that it had reorganized is companies into an even more unified and singular business. (Exhibit 7). Specifically, Anhydro announced its "realignment of the company organization, uniting the member companies under a single Anhydro brand." (Exhibit 7).

For all the foregoing reasons, it is apparent that Drytec, Drytec Processing and Drytec North America are effectively a single entity, operating in lockstep as part of their larger business group to provide equipment and contract drying services. The relationship between Drytec and its sister companies was so overlapping and so under common control as to render the various companies the agent of each other. Therefore Drytec is at once responsible for its own imports and direct business dealings with SPI, for the additional imports which Mr. Kennet claims were made for the account of Drytec

Processing, and for the installation of SPI's mannitol spray-drying plant, which Mr. Kennet claims were made for the account of Drytec North America.

## II.    EXERCISING JURISDICTION COMPORTS WITH DUE PROCESS

The exercise of personal jurisdiction satisfies due process when the defendant engaged in "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). Minimum contacts are established when the defendant "purposefully avails itself of the privilege of conducting activities within the forum State." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)), such that the defendant could have anticipated being haled into the courts of the forum State, World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92 (1980). Courts may also consider the relative burden imposed on the foreign defendant and the interests of the plaintiff and the forum State. Asahi Metal Indus. v. Superior Court of California, 480 U.S. 102, 114 (1987).

Drytec's documented conduct more than satisfies the requisite minimum contacts. Drytec purposefully availed itself of the privileges and laws of Delaware when it contracted with, sold to, and exported to the Delaware-based SPI company. Any of Drytec's direct business relationships with SPI would have given Drytec advanced notice that it could anticipate being haled into the Delaware courts. Finally, any inconvenience imposed on Drytec in having to return to Delaware for this case is slight in comparison to the countervailing interests of Roquette, in defending against infringement of its patent that occurred in this State, and the interests of Delaware in policing its resident

17

corporations and efficiently considering Roquette's claim that arises from the concerted actions of both SPI and Drytec.

CONCLUSION

For the foregoing reasons, Plaintiff Roquette respectfully requests that Drytec's motion to dismiss for lack of personal jurisdiction be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Benjamin J. Schladweiler*

_____

OF COUNSEL:

Douglas. V. Rigler
Andrew J. Patch
YOUNG & THOMPSON
745 South 23rd Street, Suite 200
Arlington, VA  22202
(703) 521.2297

Mary B. Graham (#2256)
Julia Heaney (#3052)
Benjamin J. Schladweiler (#4601)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658.9200
bschladweiler@mnat.com
   *Attorneys for Plaintiff Roquette Frères*

Original Filing Date:  February 9, 2007
Redacted Filing Date:  February 16, 2007

735455

18

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on February 16, 2007, I electronically filed

the foregoing with the Clerk of the Court using CM/ECF which will send notification of

such filing to the following:

> John W. Shaw
> YOUNG, CONAWAY, STARGATT & TAYLOR
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE 19899-0391

Additionally, I hereby certify that true and correct copies of the foregoing were

caused to be served on February 16, 2007 upon the following individuals in the manner

indicated:

| **BY E-MAIL AND HAND DELIVERY** | **BY E-MAIL** |
| --- | --- |
| John W. Shaw<br>YOUNG, CONAWAY, STARGATT &<br>TAYLOR<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, DE 19899-0391 | Brian P. Murphy<br>Oren D. Langer<br>MORGAN, LEWIS & BOCKIUS LLP<br>101 Park Avenue<br>New York, NY 10178 |

*/s/ Benjamin J. Schladweiler*

Benjamin J. Schladweiler (#4601)
bschladweiler@mnat.com

# EXHIBIT 1

## Capital Reporting Company

Page 1

1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE
2                 Civ No 06-540

3    ──────────────────────────────────────

ROQUETTE FRERES,
4

                              Plaintiff,
5    v SPI PHARMA, INC., and DRYTEC LTD.,

6                              Defendants.

7    ──────────────────────────────────────

8         ORAL DEPOSITION OF PAUL KENNET

9    Taken at Morgan Lewis & Bockius,
     2 Gresham Street, London EC2V 7PE, England,
10   on Tuesday 16 January 2007 at 12.00 pm

11   Reported by Mrs. Claire Hill.

12

13

14

15

16

17

18

19

20

21

22

## Capital Reporting Company

Page 2

1     A P P E A R A N C E S
2   For the Plaintiff:
3       YOUNG & THOMPSON
4       745 South 23rd Street
5       Arlington, VA 22202
6   By: MR. DOUGLAS V. RIGLER
7   For the Defendants:
8       SERLE COURT
9       6 New Square
10      Lincoln's Inn
11      London WC2A 3QS
12  By: MS. RUTH HOLTHAM
13
14
15
16
17
18
19
20
21
22

Page 3

1           I N D E X
2   WITNESS                 PAGE
3
4   PAUL KENNET              4
5
6   DIRECT EXAMINATION BY MR. RIGLER    4
7           E X H I B I T S
8   EXHIBIT NO              PAGE
9
10  Drytec 1  Cover letter plus D 000001 -  10
11      35
12  Drytec 2  Piers Imports accumulation   24
13      (5 pgs)
14
15  Drytec 3  Declaration (4 pgs)      35
16
17
18
19
20
21
22

Page 4

1           P R O C E E D I N G S
2   Tuesday 16 January 2007        (12.03 pm)
3           PAUL KENNET,
4           having been sworn,
5           testified as follows:
6   DIRECT EXAMINATION
7   BY MR. RIGLER:
8       Q   Could you state your name and address for
9   the record, please?
10      A   Paul Kennet, 6 Strachey Close, Reading
11  RG8 8EP.
12      Q   What is your present occupation, please?
13      A   I'm managing director of Drytec Limited.
14      Q   Have you seen the complaint in this
15  action, the amended complaint?
16      A   I have.
17      Q   And you understand that it is brought in
18  the United States District Court in the State of
19  Delaware, and Drytec Limited has been named as a
20  defendant?
21      A   I do.
22      Q   And you executed a declaration in support

Page 5

1   of a motion challenging jurisdiction over Drytec in that
2   action?
3       A   Yes.
4       Q   And you are represented here today by a
5   barrister, and you also have had the opportunity to
6   consult with a solicitor from Morgan Lewis?
7       A   Yes.
8       Q   Have you been deposed previously?
9       MS. HOLTHAM: Objection, privileged.
10      MR. RIGLER: That's not the least bit
11  privileged. It simply isn't. Are you instructing the
12  witness not to answer?
13      MS. HOLTHAM: Yes, I'm instructing him not to
14  answer.
15      Q   Have you ever been a defendant in any
16  type of legal proceeding?
17      A   Yes, I think so.
18      Q   On how many occasions, in what sort of
19  proceedings, please?
20      A   It was one previous proceeding, and it
21  was a commercial defense, or commercial litigation, as
22  far as I know.

2 (Pages 2 to 5)

## Capital Reporting Company

Page 6

1    Q    What was the nature of the litigation?
2    A    It was confidentiality of technical data.
3    Q    And were you personally a defendant in
4    the action?
5    MS. HOLTHAM:  Objection, the scope of this
6    deposition is limited to the facts and matters set out
7    in Mr. Kennet's statement.
8    MR. RIGLER:  I'm aware that this is a
9    jurisdictional deposition; nonetheless, I'm entitled to
10   inquire into the background of the witness, with respect
11   to any prior litigation in which he has been a party.
12   Q    You may answer.
13   A    I wasn't personally a defendant, no.
14   Q    A company with which you were associated
15   was accused of violating a confidentiality agreement?
16   A    The company that I was working for was
17   named as a defendant, not me personally, I was defending
18   the company, representing the company.
19   Q    What company was that, please?
20   A    It was Drytec.
21   Q    Who was the other party to the
22   litigation?

Page 7

1    A    The other party was -- the plaintiff, you
2    mean?
3    Q    Yes.
4    A    The plaintiff was Borozene (?) Inc.
5    Q    And can you tell me the year in court?
6    A    The year was -- that the deposition was
7    made, or that the file was suited, the litigation was
8    filed?  The litigation was filed in 2006.
9    Q    And the court was?
10   A    It's still proceeding, the litigation.
11   Q    Can you tell me a little bit about your
12   background, what is your educational background?
13   A    I am a chartered engineer, a graduate
14   chemical engineer, and a member of the Institute of
15   Chemical Engineers in the U.K.
16   Q    May I ask which universities?
17   A    Which universities?
18   Q    Yes, please.
19   A    University of Cape Town, which is not in
20   America.
21   Q    And not in any great detail, but can you
22   briefly tell me about your employment history?

Page 8

1    A    Certainly, I have worked for a number of
2    -- only in the U.K., for a number of U.K. companies,
3    always in engineering.  In the last company I worked
4    for, I was initially senior process engineer, and then
5    rose to sales director, transferred in 2001 to Drytec as
6    sales director, and became managing director in 2004.
7    Q    Do you have any other employment?
8    MS. HOLTHAM:  Objection, question vague as to
9    form.
10   A    Any other employment, you say?
11   Q    Yes.
12   A    Other than with Drytec?  No, I don't.
13   Q    I notice on your card that your card says
14   Anhydro.
15   A    Anhydro, yes.  Drytec Limited changed its
16   name as of 1 January to Anhydro U.K. Limited, so the
17   card's not even right, it was done by our parent
18   company, Anhydro, in Denmark.  They jumped the gun
19   slightly.  But formally, Drytec Limited is -- as of 1
20   January this year, is Anhydro U.K. Limited.  No other
21   changes have been effected.
22   Q    Did you bring any documents with you

Page 9

1    today?
2    A    I have not brought any documents with me
3    today.
4    Q    Were you asked to search for any
5    additional documents?
6    A    I was requested to bring some documents,
7    if I could find any, yes.
8    Q    Were you able to locate any documents?
9    A    No.
10   Q    I won't clutter up the record with
11   needless paper, since this is before the court, but let
12   me show you the declaration of Paul C. Kennet and ask if
13   you recognize this document. (Handed).
14   A    Yes.
15   Q    And you read it and subscribed to it?
16   A    I have and do.
17   Q    And I take it you had the assistance of
18   counsel when the document was prepared?
19   A    Yes, I did.
20   Q    Were you asked to search for any
21   documents in connection with the declaration you signed
22   in this action?

3 (Pages 6 to 9)

# Capital Reporting Company



Page 10

1    MS. HOLTHAM: Objection, the instructions and
2  interaction between Mr. Kennet and counsel are
3  privileged.
4    MR. RIGLER: I agree with that, I just asked
5  if he was asked to search for any documents.
6      A   I was asked to search for some documents,
7  yes.
8      Q   I would like to have the reporter mark as
9  Drytec exhibit 1 a cover letter of December 27, 2006,
10 from Mr. Langer at Morgan Lewis, and it is followed by
11 documents with the series of numbers which we refer to
12 in America as Bates numbers, and this goes with a series
13 commencing 1 through 35.
14    (Exhibit Drytec 1 marked for identification)
15      Q   Were those the documents which you
16 located in response to the search request?
17      A   No, I have not located those documents.
18      Q   You have not seen these documents
19 previously?
20      A   I have seen the documents -- sorry, let
21 me correct that.  The last of the documents I located
22 and submitted, which is this, from D 11 onwards.  The

Page 11

1  remainder were obtained elsewhere, I had no involvement
2  in those.
3      Q   Tell me what the document beginning at
4  page D 11 and continuing through D 35 is, please.
5
6
7
8
9
10
11
12
13      Q   Grand Haven is merely a manufacturing
14 location of SPI Pharma Inc., correct?
15      A   It is a manufacturing location.
16      Q   But it is not the exclusive location in
17 the United States of SPI Pharma?
18      A   I believe not.
19
20
21
22

Page 12

Page 13

4      Q   What is the business of Drytec Limited?
5      A   Drytec Limited designs, supplies,
6  installs and commissions drying equipment.
7      Q   Did I understand correctly that your only
8  employment is as the managing director of Drytec
9  Limited?
10     A   It's not only Drytec Limited, no.
11     Q   What other companies?
12     A   Drytec Contract Processing Limited and
13 Drytec Holdings Limited.
14     Q   And what are the activities of each of
15 those companies?
16     A   Drytec Holdings Limited is purely an
17 administrative holding company for Drytec Limited and
18 Drytec Contract Processing.  Drytec Contract Processing
19 Limited spray dries -- toll spray dries various
20 materials for clients.
21     Q   Do those materials include Mannitol?
22     MS. HOLTHAM: Objection, again, the scope of

4 (Pages 10 to 13)

## Capital Reporting Company

Page 14

1 the deposition is limited to the matters stated in Mr.
2 Kennet's statement.
3      MR. RIGLER: I'm sorry?
4      MS. HOLTHAM: The scope of the deposition is
5 limited to the matters in Mr. Kennet's statements.
6      MR. RIGLER: Are you instructing him not to
7 answer?
8      MS. HOLTHAM: No. You may answer.
9      Q   Could you read the question back, please?
10      (Read back)
11      A   The materials do not currently
12 include Mannitol.
13      Q   What about Mannogem EZ?
14      A   They do not currently include
15 Mannogem EZ.
16      Q   And we're speaking of Drytec
17 Contract only?
18      A   We are.
19      Q   With the recent name change of
20 Drytec Limited, was there any amalgamation with
21 any other company?
22      A   No, no other change except the name

Page 15

1 change.
2      Q   How did you come, how did Drytec
3 Limited come to have the document beginning at
4 D 11 through D 35 in its files?
5      A   We were sent it, I understand, from
6 our American colleagues.
7      Q   For what purpose?
8      A   The purpose for information to have
9 on file, that's all.
10      Q   Why would the American company send
11 you that information?
12      MS. HOLTHAM: Objection, the question is
13 plainly not within Mr. Kennet's own knowledge.
14      MR. RIGLER: It's a document that was
15 submitted by Drytec, I'm certainly entitled him to
16 question him about a document which he produced in
17 respond to the dispute with respect to the
18 jurisdiction.
19      MS. HOLTHAM: The question invites
20 speculation as to why the American company
21 provided it.
22      Q   What is your understanding of why

Page 16

1 it was provided?
2
3
4
5
6
7
8
9
10
11      Q   Is it correct that you are
12 a managing director and the director of sales for
13 Drytec Limited?
14      A   I am managing director responsible
15 for all commercial and fiscal matters of Drytec
16 Limited.
17      Q   Is it correct that you are the
18 managing director and director of sales for Drytec
19 Contract Processing Limited?
20      A   I am managing director of Drytec
21 Contract Processing Limited.
22      Q   Is it correct that you are managing

Page 17

1 director of Drytec Holdings Limited?
2      A   I am.
3      Q   Have either Drytec Holdings Limited
4 or Drytec Contract Processing Limited had any
5 change in name or affiliation in the past year?
6      A   That is correct, they have not had
7 any change in name.
8      Q   Who is the parent of Drytec
9 Holdings Limited?
10      A   Anhydro Holdings A.S. in Denmark.
11      Q   Is that a recent name change?
12      A   No, it's not. I don't think so.
13      Q   Who is Dedert Europe Holding B.V.?
14      A   Dedert was the previous owner, from
15 2001 to 2004, as I understand it. I'm not privy
16 to the legal aspect of the corporate structure.
17      Q   Was that a name change in 2004 from
18 Dedert to Anhydro, or was it the sale of
19 a business?
20      A   No, the name change from Dedert to
21 Anhydro occurred on 1 January this year, at the
22 same time as Drytec Limited changed its name to

5 (Pages 14 to 17)

## Capital Reporting Company

Page 18

1  Anhydro U.K. Limited, as part of Anhydro's efforts
2  to unify the world market or world representation.
3      Q   So there has been no actual sale of
4  any of these companies or their assets?
5      MS. HOLTHAM: Objection, this is way
6  beyond the scope of the jurisdiction, I'm
7  instructing you not to answer.
8      MR. RIGLER: I am going to ask you to
9  reconsider, because this kind of thing I'll take
10 to the court. You're going to be able to make
11 your instructions today, and the witness, I'm
12 sure, will follow your instructions, but
13 ultimately the issue is going to be decided before
14 the judge in the United States, and I'm trying to
15 confine my questions to what I consider to be
16 relevant, and I think the court is going to agree
17 with me. Now do you wish to maintain your
18 instruction?
19     MS. HOLTHAM: In relation to specific
20 questions that are focused on the corporate
21 identities, you may answer.
22     A   Could you repeat the question? (Read

Page 19

1          back)
2      A   The sale of any of the companies
3  that we have been discussing or naming, no, that
4  is correct, there been no sales of those
5  companies.
6      Q   And is it correct that the ultimate
7  parent corporation is named Dedert Corporation,
8  and that is an entity formed under the laws of the
9  State of Illinois in the United States?
10     A   I believe the ultimate owning
11 company is Anhydro Holding A.S. in Denmark, but
12 I'm not privy to the legal structure, that's as
13 I understand it, Anhydro Holdings A.S. owns
14 100 percent of all Anhydro companies, which
15 includes Dedert, now Anhydro Inc., it includes
16 Drytec Limited, which is now Anhydro U.K. Limited
17 as well as other companies.
18     Q   Do you know who the ultimate
19 managing director of the group of companies is, at
20 highest holding company level?
21     A   Yes, I know both the CEO and the
22 chairman of the board; the chairman of the board,

Page 20

1  whose name I can't remember, but the CEO I do.
2  I only know his nickname.
3      Q   Which is?
4      A   His nickname is Ziggy somebody or
5  other, bizarre as it may seem, but the CEO is
6  Allan Jorgensen, who is chairman of the Drytec
7  board as well.
8      Q   What is the role of Mr. Dedert?
9      A   I don't know what the role of
10 Mr. Dedert is, he's a shareholder of Anhydro
11 Holdings. More than that, I don't know.
12     Q   Does Drytec Limited have any drying
13 facilities?
14     A   No.
15     Q   Does it hold itself out as willing
16 to do drying projects in support of either sales
17 or to accommodate its clients on a short-term
18 basis?
19     A   It does have the ability to
20 undertake small scale drying trials, and in that
21 respect, we have a number of test facilities only,
22 so I correct my previous statement.

Page 21

1      Q   And that would include the ability
2  to dry Mannitol products, would it not?
3      A   Depending on your definition of it,
4  Drytec Limited has the ability to design spray
5  dryers for the production of Mannitol, yes, or to
6  test the drying of Mannitol.
7      Q   So physically, it dries Mannitol?
8      A   Drytec Limited does not dry
9  Mannitol, no.
10     Q   And that ability would also apply
11 to Mannogem EZ, would it not?
12     A   It would.
13     Q   What is the relationship between
14 Drytec Limited and SPI Pharma Incorporated?
15     A   There's no direct association or
16 relationship.
17     Q   What is the indirect association?
18     A   We have supplied through Drytec
19 North America L.L.C. key parts for spray drying
20 for -- spray drying system for Mannitol, or
21 Mannogem, whatever it's called.
22     Q   Drytec Contract Processing dries

6 (Pages 18 to 21)

## Capital Reporting Company

Page 22

1  both Mannitol and Mannogem EZ, correct?
2      A   It doesn't currently dry either of
3  those products, but has in the past.
4      Q   In the recent past?
5      A   It depends on your definition of
6  recent.
7      Q   Give me a timeframe, please.
8      A   In the past, it has, in the recent
9  past it has.
10      Q   Do you know if there are any
11  customers in the United States for either of those
12  products?
13      A   Do I know if there are customers in
14  the United States?
15      Q   Yes, you are the managing director
16  of the company, right?
17      A   I am indeed the managing director
18  of the company, we have established that.
19  I believe there are customers in the United States
20  for those products.
21      Q   And the products are dried here in
22  the U.K. and then imported by the customer or

Page 23

1  exported by Drytec to the United States, correct?
2      MS. HOLTHAM:   Objection, question vague
3  and compound.
4      Q   Do you need it broken down? I'm
5  happy to do it in parts, but I thought it was
6  fairly straightforward.
7      A   Drytec Contract Processing has in
8  the past manufactured Mannitol based products
9  under strict instructions of clients, clients
10  prescribing every aspect of the process.
11      Q   And those products have been
12  shipped to the United States?
13      A   I believe Drytec haven't shipped
14  any products, but I understand products have been
15  ultimately despatched by someone to the
16  United States.
17      Q   By whom?
18      A   Normally by our clients, Drytec
19  doesn't normally get involved in shipping of
20  products.
21      Q   Let's mark as Drytec exhibit 2 four
22  pages which are from a compilation by Piers

Page 24

1  Imports, they have been marked confidential
2  because although the information is public, it's
3  an import record, the company that accumulates the
4  information has proprietary interest in the
5  report. I'm certainly free to give it to you, but
6  I do remind you that they --
7      A   It's under confidentiality.
8      MS. HOLTHAM:   I'd like to make
9  an objection certainly for the record at least,
10  I'm not going to instruct Mr. Kennet not to look
11  at these documents, but in the confidentiality
12  agreement pursuant to which disclosure of these
13  documents was made, you specifically agreed that
14  the documents were not to be disclosed if marked
15  confidential, as they had been by you, to Drytec's
16  personnel.
17      That agreement was on letter from Morgan
18  Lewis dated December 21st 2006, and specifically
19  provides:
20      "Outside counsel for Roquette and Drytec
21  agree to hold the confidential information in the
22  strictest confidence and not disclose it or

Page 25

1  otherwise permit it to become available to any
2  person, including but not limited to Roquette and
3  Drytec personnel."
4      MR. RIGLER:   Yes, and now I was the
5  producing party, or Roquette, the plaintiff, was
6  the producing party, and it is willing to waive
7  that confidentiality. The only reason it was
8  marked confidential is because of the proprietary
9  interest in the accumulation. This is not even
10  a full accumulation, and I believe that this is
11  within the legitimate scope of the information,
12  and since my client is the one who produced,
13  I believe that I can waive that confidentiality.
14      (Exhibit Drytec 2 marked for identification)
15      MS. HOLTHAM:   Would you give Mr. Kennet
16  a moment to look through the document?
17      MR. RIGLER:   Sure. (Pause).
18      Q   Have you seen Drytec exhibit 2
19  previously?
20      A   No, I have not.
21      Q   I see it has no Bates numbers. May
22  I have it, please?

7 (Pages 22 to 25)

## Capital Reporting Company

Page 26

1      A   Sure. (Handed).

2      Q   I'm going to mark page 1, page 2,

3  page 3, page 4, page 5. Maybe I'll ask your

4  counsel to initial that as marked, so when that

5  becomes part of the record, we'll know that's the

6  correct document and correct page.

7      MS. HOLTHAM: Thank you.

8      Q   Could you turn to page 2 of Drytec

9  exhibit 2?

10     A   Yes.

11     Q   Does this refresh your recollection

12 as to whether Drytec has ever imported any

13 Mannitol powder into the United States?

14     A   It seems from this documentation

15 that Drytec Contract Processing has imported --

16 exported material to the United States, Mannitol

17 material.

18     Q   And why do you say Drytec Contract

19 Processing?

20     A   Because Drytec Contract Processing

21 is the only company with any Mannitol association,

22 with any client in the United States that produces

Page 27

1  Mannitol.

2      Q   But Drytec Limited does have the

3  test facility where it is able to dry Mannitol

4  powder?

5      A   Yes, to my knowledge, Mannitol

6  powder has never been produced on the test unit.

7      Q   But we do agree, I think, the

8  document speaks for itself, that the exporter is

9  described as Drytec?

10     A   It is described in this document as

11 Drytec.

12     Q   Without distinction as between

13 Drytec Contract Processing and Drytec Limited?

14     A   It would be Drytec Contract

15 Processing Limited as the legal name of the

16 company who has undertaken that exporting,

17 although this document doesn't identify that,

18 you're correct.

19     Q   Let's turn to what I think is going

20 to be page 4.

21     A   Yes.

22     Q   You've not seen this document

Page 28

1  previously?

2      A   I have not, no.

3      Q   This indicates that 35,540 pounds

4  of Mannitol in 300 drums were shipped -- were

5  exported by Drytec Limited to SPI Pharma, correct?

6      A   So this document seems to indicate,

7  yes.

8      Q   And then if we turn to page 5, we

9  see that 298 kegs weighing 35,301 pounds of

10 Mannitol powder were exported by Drytec Contract

11 Processing, again to SPI Pharma, correct?

12     A   Yes, so it seems.

13     Q   Do you have any reason to believe

14 that Piers Imports, the compilation service, would

15 have misread the shipping documents?

16     A   I don't have any reason -- I have

17 no knowledge whether the system could result in

18 errors. However, it significantly surprises me

19 that Drytec Limited is listed there, because

20 Drytec Limited did not have any contractual

21 relationship with SPI Pharma, and they do not

22 normally from the U.K. export anything since they

Page 29

1  don't produce anything. But the documentation

2  seems to contradict this, so it comes as

3  a surprise to me.

4      Q   SPI Pharma certainly believes that

5  it is purchasing Mannogem EZ spray dry Mannitol

6  from Drytec Limited, does it not?

7      MS. HOLTHAM: Objection, the question

8  invites speculation on behalf of the witness.

9      Q   You may answer.

10     A   I do not believe that Drytec

11 Limited, whose activities is purely the design and

12 supply of spray drying equipment, had any Mannitol

13 production contract or obligation, whatever you

14 want to call it, with SPI Pharma. It is Drytec

15 Contract Processing Limited which is the toll

16 manufacturing facility that Drytec has, or company

17 that Drytec has.

18     Q   And those are sister companies both

19 owned by Drytec Holdings, and you're the chief

20 executive officer of all three, or the managing

21 director of all three?

22     A   I am managing director of all

8 (Pages 26 to 29)

## Capital Reporting Company

Page 30

1  three, yes.
2      Q   But my question to you was whether
3  SPI Pharma regarded Drytec Limited as its supplier
4  of Mannogem EZ spray dry Mannitol.
5      A   I can't possibly answer for
6  SPI Pharma, but my understanding is they wouldn't
7  have had that expectation or impression.
8      Q   If I turn -- is that your
9  declaration in front of you?
10     A   Yes.
11     Q   Can you turn to number 14, please?
12     A   Yes.
13     Q   In paragraph 14, you state that:
14         "Drytec derives no revenue from any
15  clients, consumers, customers or any other
16  business in Delaware."
17         Isn't it correct that Drytec Limited
18  has derived revenue from SPI Pharma Inc. in
19  Delaware?
20     A   I do not believe that Drytec
21  Limited has.  I do not believe any invoicing has
22  been issued by Drytec Limited to SPI Pharma

Page 31

1  directly, since they did not manufacture anything
2  for SPI, any material.
3      Q   Would you turn to number 15,
4  please?  That says:
5         "Drytec has never contracted to do any
6  business related to Mannitol products with
7  SPI Pharma Inc."
8         That statement either is incorrect or
9  requires a qualification, is that correct?
10     A   It is still my understanding that
11  Drytec Limited has never contracted.
12     Q   So you're saying that there is no
13  piece of paper exchanged directly between Drytec
14  Limited and SPI Pharma Incorporated?
15     A   That is my understanding.
16     Q   Not that they have not done
17  business?
18     A   Well, as a contracted business,
19  there needs to be a piece of paper, presumably.
20  There needs to be a formal contract to do business
21  and I do not believe there is any formal contract
22  between SPI Pharma and Drytec Limited to produce

Page 32

1  Mannitol.



15         Q   Well, I think our answers are
16  passing somewhat --
17     A   Our understanding was that it was
18  for SPI Pharma, yes.
19     Q   Thank you, and Drytec Limited did
20  record the income?
21     A   It did record the income, yes.
22     Q   And turning to number 16 in your

Page 33

1  declaration:
2         "Drytec has never made, used, offered
3  to sell or sold any Mannitol product in the
4  United States, nor has it imported any Mannitol
5  product into the United States."
6         At the time you said that, I take it
7  you were unaware of the Piers report, and page 4
8  I believe it is, showing Drytec Limited as the
9  exporter?
10     A   I was unaware of that document, but
11  I still stand by that statement.  Drytec has never
12  sold any Mannitol product in the United States,
13  which we have not, nor has it imported any
14  Mannitol product into the United States.  Drytec
15  has exported allegedly, by the documentation,
16  material into the United States.
17     Q   Have you ever met personally with
18  anyone at SPI Pharma Inc.?
19     A   I have met.
20     Q   How many times?
21     A   No more than two or three
22  occasions.

9 (Pages 30 to 33)

## Capital Reporting Company

Page 34

1    Q   With whom did you meet?
2    A   I believe I met with Colleen
3  Blackney and with Todd Lumbert. It was some time
4  ago, so my memory is very hazy, I'm afraid.
5  I meet an awful lot of people.
6    Q   Tell me what you mean by some time
7  ago.
8    A   We stopped all production of
9  Mannitol products back in September/October 2005,
10  so there certainly has been no meeting since well
11  before that time; probably almost two years ago,
12  I would have thought, would be the last time I met
13  them.
14    Q   This may go beyond your
15  restriction, and here I would defer to any
16  instruction your counsel may choose to give, or
17  may not choose to give, but why did Drytec stop
18  production of Mannitol in September of 2005?
19    MS. HOLTHAM: I will object, it is
20  beyond the scope of the deposition, I instruct you
21  not to answer.
22    Q   I think it may be within, but

Page 35

1  I wouldn't quarrel with the instruction. Why
2  don't you give me a minute? I think we're very
3  close to finishing.
4  (Short break at 12.54 pm until 12.57 pm)
5    Q   Was there any kind of a contract
6  between Drytec Limited and Drytec North America
7
8
9    A   I'm not sure if there was anything
10  formally written. Certainly there would have been
11  an understanding.
12    Q   Does that change your answer of
13  a few minutes ago that there's no understanding
14  until it's in writing?
15    A   Sorry, no understanding?
16    Q   Until it is in writing.
17    A   I don't know what there is.
18  Certainly there was an agreement of a standard
19  markup, but whether that extended -- you know, is
20  an intercompany agreement the same as a contract?
21  I don't know.
22    Q   Where did the -- what were the

Page 36

1  locations of the various meetings with
2  Ms. Blackney?
3    A   They would have happened at Drytec
4  CP's -- Drytec's offices. I've never met
5  anybody -- I've never been to SPI Pharma, I've
6  never been to the States and met anybody there,
7  they would have all occurred at Drytec's offices
8  in Tonbridge.
9    Q   So Ms. Blackney and Mr. Lambert
10  both came to --
11    A   Correct.
12    Q   -- Tonbridge?
13    A   Correct.
14    Q   All right, thank you very much.
15    MR. RIGLER: Do you have questions for
16  Mr. Kennet?
17    MS. HOLTHAM: No, I simply want to
18  reserve the right of the witness to read through
19  the transcript.
20    MR. RIGLER: He certainly does. I have
21  asked for a five day turnaround on the transcript.
22  Under the American procedural rules, you should

Page 37

1  have 30 days in which to review it and make any
2  corrections. However, I'm going to ask if you
3  will accelerate that process, because your
4  attorneys have stipulated with us that we will be
5  briefing the issue, your side has already
6  submitted a motion saying there's no jurisdiction,
7  but our opposition will be due on an accelerated
8  basis, so if you could get back to me with any
9  corrections within a week or 10 days.
10    A   10 days, yes.
11    MS. HOLTHAM: Just to confirm as well
12  that the record will be provided in transcript
13  manuscript and disk copies, is that correct?
14  Good.
15    MR. RIGLER: And under the American
16  rules, you are required to sign the transcript
17  under oath, frequently that is waived, and I am
18  perfectly happy to waive it.
19    A   Thank you, that makes it a lot
20  easier for us.
21    MR. RIGLER: I think I will reconsider
22  and I will ask that a copy of your declaration be

10 (Pages 34 to 37)

# Capital Reporting Company

## Page 38

1  included, as an exhibit, so that would be Drytec
2  exhibit 3.
3      (Exhibit Drytec 3 marked for identification)
4      Q   Thank you, Mr. Kennet.
5      (The deposition concluded at 1.02 pm)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

## Page 39

1  ACKNOWLEDGEMENT OF DEPONENT
2
3
4  I, (PAUL KENNET), do hereby acknowledge I have read
5  And examined the foregoing pages of testimony, and
6  examined the same is a true, correct and complete
7  Transcription of the testimony give by me, and any
8  Changes or corrections, if any, appear in the attached
9  Errata sheet signed by me.
10
11
12
13
14
15
16  _____   _____
17  Date        PAUL KENNET
18
19
20
21
22

## Page 40

1  MS. RUTH HOLTHAM
2  SERLE COURT
3  6 New Square
4  Lincoln's Inn
5  London WC2A 3QS
6      IN RE:  FRERES v. SPI PHARMA, INC., and DRYTEC LTD.
7  Dear Ms. Holtham,
8      Enclosed please find your copy of the deposition
9  Of PAUL KENNET, along with the original signature page.
10 As agreed, you will be responsible for contacting the
11 witness regarding signature.
12     Within 30 days of receipt, please forward errata
13 sheet and original signed signature page to counsel
14 For Plaintiff.
15     If you have any questions, please do not hesitate
16 to call. Thank you.
17 Yours,
18
19
20 Reporter/Notary
21 Cc: MR. DOUGLAS V. RIGLER, ESQ.
22

## Page 41

1  Capital Reporting Company
2  1000 Connecticut Avenue, Northwest
3  Suite 505
4  Washington, D.C. 20006
5  (202) 857-3376
6      E R R A T A   S H E E T
7  Case Name:  FRERES v. SPI PHARMA, INC., and DRYTEC LTD.
8  Witness Name:  . PAUL KENNET
9  Deposition Date:  January 16, 2007
10 Page No.       Line No.        Change
11
12
13
14
15
16
17
18
19  _____   _____
20 Signature           Date
21
22

11 (Pages 38 to 41)

## Capital Reporting Company

Page 42

1          CERTIFICATE OF COURT REPORTER
2              I, Claire G. Hill, LiveNote Accredited
3     Reporter of London, England, hereby certify that the
4     foregoing testimony was recorded by me stenographically
5     and thereafter transcribed by me; and that the foregoing
6     transcript is a true and accurate verbatim record of the
7     said testimony.
8              I further certify that I am not a relative,
9     employee or counsel of any of the parties of the within
10    cause, nor am I an employee or relative of any counsel
11    for the parties, nor am I in any way interested in the
12    outcome of the within cause.
13
14
15
16          Claire G. Hill
17          Dated  Friday 19 January 2007
18
19
20
21
22

12 (Page 42)

Page 42

1        CERTIFICATE OF COURT REPORTER

2            I, Claire G. Hill, LiveNote Accredited

3    Reporter of London, England, hereby certify that the

4    foregoing testimony was recorded by me stenographically

5    and thereafter transcribed by me; and that the foregoing

6    transcript is a true and accurate verbatim record of the

7    said testimony.

8            I further certify that I am not a relative,

9    employee or counsel of any of the parties of the within

10   cause, nor am I an employee or relative of any counsel

11   for the parties, nor am I in any way interested in the

12   outcome of the within cause.

13 .

14

15            *Claire G. Hill*

16            Claire G. Hill

17        Dated   Friday 19 January 2007

18

19

20

21

22

## Capital Reporting Company

Page 1

| A |
|---|
| **ability** 20:19 21:1,4,10 |
| **able** 9:8 18:10 27:3 |
| **accelerate** 37:3 |
| **accelerated** 37:7 |
| **accepted** 12:3 |
| **accommodate** 20:17 |
| **Accredited** 42:2 |
| **accumulates** 24:3 |
| **accumulation** 3:12 25:9,10 |
| **accurate** 42:6 |
| **accused** 6:15 |
| **acknowledge** 39:4 |
| **action** 4:15 5:2 6:4 9:22 |
| **activities** 13:14 29:11 |
| **actual** 18:3 |
| **additional** 9:5 |
| **address** 4:8 |
| **administrative** 13:17 |
| **affiliation** 17:5 |
| **afraid** 34:4 |
| **ago** 34:4,7,11 35:13 |
| **agree** 10:4 18:16 24:21 27:7 |
| **agreed** 24:13 40:10 |
| **agreement** 6:15 24:12 24:17 35:18,20 |
| **Allan** 20:6 |
| **allegedly** 33:15 |
| **amalgamation** 14:20 |
| **amended** 4:15 |
| **America** 7:20 10:12 12:13,14,22 21:19 32:6,14 35:6 |
| **American** 11:6 12:9 15:6,10,20 36:22 37:15 |
| **Americans** 16:3 |
| **Anhydro** 8:14,15,16,18 8:20 17:10,18,21 18:1 19:11,13,14,15 19:16 20:10 |
| **Anhydro's** 18:1 |
| **answer** 5:12,14 6:12 14:7,8 18:7,21 29:9 30:5 32:8 34:21 35:12 |
| **answers** 32:15 |

| B |
|---|
| **anybody** 36:5,6 |
| **appear** 39:8 |
| **apply** 21:10 |
| **Arlington** 2:5 |
| **asked** 9:4,20 10:4,5,6 16:8 36:21 |
| **aspect** 17:16 23:10 |
| **assembly** 12:20 |
| **assets** 18:4 |
| **assistance** 9:17 |
| **associated** 6:14 |
| **association** 21:15,17 26:21 |
| **atomizer** 12:20 32:4,10 |
| **attached** 39:8 |
| **attorneys** 37:4 |
| **available** 25:1 |
| **Avenue** 41:2 |
| **aware** 6:8 |
| **awful** 34:5 |
| **A.S** 17:10 19:11,13 |

| B |
|---|
| **B** 3:7 |
| **back** 14:9,10 19:1 34:9 37:8 |
| **background** 6:10 7:12 7:12 |
| **barrister** 5:5 |
| **based** 23:8 |
| **basis** 20:18 37:8 |
| **Bates** 10:12 25:21 |
| **beginning** 11:3 15:3 |
| **behalf** 29:8 |
| **believe** 11:11,18 12:6 12:17,20 19:10 22:19 23:13 25:10,13 28:13 29:10 30:20,21 31:21 33:8 34:2 |
| **believes** 29:4 |
| **beyond** 18:6 34:14,20 |
| **bid** 12:2 |
| **bit** 5:10 7:11 |
| **bizarre** 20:5 |
| **Blackney** 34:3 36:2,9 |
| **board** 19:22,22 20:7 |
| **Bockius** 1:9 |
| **books** 32:3,8 |
| **Borozene** 7:4 |
| **break** 35:4 |

| C |
|---|
| **briefing** 37:5 |
| **briefly** 7:22 |
| **bring** 8:22 9:6 |
| **broken** 23:4 |
| **brought** 4:17 9:2 |
| **business** 13:4 17:19 30:16 31:6,17,18,20 32:5 |
| **B.V** 17:13 |

| C |
|---|
| **C** 2:1 4:1 9:12 39:1 |
| **call** 29:14 40:16 |
| **called** 21:21 |
| **Cape** 7:19 |
| **Capital** 41:1 |
| **card** 8:13,13 |
| **card's** 8:17 |
| **Case** 41:7 |
| **cause** 42:10,12 |
| **Cc** 40:21 |
| **CEO** 19:21 20:1,5 |
| **certainly** 8:1 15:15 24:5,9 29:4 34:10 35:10,18 36:20 |
| **CERTIFICATE** 42:1 |
| **certify** 42:3,8 |
| **chairman** 19:22,22 20:6 |
| **challenging** 5:1 |
| **change** 14:19,22 15:1 17:5,7,11,17,20 35:12 41:10 |
| **changed** 8:15 17:22 |
| **changes** 8:21 39:8 |
| **chartered** 7:13 |
| **chemical** 7:14,15 |
| **chief** 29:19 |
| **choose** 34:16,17 |
| **Civ** 1:2 |
| **Claire** 1:11 42:2,16 |
| **client** 25:12 26:22 |
| **clients** 13:20 20:17 23:9,9,18 30:15 |
| **close** 4:10 35:3 |
| **clutter** 9:10 |
| **colleagues** 15:6 |
| **Colleen** 34:2 |
| **come** 15:2,3 |
| **comes** 29:2 |

| C |
|---|
| **commencing** 10:13 |
| **commercial** 5:21,21 16:15 |
| **commissions** 13:6 |
| **companies** 8:2 13:11 13:15 18:4 19:2,5,14 19:17,19 29:18 |
| **company** 6:14,16,18,18 6:19 8:3,18 12:9 13:17 14:21 15:10,20 19:11,20 22:16,18 24:3 26:21 27:16 29:16 41:1 |
| **competitive** 12:2,2 |
| **compilation** 23:22 28:14 |
| **complaint** 4:14,15 |
| **complete** 39:6 |
| **component** 16:8 |
| **components** 12:18,20 |
| **compound** 23:3 |
| **concluded** 38:5 |
| **confidence** 24:22 |
| **confidential** 24:1,15,21 25:8 |
| **confidentiality** 6:2,15 24:7,11 25:7,13 |
| **confine** 18:15 |
| **confirm** 37:11 |
| **confirmation** 16:2 |
| **Connecticut** 41:2 |
| **connection** 9:21 16:6 32:3,9 |
| **consider** 18:15 |
| **consult** 5:6 |
| **consumers** 30:15 |
| **contacting** 40:10 |
| **continuing** 11:4 |
| **contract** 12:21 13:1,12 13:18,18 14:17 16:19 16:21 17:4 21:22 23:7 26:15,18,20 27:13,14 28:10 29:13 29:15 31:20,21 35:5 35:20 |
| **contracted** 31:5,11,18 |
| **contractual** 28:20 |
| **contradict** 29:2 |
| **copies** 37:13 |
| **copy** 37:22 40:8 |

corporate 17:16 18:20
corporation 19:7,7
correct 10:21 11:14
 16:11,17,22 17:6
 19:4,6 20:22 22:1
 23:1 26:6,6 27:18
 28:5,11 30:17 31:9
 32:12 36:11,13 37:13
 39:6
corrections 37:2,9 39:8
correctly 13:7
counsel 9:18 10:2
 24:20 26:4 34:16
 40:13 42:9,10
court 1:1 2:8 4:18 7:5,9
 9:11 18:10,16 40:2
 42:1
cover 3:10 10:9
CP's 36:4
currently 14:11,14
 22:2
customer 11:8 22:22
customers 22:11,13,19
 30:15

**D**
D 3:1,10 4:1 10:22 11:4
 11:4 15:4,4 39:1,1
data 6:2
Date 39:17 41:9,20
dated 24:18 42:17
day 36:21
days 37:1,9,10 40:12
Dear 40:7
December 10:9 24:18
decided 18:13
declaration 3:15 4:22
 9:12,21 30:9 33:1
 37:22
Dedert 17:13,14,18,20
 19:7,15 20:8,10
defendant 4:20 5:15
 6:3,13,17
Defendants 1:6 2:7
defending 6:17
defense 5:21
defer 34:15
definition 21:3 22:5
Delaware 1:1 4:19
 30:16,19

Denmark 8:18 17:10
 19:11
Depending 21:3
depends 22:5
deposed 5:8
deposition 1:8 6:6,9 7:6
 14:1,4 34:20 38:5
 40:8 41:9
derived 30:18
derives 30:14
described 27:9,10
design 21:4 29:11
designs 13:5
despatched 23:15
detail 7:21
direct 3:6 4:6 21:15
directly 31:1,13
director 4:13 8:5,6,6
 13:8 16:12,12,14,18
 16:18,20 17:1 19:19
 22:15,17 29:21,22
disclose 24:22
disclosed 24:14
disclosure 24:12
discussing 19:3
disk 37:13
dispute 15:17
distinction 27:12
District 1:1,1 4:18
document 9:13,18 11:3
 15:3,14,16 25:16
 26:6 27:8,10,17,22
 28:6 33:10
documentation 26:14
 29:1 33:15
documents 8:22 9:2,5,6
 9:8,21 10:5,6,11,15
 10:17,18,20,21 24:11
 24:13,14 28:15
DOUGLAS 2:6 40:21
dried 22:21
dries 13:19,19 21:7,22
drums 28:4
dry 21:2,8 22:2 27:3
 29:5 30:4
dryer 11:7
dryers 21:5
drying 12:1 13:6 20:12
 20:16,20 21:6,19,20
 29:12 35:7,8

Drytec 1:5 3:10,12,15
 4:13,19 5:1 6:20 8:5
 8:12,15,19 10:9,14
 12:14,22 13:1,4,5,8
 13:10,12,13,16,17,18
 13:18 14:16,20 15:2
 15:15 16:5,7,13,15,18
 16:20 17:1,3,4,8,22
 19:16 20:6,12 21:4,8
 21:14,18,22 23:1,7,13
 23:18,21 24:20 25:3
 25:14,18 26:8,12,15
 26:18,20 27:2,9,11,13
 27:13,14 28:5,10,19
 28:20 29:6,10,14,16
 29:17,19 30:3,14,17
 30:20,22 31:5,11,13
 31:22 32:2,6,9,13,19
 33:2,8,11,14 34:17
 35:6,6 36:3 38:1,3
 40:6 41:7
Drytec's 24:15 36:4,7
due 37:7
D.C 41:4

**E**
E 2:1,1 3:1,7 4:1,1 39:1
 39:1,1,1,1 41:6,6,6
easier 37:20
EC2V 1:9
educational 7:12
effected 8:21
efforts 18:1
either 17:3 20:16 22:2
 22:11 31:8
employee 42:9,10
employment 7:22 8:7
 8:10 13:8
Enclosed 40:8
engineer 7:13,14 8:4
engineering 8:3 11:7
 12:1
Engineers 7:15
England 1:9 42:3
entitled 6:9 15:15
entity 19:8
equipment 11:6,7
 12:11,12,15 13:6
 29:12 35:8,8
errata 39:9 40:12

errors 28:18
ESQ 40:21
established 22:18
estimate 11:19,20
Europe 12:13 17:13
EXAMINATION 3:6
 4:6
examined 39:5,6
exchanged 31:13
exclusive 11:16
exclusively 12:9
executed 4:22 12:21
executive 29:20
exhibit 3:8 10:9,14
 23:21 25:14,18 26:9
 38:1,2,3
expectation 30:7
export 28:22
exported 23:1 26:16
 28:5,10 33:15
exporter 27:8 33:9
exporting 27:16
extended 35:19
EZ 14:13,15 21:11 22:1
 29:5 30:4

**F**
F 39:1
facilities 20:13,21
facility 27:3 29:16
facts 6:6
fairly 23:6
far 5:22
file 7:7 15:9
filed 7:8,8
files 15:4
find 9:7 40:8
finishing 35:3
fiscal 16:15
five 36:21
focused 18:20
follow 18:12
followed 10:10
follows 4:5
foregoing 39:5 42:4,5
form 8:9
formal 31:20,21
formally 8:19 35:10
formed 19:8
forward 40:12

**Capital Reporting Company**

Page 3

| | | | |
|---|---|---|---|
| four 23:21 | 40:1,7 | invoicing 30:21 | 13:5,9,10,12,13,16,17 |
| free 24:5 | | involved 23:19 | 13:19 14:1,5,20 15:3 |
| frequently 37:17 | **I** | involvement 11:1 | 16:5,7,13,16,19,21 |
| FRERES 1:3 40:6 41:7 | identification 10:14 | issue 18:13 37:5 | 17:1,3,4,9,22 18:1 |
| Friday 42:17 | 25:14 38:3 | issued 30:22 | 19:16,16 20:12 21:4 |
| front 30:9 | identify 27:17 | | 21:8,14 25:2 27:2,13 |
| full 25:10 | identities 18:21 | **J** | 27:15 28:5,19,20 |
| further 42:8 | Illinois 19:9 | January 1:10 4:2 8:16 | 29:6,11,15 30:3,17,21 |
| | import 24:3 | 8:20 17:21 41:9 | 30:22 31:11,14,22 |
| **G** | imported 22:22 26:12 | 42:17 | 32:2,9,19 33:8 35:6 |
| G 4:1 39:1 42:2,16 | 26:15 33:4,13 | Jorgensen 20:6 | Lincoln's 2:10 40:4 |
| generally 12:19 | Imports 3:12 24:1 | judge 18:14 | Line 41:10 |
| give 22:7 24:5 25:15 | 28:14 | jumped 8:18 | listed 28:19 |
| 34:16,17 35:2 39:7 | impression 30:7 | jurisdiction 5:1 15:18 | litigation 5:21 6:1,11 |
| go 34:14 | include 13:21 14:12,14 | 18:6 37:6 | 6:22 7:7,8,10 |
| goes 10:12 | 21:1 | jurisdictional 6:9 | little 7:11 |
| going 18:8,10,13,16 | included 38:1 | | LiveNote 42:2 |
| 24:10 26:2 27:19 | includes 19:15,15 | **K** | locate 9:8 |
| 37:2 | including 25:2 | K 39:1 | located 10:16,17,21 |
| Good 37:14 | income 32:3,8,20,21 | kegs 28:9 | location 11:14,15,16 |
| graduate 7:13 | Incorporated 21:14 | Kennet 1:8 3:4 4:3,10 | locations 12:13 36:1 |
| Grand 11:12,13 | 31:14 32:11 | 9:12 10:2 24:10 | London 1:9 2:11 40:5 |
| great 7:21 | incorrect 31:8 | 25:15 36:16 38:4 | 42:3 |
| Gresham 1:9 | indicate 28:6 | 39:4,17 40:9 41:8 | look 24:10 25:16 |
| group 19:19 | indicates 28:3 | Kennet's 6:7 14:2,5 | lot 34:5 37:19 |
| gun 8:18 | indirect 21:17 | 15:13 | Lumbert 34:3 |
| | information 11:21,22 | key 11:6,22 16:8 21:19 | L.L.C 21:19 32:6,14 |
| **H** | 15:8,11 24:2,4,21 | kind 18:9 35:5 | |
| H 3:7 41:6 | 25:11 | know 5:22 12:19 19:18 | **M** |
| Handed 9:13 26:1 | initial 26:4 | 19:21 20:2,9,11 | M 39:1 |
| happened 36:3 | initially 8:4 | 22:10,13 26:5 35:17 | maintain 18:17 |
| happy 23:5 37:18 | Inn 2:10 40:4 | 35:19,21 | managing 4:13 8:6 |
| Haven 11:12,13 | inquire 6:10 | knowledge 15:13 27:5 | 13:8 16:12,14,18,20 |
| hazy 34:4 | installation 12:5 | 28:17 | 16:22 19:19 22:15,17 |
| hesitate 40:15 | installed 12:10 | | 29:20,22 |
| highest 19:20 | installs 13:6 | **L** | Mannitol 13:21 14:12 |
| Hill 1:11 42:2,16 | Institute 7:14 | L 39:1 | 21:2,5,6,7,9,20 22:1 |
| history 7:22 | instruct 24:10 34:20 | Lambert 36:9 | 23:8 26:13,16,21 |
| hold 20:15 24:21 | instructing 5:11,13 | Langer 10:10 | 27:1,3,5 28:4,10 29:5 |
| holding 13:17 17:13 | 14:6 18:7 | laws 19:8 | 29:12 30:4 31:6 32:1 |
| 19:11,20 | instruction 18:18 34:16 | legal 5:16 17:16 19:12 | 33:3,4,12,14 34:9,18 |
| Holdings 13:13,16 17:1 | 35:1 | 27:15 | 35:8 |
| 17:3,9,10 19:13 | instructions 10:1 18:11 | legitimate 25:11 | Mannogem 14:13,15 |
| 20:11 29:19 | 18:12 23:9 | letter 3:10 10:9 24:17 | 21:11,21 22:1 29:5 |
| Holtham 2:12 5:9,13 | intended 11:8 | Let's 23:21 27:19 | 30:4 |
| 6:5 8:8 10:1 13:22 | interaction 10:2 | level 19:20 | manufacture 31:1 |
| 14:4,8 15:12,19 18:5 | intercompany 35:20 | Lewis 1:9 5:6 10:10 | manufactured 12:11 |
| 18:19 23:2 24:8 | interest 24:4 25:9 | 24:18 | 12:12,15 23:8 |
| 25:15 26:7 29:7 | interested 42:11 | limited 4:13,19 6:6 | manufacturing 11:13 |
| 34:19 36:17 37:11 | invites 15:19 29:8 | 8:15,16,19,20 13:2,4 | 11:15 29:16 |

Capital Reporting Company

manuscript 37:13
mark 10:8 23:21 26:2
marked 10:14 24:1,14
  25:8,14 26:4 38:3
market 18:2
markup 35:19
material 26:16,17 31:2
  33:16
materials 13:20,21
  14:11
matters 6:6 14:1,5
  16:15
mean 7:2 34:6
meet 34:1,5
meeting 34:10
meetings 36:1
member 7:14
memory 34:4
merely 11:13
met 33:17,19 34:2,12
  36:4,6
minute 35:2
minutes 35:13
misread 28:15
moment 25:16
Morgan 1:9 5:6 10:10
  24:17
motion 5:1 37:6

_____ N _____
N 2:1 3:1 4:1 39:1,1,1,1
name 4:8 8:16 14:19,22
  17:5,7,11,17,20,22
  20:1 27:15 41:7,8
named 4:19 6:17 19:7
naming 19:3
nature 6:1
need 23:4
needless 9:11
needs 31:19,20
never 12:8 27:6 31:5
  31:11 33:2,11 36:4,5
  36:6
New 2:9 40:3
nickname 20:2,4
normally 23:18,19
  28:22
North 11:6 12:14,22
  21:19 32:6,14 35:6
Northwest 41:2

notice 8:13
number 8:1,2 20:21
  30:11 31:3 32:22
numbers 10:11,12
  25:21

_____ O _____
O 4:1 39:1,1,1
oath 37:17
object 34:19
objection 5:9 6:5 8:8
  10:1 13:22 15:12
  18:5 23:2 24:9 29:7
obligated 16:3
obligation 29:13
obtained 11:1
occasions 5:18 33:22
occupation 4:12
occurred 17:21 36:7
offered 33:2
office 11:6
officer 29:20
offices 36:4,7
onwards 10:22
opportunity 5:5
opposition 37:7
ORAL 1:8
order 11:22
original 40:9,13
outcome 42:12
Outside 24:20
owned 29:19
owner 17:14
owning 19:10
owns 19:13

_____ P _____
P 2:1,1 4:1 39:1
page 3:2,8 11:4 26:2,2
  26:3,3,3,6,8 27:20
  28:8 33:7 40:9,13
  41:10
pages 23:22 39:5
paper 9:11 31:13,19
paragraph 30:13
parent 8:17 17:8 19:7
part 18:1 26:5 32:7
parties 12:21 42:9,11
parts 11:6,22 21:19
  23:5

party 6:11,21 7:1 25:5
  25:6
passing 32:16
Paul 1:8 3:4 4:3,10
  9:12 39:4,17 40:9
  41:8
Pause 11:11 25:17
people 34:5
percent 19:14
perfectly 37:18
permit 25:1
person 25:2
personally 6:3,13,17
  33:17
personnel 24:16 25:3
pgs 3:13,15
Pharma 1:5 11:9,10,14
  11:17,21 13:2 21:14
  28:5,11,21 29:4,14
  30:3,6,18,22 31:7,14
  31:22 32:4,11,18
  33:18 36:5 40:6 41:7
physically 21:7
piece 31:13,19
Piers 3:12 23:22 28:14
  33:7
plainly 15:13
plaintiff 1:4 2:2 7:1,4
  25:5 40:14
plant 32:4,11
please 4:9,12 5:19 6:19
  7:18 11:4 12:18 14:9
  22:7 25:22 30:11
  31:4 40:8,12,15
plus 3:10
pm 1:10 4:2 35:4,4
  38:5
possibly 30:5
pounds 28:3,9
powder 26:13 27:4,6
  28:10
prepared 9:18
prescribing 23:10
present 4:12
presumably 31:19
previous 5:20 17:14
  20:22
previously 5:8 10:19
  25:19 28:1
prior 6:11

privileged 5:9,11 10:3
privy 17:15 19:12
probably 34:11
procedural 36:22
proceeding 5:16,20
  7:10
proceedings 5:19
process 8:4 23:10 37:3
Processing 13:12,18,18
  16:19,21 17:4 21:22
  23:7 26:15,19,20
  27:13,15 28:11 29:15
produce 29:1 31:22
produced 15:16 25:12
  27:6
produces 26:22
producing 25:5,6
product 33:3,5,12,14
production 21:5 29:13
  34:8,18
products 21:2 22:3,12
  22:20,21 23:8,11,14
  23:14,20 31:6 34:9
projects 20:16
proprietary 24:4 25:8
provide 11:21 16:4
provided 15:21 16:1
  37:12
provides 24:19
public 24:2
purchase 11:22
purchasing 29:5
purely 13:16 29:11
purpose 11:19,20 15:7
  15:8
pursuant 24:12

_____ Q _____
qualification 31:9
quarrel 35:1
question 8:8 14:9 15:12
  15:16,19 18:22 23:2
  29:7 30:2
questions 18:15,20
  36:15 40:15
quotation 11:5 12:2,3

_____ R _____
R 2:1 4:1 41:6,6
read 9:15 14:9,10

# Capital Reporting Company

18:22 36:18 39:4
**Reading** 4:10
**reason** 25:7 28:13,16
**receipt** 40:12
**recognize** 9:13
**recollection** 26:11
**reconsider** 18:9 37:21
**record** 4:9 9:10 24:3,9
  26:5 32:2,5,20,21
  37:12 42:6
**recorded** 32:8 42:4
**refer** 10:11
**refresh** 26:11
**regarded** 30:3
**regarding** 40:11
**related** 31:6
**relation** 18:19
**relationship** 21:13,16
  28:21
**relative** 42:8,10
**relevant** 18:16
**remainder** 11:1
**remember** 20:1
**remind** 24:6
**repeat** 18:22
**report** 24:5 33:7
**Reported** 1:11
**reporter** 10:8 42:1,3
**Reporter/Notary** 40:20
**Reporting** 41:1
**representation** 18:2
**represented** 5:4
**representing** 6:18
**request** 10:16
**requested** 9:6
**required** 37:16
**requires** 31:9
**reserve** 36:18
**respect** 6:10 15:17
  20:21 35:7
**respond** 15:17
**response** 10:16
**responsibility** 16:6
**responsible** 16:14
  40:10
**restriction** 34:15
**result** 28:17
**revenue** 30:14,18
**review** 37:1
**RG8** 4:11

**right** 8:17 22:16 36:14
  36:18
**RIGLER** 2:6 3:6 4:7
  5:10 6:8 10:4 14:3,6
  15:14 18:8 25:4,17
  36:15,20 37:15,21
  40:21
**role** 20:8,9
**Roquette** 1:3 24:20
  25:2,5
**rose** 8:5
**rules** 36:22 37:16
**RUTH** 2:12 40:1

_____

## S

**S** 2:1 3:7 4:1 41:6
**sale** 17:18 18:3 19:2
  32:3 35:7
**sales** 8:5,6 16:12,18
  19:4 20:16
**saying** 31:12 37:6
**says** 8:13 31:4
**scale** 20:20
**scope** 6:5 13:22 14:4
  16:2 18:6 25:11
  34:20
**search** 9:4,20 10:5,6,16
**see** 25:21 28:9
**seen** 4:14 10:18,20
  25:18 27:22
**sell** 33:3
**send** 15:10
**senior** 8:4
**sent** 15:5
**September** 34:18
**September/October**
  34:9
**series** 10:11,12
**SERLE** 8:2 40:2
**service** 28:14
**set** 6:6
**shareholder** 20:10
**sheet** 39:9 40:13
**shipped** 23:12,13 28:4
**shipping** 23:19 28:15
**Short** 35:4
**short-term** 20:17
**show** 9:12
**showing** 33:8
**side** 37:5

**sign** 37:16
**signature** 40:9,11,13
  41:20
**signed** 9:21 39:9 40:13
**significantly** 28:18
**simply** 5:11 36:17
**sister** 29:18
**slightly** 8:19
**small** 20:20
**sold** 33:3,12
**solicitor** 5:6
**somebody** 20:4
**somewhat** 32:16
**sorry** 10:20 14:3 35:15
**sort** 5:18
**South** 2:4
**speaking** 14:16
**speaks** 27:8
**specific** 18:19
**specifically** 24:13,18
**specified** 32:13
**speculation** 15:20 29:8
**SPI** 1:5 11:9,10,14,17
  11:21 13:2 21:14
  28:5,11,21 29:4,14
  30:3,6,18,22 31:2,7
  31:14,22 32:4,10,18
  33:18 36:5 40:6 41:7
**spray** 11:7 12:1 13:19
  13:19 21:4,19,20
  29:5,12 30:4 35:7,8
**Square** 2:9 40:3
**stand** 33:11
**standard** 35:18
**state** 4:8,18 19:9 30:13
**stated** 14:1
**statement** 6:7 14:2
  20:22 31:8 33:11
**statements** 14:5
**States** 1:1 4:18 11:17
  18:14 19:9 22:11,14
  22:19 23:1,12,16
  26:13,16,22 32:11
  33:4,5,12,14,16 36:6
**stenographically** 42:4
**stipulated** 37:4
**stop** 34:17
**stopped** 34:8
**Strachey** 4:10
**straightforward** 23:6

**Street** 1:9 2:4
**strict** 23:9
**strictest** 24:22
**structure** 17:16 19:12
**submitted** 10:22 11:5
  15:15 37:6
**subscribed** 9:15
**sufficient** 11:21
**Suite** 41:3
**suited** 7:7
**supplied** 12:13 21:18
**supplier** 30:3
**supplies** 13:5
**supply** 11:6,7 16:3,8
  29:12 32:9
**support** 4:22 20:16
**sure** 12:7,8 18:12 25:17
  26:1 35:9
**surprise** 29:3
**surprises** 28:18
**sworn** 4:4
**system** 11:7 12:1 21:20
  28:17

_____

## T

**T** 3:7 39:1,1 41:6,6
**take** 9:17 18:9 33:6
**Taken** 1:9
**technical** 6:2
**tell** 7:5,11,22 11:3 34:6
**test** 20:21 21:6 27:3,6
**testified** 4:5
**testimony** 39:5,7 42:4
  42:7
**thank** 26:7 32:19 36:14
  37:19 38:4 40:16
**thing** 18:9
**think** 5:17 17:12 18:16
  27:7,19 32:15 34:22
  35:2 37:21
**THOMPSON** 2:3
**thought** 23:5 34:12
**three** 29:20,21 30:1
  33:21
**time** 12:10 17:22 33:6
  34:3,6,11,12
**timeframe** 22:7
**times** 33:20
**today** 5:4 9:1,3 18:11
**Todd** 34:3

_____

## Capital Reporting Company

toll 13:19 29:15
Tonbridge 36:8,12
Town 7:19
transcribed 42:5
transcript 36:19,21
   37:12,16 42:6
Transcription 39:7
transferred 8:5
trials 20:20
true 39:6 42:6
trying 18:14
Tuesday 1:10 4:2
turn 26:8 27:19 28:8
   30:8,11 31:3
turnaround 36:21
turning 32:22
two 33:21 34:11
type 5:16

---

**U**

ultimate 19:6,10,18
ultimately 18:13 23:15
unaware 33:7,10
understand 4:17 12:10
   13:7 15:5 16:10
   17:15 19:13 23:14
   32:7
understanding 15:22
   30:6 31:10,15 32:17
   35:11,13,15
understood 32:10
undertake 20:20
undertaken 27:16
unify 18:2
unit 27:6
United 1:1 4:18 11:17
   18:14 19:9 22:11,14
   22:19 23:1,12,16
   26:13,16,22 32:11
   33:4,5,12,14,16
universities 7:16,17
University 7:19
U.K 7:15 8:2,2,16,20
   12:16 18:1 19:16
   22:22 28:22

---

**V**

v 1:5 2:6 40:6,21 41:7
VA 2:5
vague 8:8 23:2

---

various 12:12 13:19
   36:1
verbatim 42:6
violating 6:15

---

**W**

W 39:1
waive 25:6,13 37:18
waived 37:17
want 29:14 36:17
Washington 41:4
wasn't 6:13
way 18:5 42:11
WC2A 2:11 40:5
week 37:9
weighing 28:9
we'll 26:5
we're 14:16 35:2
willing 20:15 25:6
wish 18:17
witness 3:2 5:12 6:10
   18:11 29:8 36:18
   40:11 41:8
worked 8:1,3
working 6:16
world 18:2,2
wouldn't 30:6 35:1
writing 35:14,16
written 35:10

---

**X**

X 3:1,7

---

**Y**

year 7:5,6 8:20 17:5,21
years 34:11
YOUNG 2:3

---

**Z**

Ziggy 20:4

---

**0**

000001 3:10
06-540 1:2

---

**1**

1 3:10 8:16,19 10:9,13
   10:14 17:21 26:2
1.02 38:5
10 3:10 37:9,10

---

100 19:14
1000 41:2
11 10:22 11:4 15:4
12.00 1:10
12.03 4:2
12.54 35:4
12.57 35:4
14 30:11,13
15 31:3
16 1:10 4:2 32:22 41:9
19 42:17

---

**2**

2 1:9 3:12 23:21 25:14
   25:18 26:2,8,9
20006 41:4
2001 8:5 17:15
2004 8:6 17:15,17
2005 34:9,18
2006 7:8 10:9 24:18
2007 1:10 4:2 41:9
   42:17
202 41:5
21st 24:18
22202 2:5
23rd 2:4
24 3:12
27 10:9
298 28:9

---

**3**

3 3:15 26:3 38:2,3
3QS 2:11 40:5
30 37:1 40:12
300 28:4
35 3:11,15 10:13 11:4
   15:4
35,301 28:9
35,540 28:3

---

**4**

4 3:4,6,15 26:3 27:20
   33:7

---

**5**

5 3:13 26:3 28:8
505 41:3

---

**6**

6 2:9 4:10 40:3

---

**7**

7PE 1:9
745 2:4

---

**8**

8EP 4:11
857-3376 41:5

# EXHIBIT 2

DEPOSITION EXHIBIT
DRYTEC 2
Jan 16,07    CM
Briault Reporting Services

## BASE INTERROGEE :

File 573:Piers Imports(US Ports) 2006/Jun W3

The **PIERS Imports (U.S. Ports)** database offers timely, accurate and complete import information on global cargo entering seaports in the United States. The file contains the most recent 18 months of information. PIERS monitors global shipments of goods and commodities on everything from raw materials to consumer goods. PIERS reporters throughout the country collect import information obtained from vessel manifests and U.S. Customs Automated Manifest Systems (AMS) from all U.S. ports. To ensure accuracy, the PIERS quality-assurance staff audits and cross-checks shipping documentation. Ship lines along with importers and exporters that subscribe to PIERS verify their own shipments and notify PIERS of any discrepancies among the shipment records. Due to PIERS quality assurance procedures, there is up to a two-month lag between vessel arrivals and the loading of data into the file

## STRATEGIE :

| | | |
|---|---|---|
| S1 | 239 | MANNITOL |
| S2 | 239 | MANNITOL? |
| S3 | 0 | MANNOGEM |
| S4 | 0 | MANNOGEM? |
| S5 | 73 | SPI()POLYOLS OR SPI()PHARMA |
| S6 | 73 | E38-E39 |
| S7 | 62 | S2 AND (S6 OR S5) |
| S8 | 7 | EX='SPI PHARMA' |
| S9 | 72 | IM='SPI PHARMA' OR IM='SPI POLYOLS' |
| S10 | 73 | S8 OR S9 |
| S11 | 0 | S8 AND S2 |
| **S12** | **62** | **S9 AND S2** |
| S13 | 0 | S12 NOT S5 |
| S14 | 11 | S5 NOT S12 |

CONFIDENTIAL

DIALOG(R)File 573:Piers Imports(US Ports)
(c) 2006 Commonwealth Bus. Media. All rts. reserv.

0058791970
Product Imported: *MANNITOL* POWDER
Product Code: 4936810 (MANNITOL)
    Weight of Cargo:        30091 POUNDS
    Number of Units of Cargo:    335 PIECES(LOGS,EMPTY BEAMS)

Date of Arrival (YY/MM/DD): 060422

Exporter: DRYTEC
    Company Location: TONBRIDGE, U KING (412)

U.S.-Based Importer: *SPI PHARMA*

[!] CONFIDENTIAL

Company Location: NEWARK, DE

Point of Origin: TONBRIDGE (41398), U KING (412)

U.S. Port of Discharge: NEW YORK (1001)

P. 3

[!] CONFIDENTIAL

DIALOG(R)File 573:Piers Imports(US Ports)
(c) 2006 Commonwealth Bus. Media. All rts. reserv.

0047478520
Product Imported: *MANNITOL*
Product Code: 4936810 (MANNITOL)
 Weight of Cargo:        35540 POUNDS
 Number of Units of Cargo:      300 DRUMS, FIBER DRUMS, POLY DR

Date of Arrival (YY/MM/DD): 050208

Exporter: DRYTEC LTD
 Company Location: TONBRIDGE, U KING (412)

U.S.-Based Importer: *SPI PHARMA*
 Company Location: NA, NA

Point of Origin: TONBRIDGE (41398), U KING (412)

U.S. Port of Discharge: NEW YORK (1001)

CONFIDENTIAL

DIALOG(R)File 573:Piers Imports(US Ports)
(c) 2006 Commonwealth Bus. Media. All rts. reserv.

0045856485
Product Imported: *MANNITOL* POWDER
Product Code: 4936810 (MANNITOL)
   Weight of Cargo:      35301 POUNDS
   Number of Units of Cargo:   298 KEGS

Date of Arrival (YY/MM/DD): 041119

Exporter: DRYTEC CONTRACT PROCESSING
   Company Location: TONBRIDGE, U KING (412)

U.S.-Based Importer: *SPI PHARMA*
   Company Location: GRAND HVN, MI

Point of Origin: TONBRIDGE (41398), U KING (412)

U.S. Port of Discharge: NEW YORK (1001)

un    P.S

[!] CONFIDENTIAL

# EXHIBIT 3



SPI Pharma, Inc.
321 Cherry Lane
New Castle, DE 19720-2780
USA
302-576-8500

April 2005

RE: <u>Manufacture of Mannogem ™ EZ Spray Dried Mannitol</u>

The above product is manufactured exclusively for SPI Pharma Inc. in the U.K. at the following location:

> Drytec Ltd.
> Morley Road
> Tonbidge
> Kent, TN9 1RA
> England

Quality approval and release for Mannogem EZ is by SPI Pharma's Grand Haven manufacturing site. Contact is :

> Todd Lumbert
> Quality Assurance Manager
> SPI Pharma Inc.
> 1711 Tiles Ct.
> Grand Haven , MI  49417
> 302-576-8500 X 6912

For commercial or order information, contact SPI Pharma's customer service team at 302-576-8500.

Sincerely,

Colleen N. Blackney
Marketing Manager

# EXHIBIT 4

# EXHIBIT 4

## FULLY REDACTED

# EXHIBIT 5

# **Anhydro** Group

You have tried to access the website either for **Drytec Ltd**. or **Simatek**.

Please go to the correct web address which is either www.drytecdryers.com or www.simatek.com

# DRYTEC

## A member of the Anhydro Group



For over 20 years, Drytec has been a worldwide supplier of particle drying equipment. We offer our customers a range of drying services that is second to none in quality and efficiency. Drytec products include spray dryers, flash dryers, ring dryers, and spray fluid bed dryers.

Our experience has given us the benefit of working with leading companies in the chemical, food manufacturing, and pharmaceutical industries in more than 20 different countries. Our customers exacting demands for quality processing of top quality materials has driven our search for better answers to drying and encapsulation requirements.

At Drytec we aim to be more than just an equipment supplier. We hope to be helpful business partners to our customers. We always try to work as an extension of your team, to find the new and better drying solutions that will help your business maximise its potential.

 **PILOT SCALE DRYERS**

 **SPRAY DRYERS**

 **FLASH DRYERS**

 **RING DRYERS**

 **SPRAY FLUID BED DRYERS**

 **CONTROL SYSTEMS**

 **PILOT PLANT FACILITIES**

 **CONTRACT DRYING**

## Contact DRYTEC

**Drytec (North America)**
**20000 Governors Drive • Olympia Fields, IL60461**
**Contact: John Betts**

**(1) 708 747 7846 • Fax: (1) 708 755 8815**
**E-mail: drytec@dedert.com**

**UK Office: Drytec Ltd. • 46 Morley Rd.**
**Tonbridge, Kent, TN9 1RA • England**

**Contact: Paul Kennet**

**(44) 1732 362611 • Fax: (44) 1732 770776**
**E-mail: sales@drytecltd.com**

# DRYTEC

## A member of the __Anhydro Group__

### CONTRACT DRYING

Food Grade Dryer at Drytec's contract drying facility.

 The Drytec Contract Drying operation is one that is in constant demand from the company's many customers who do not wish to invest unnecessarily in expensive capital equipment.

Products can be dried for test marketing or to satisfy the demands of a client who is waiting for a new dryer to be installed.

Drytec can offer manufacturers a level of cleanliness that is second to none, exceeding ISO9002 requirements and with HACCP analysis as an integral part of our quality control systems.

This facility enables Drytec to provide a complete drying service.



Chemical processing plant at Drytec's contract drying facility.



- **PILOT SCALE DRYERS**
- **SPRAY FLUID BED DRYERS**
- **SPRAY DRYERS**
- **CONTROL SYSTEMS**
- **FLASH DRYERS**
- **PILOT PLANT FACILITIES**
- **RING DRYERS**
- **CONTRACT DRYING**

**Contact DRYTEC**
*Contact:* John Betts • Drytec North America LLC.
**20000 Governors Drive • Olympia Fields, IL 60461**
**(1) 708 747 7846 • Fax (1) 708 755 8815 • E-mail drytec@dedert.com**

*Contact:* Paul Kennet • Drytec Ltd. • 46 Morley Road
**Tonbridge, Kent, TN9 1RA England**
**(44) 1732 362611 • Fax (44) 1732 770776 • E-mail sales@drytecltd.com**

# EXHIBIT 6

# Anhydro Group

Contact Us | Sitemap | Print page

Group profile | Group companies | Your industry | Technologies | Services | News | Jobs

[                    ] Search

**Group companies**

Anhydro

Dedert Corporation

Drytec

Simatek

Vetter Maschinenfabrik

Group Sales Companies

**Drytec Ltd**

Founded 1982

**Field of Technology:**
Drying

**Business activity:**
Industrial plant engineering and supply of:
- Flash dryers
- Flash (Ring) dryers
- Spray dryers

Tailor made plants specifically designed for the individual customer requirements

Pilot plant laboratory and facilities for product testing available

Contract spray drying facilities available

**Customer reference list:**
More than 170 Drytec plants supplied

## DRYTEC

**Company website:**
www.drytecdryers.com





**Drytec - Contact us**

**UK Head Office:**
Drytec Ltd.
46 Morley Rd.
Tonbridge, Kent, TN9 1RA
England

Tel: +44 1 732 362 611
Fax: +44 1 732 770 776
E-mail: sales@drytecltd.com

**North American Office:**
Drytec North America
20000 Governors Drive
Olympia Fields, IL 60461
United States of Amerca

Tel: +1 708-747-7846
Fax: +1 708-755-8815
E-mail: drytec@dedert.com

Anhydro Holding A/S
Oestmarken 7
2860 Soeborg
Denmark
Tel: +45 70 278 222
Fax: +45 70 278 223

» Home » Group companies » Drytec

© 2005 Anhydro Holding A/S. All rights reserved. Disclaimer. E-mail: info@anhydrogroup.com

# EXHIBIT 7

# Anhydro Group

| Group profile | Group companies | Your industry | Technologies | Services | News | Jobs |

Search

**News**

Exihibitions & conferences

News Archive

New global force in industrial
evaporation and dry

New global force in industrial evaporation and drying

**Anhydro Group realigns its global organization and brand by drawing the member companies in under a single Anhydro brand. The move adds new power and direction to a wide solution portfolio in the fields of industrial evaporation, drying and filtration.**

The Anhydro Group, incorporating Anhydro and Simatek in Denmark, Dedert Corporation in the USA, Drytec in the UK, and Vetter Maschinenfabrik in Germany, announced today a realignment of the company organization, uniting the member companies under a single Anhydro brand.

Based in Copenhagen, Denmark, the new company retains the Anhydro name with a redesigned corporate brand profile and a restructured organization designed to provide even faster and more effective solutions to customers all over the world.

**Centres of Excellence**

"The new customer-focused organization is based on three Centres of Excellence – Dairy & Food, Starch & Ethanol, and Industrial & Pharma" says Anhydro CEO Allan Jørgensen. "Each of these centres unites the relevant technologies, expertise and competences within the organization, directing them specifically at customer needs in the industries they serve."

Supporting the three Centres of Excellence is a fourth Centre of Excellence, Parts & Service. This Centre of Excellence integrates the global Customer Service organization and is dedicated to helping customers to achieve consistent high quality and performance for the lifetime of their Anhydro equipment. The new, state-of-the-art Anhydro Test Centre in Denmark will also support the Centres of Excellence by enabling customers to pilot new processes and optimize existing applications using leading-edge evaporation and drying technology from Anhydro.

Contact: Allan Jørgensen, CEO & President, Anhydro

Email: A.Joergensen@anhydro.com Tel: +45 39 54 6022

**Anhydro Holding A/S**
Oestmarken 7
2860 Soeborg
Denmark
Tel: +45 70 278 222
Fax: +45 70 278 223

» Home » News » News Archive » New global force in industrial evaporation and dry

© 2005 Anhydro Holding A/S. All rights reserved. Disclaimer. E-mail: info@anhydrogroup.com

# EXHIBIT 8

Not Reported in F.Supp.2d                                                                          Page 1
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

H

Briefs and Other Related Documents

Philips Electronics North America Corp. v. Contec
Corp.D.Del.,2004.Only the Westlaw citation is cur-
rently available.

United States District Court,D. Delaware.
PHILIPS ELECTRONICS NORTH AMERICA
CORPORATION and U.S. Philips Corporation,
Plaintiffs,
v.
CONTEC CORPORATION, Compo Micro Tech,
Inc., Seoby Electronics Co., Ltd., Remote Solution
Co., Ltd., F/K/A Hango Electronics Co., Ltd., Hango
Remote Solution, Inc., Defendants.
No. Civ.A. 02-123-KAJ.

March 11, 2004.

Richard L. Horwitz, Potter Anderson & Corroon,
LLP, Wilmington, DE, for Plaintiffs.
Patricia Smink Rogowski, Connolly, Bove, Lodge &
Hutz, Jack B. Blumenfeld, Morris, Nichols, Arsht &
Tunnell, Kathleen Jennings-Hostetter, Oberly & Jen-
nings, Andre G. Bouchard, Bouchard, Margules &
Friedlander, David L. Finger, David L. Finger, Esq.,
Wilmington, DE, for Defendants.

*MEMORANDUM ORDER*
JORDAN, J.

## I. INTRODUCTION

*1 This is a patent infringement case. Jurisdiction is
proper under 28 U.S.C. § 1338. Presently before me
is a Motion to Dismiss for Lack of Personal Jurisdic-
tion (the "Motion") filed by defendant Remote Solu-
tion Co., Ltd. ("Remote Solution") pursuant to Feder-
al Rule of Civil Procedure 12(b)(2). (Docket Item
["D.I."] 105.) For the following reasons, Remote
Solution's Motion will be denied.

## II. BACKGROUND

Plaintiffs Philips Electronics North America Corpora-
tion and U.S. Philips Corporation (collectively,
"Philips"), both Delaware corporations, filed an ac-
tion on February 12, 2002, alleging that Contec Cor-

poration ("Contec"), also a Delaware corporation,
was infringing U.S. Patent Nos. 4,703,359 FN1 (the "
'359 patent") and 5,872,562 FN2 (the " '562 patent"),
both owned by Philips. FN3 The technology disclosed
in the '359 and '562 patents is directed to remote con-
trol units ("RCUs") for controlling home appliances
from different manufacturers and categories. See '359
patent, col 1, lns. 15-17; '562 patent, col 1, lns. 13-16
(attached to D.I. 1 as Exs. A and B). On September
17, 2002, Philips filed an amended complaint joining
Remote Solution and others as additional defendants
in this action. (D.I.41, 42.) Remote Solution is a
Korean corporation with its principal place of busi-
ness in Kimcheon City, Kyongbuk, Korea. (D.I. 41,
Ex. A at ¶ 6.) Philips alleges that Remote Solution
"manufactures and designs RCUs that infringe the
patents in suit under a manufacturing and purchase
agreement with Contec, and is subject to personal jur-
isdiction in [the District of Delaware]." (Id. at ¶ 12.)
One of the types of RCUs accused of infringement in
this case is Remote Solution's model RT U49C. (Id.)

> FN1. The '359 patent, entitled "Universal
> Remote Control Unit With Model Identifica-
> tion Capability," names as inventors Robin
> B. Rumbolt, William R. McIntyre, and Larry
> E. Goodson. The '359 patent issued on Octo-
> ber 27, 1987 and was assigned to Philips on
> May 25, 1993. (D.I. 42, Ex. A at ¶ 16.)

> FN2. The '562 patent, entitled "Universal
> Remote Control Transmitter With Simpli-
> fied Device Identification," names as invent-
> ors Donald P. McConnell and William R.
> McIntyre. The '562 patent issued on Febru-
> ary 16, 1999 and was assigned to Philips on
> the same day. (D.I. 42, Ex. A at ¶ 17.)

> FN3. Defendants Contec Corporation and
> Seoby Electronics Co. are no longer in-
> volved in this case, having submitted to a
> Consent Judgment on August 28, 2003.
> (D.I.258.)

Remote Solution filed its Motion on January 24,
2003, arguing that this court cannot properly exercise

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                      Page 2
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

personal jurisdiction over it under Delaware's long-arm statute, 10 Del. C. § 3104, or consistent with the requirements of the Due Process Clause. (D.I. 106 at 4, 9.) In support of its Motion, Remote Solution submitted the Declaration of its Director, Suk-Kyu Park. (*Id.,* Ex. A.) In his declaration, Mr. Park stated that Remote Solution does not have any offices, facilities, subsidiaries or employees in Delaware; is not registered to do business in Delaware; has not contracted to supply services or things in Delaware; has no sales force in Delaware; has derived no revenues from sales in Delaware; does not own any property, assets or bank accounts in Delaware or maintain any offices in Delaware. (*Id.* ¶ 4, 7-10.) According to Mr. Park, Contec is Remote Solution's only customer for the accused RT U49C RCU. (*Id.* ¶ 5.) Mr. Park further stated that Remote Solution maintains a website to provide information about its products, but Remote Solution does not accept orders through its website. (*Id.* ¶ 12.)

After Remote Solution filed its Motion, the parties conducted jurisdictional and substantive discovery until September 15, 2003. (D.I. 286 at 2.) The following facts are taken from Philips' opposition to Remote Solution's Motion. (D.I.286.) Since Philips' factual allegations are not directly controverted, they are taken as true for purposes of determining jurisdiction in this court. *See Beverly Hills Fan Co. V. Royal Sovereign Corp.,* 21 F.3d 1558, 1563 (Fed.Cir.1994).

*\*2* In 1997, Remote Solution decided to expand its RCU sales by entering the United States consumer market. (*Id.* at 5 citing deposition testimony of Suk-Kyu Park at D.I. 287, Ex. 14).) To that end, Remote Solution hired David Ahn, a native Korean living in California, as its exclusive sales agent in the United States. (*Id* .) Mr. Ahn established Hango Electronics, Inc., d/b/a Remote Solution ("HEI") in California, for the sole purpose of soliciting customers in the United States on behalf of Remote Solution. (*Id.* citing deposition testimony of David Ahn at D.I. 287, Ex. 3).) HEI is an independent corporation of which Mr. Ahn is the sole owner and employee. (*Id.*)

In 1999, HEI entered into a Manufacturing and Purchase Agreement with Contec, L.P., a New York limited partnership, wherein Contec L.P. retained HEI to

design and manufacture RCUs and sell them to Contec L.P.[FN4] (D.I. 287, Ex. 15 at 1.) HEI also agreed to "defend any suit or proceeding brought against Contec L.P. to the extent that such suit or proceeding is based on a claim that the [RCUs] constitute an infringement of any valid United States ... patent...." (*Id.* at 3.) In 2000, with Mr. Ahn's consent, HEI changed its name to Remote Solution, the name under which Mr. Ahn conducts business in California. (*Id.* at 6.)

> FN4. The relationship between Contec L.P. and Contec Corporation was fleshed out at oral argument. At some point in time, Contec L.P., a New York entity, merged with Contec LLC, another New York entity, which then merged with Contec Corporation, a Delaware entity. (D.I. 338 at 67:16-25.)

According to Mr. Ahn, Remote Solution's business plan was to sell as many RCUs as possible. (*Id.*) As a result of his extensive efforts to market the RCUs, Mr. Ahn acquired Contec, TiVo, Inc., Harman Kardon, Inc. and Hy-Tek Manufacturing Co., Inc. as customers for Remote Solution. (*Id.*) Remote Solution does not design its own remote controls, rather, it manufactures them according to its customers' specifications. (*Id.* at 7.) Contec is a Delaware corporation with its principal place of business in New York, and its primary business is to sell refurbished cable set top boxes and RCUs to major cable companies in the United States. (*Id.* at 10.) Contec's customers include Comcast, which provides cable television services to residents of Delaware. (*Id.*) Generally, Remote Solution knows who Contec's customers are because Remote Solution marks the RCUs with those customer's logos. (*Id.;* D.I. 287, Ex. 10.) Remote Solution knew that Comcast was one of Contec's customers, as it sent drawings of the Comcast logo to Contec via email on April 24, 2002. (D.I.287, Ex. 36.)

In 2000, Remote Solution established a subsidiary in the United States, Hango Remote Solution, Inc. ("Hango"). (D.I. 286 at 8.) Remote Solution was a 70% shareholder in Hango and Mr. Ahn owned the remaining 30%. (*Id.*) About half of Hango's revenue

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

came from sales of Remote Solution's RCUs, Hango's primary business was marketing an MP3 player called Personal Jukebox. (*Id.* at 8-9.) Ultimately, however, Hango's business failed, and the company folded in December 2002. (*Id.* at 9.) Thereafter, Remote Solution began litigating this case on Hango's behalf as well as its own, filing an answer to the complaint and a motion to amend the answer to include a crossclaim against Contec for indemnification in the event Hango is found liable for patent infringement. (*Id.* at 9; *see also* D.I. 287, Ex. 2 at 8.)

**\*3** Remote Solution has sold at least 1,969,849 of the accused RCUs in the United States since November 22, 2000. (D.I. 286 at 2 (citing Expert Report of Kerry Ruoff at D.I. 287, Ex. 1).) Based on the records obtained from TiVo, one of Remote Solution's customers, Philips discovered that at least 2,000 infringing RCUs manufactured by Remote Solution for TiVo have been sold or used in Delaware since March 31, 1999. (D.I. 286 at 3, 13.) According to TiVo's records, 1,738 residents of Delaware subscribed to TiVo's service between March 31, 1999 and May 28, 2003. (*Id.* (citing Declaration of Matthew P. Zinn at D.I. 287, Ex. 39 ¶ 12).) Because TiVo sells its digital video recorders ("DVRs") bundled with the RCUs manufactured by Remote Solution, it is likely that more than 1,500 Remote Solution RCUs are being used for TiVo recorders in Delaware today. (*Id.* (citing D.I. 287, Ex. 39 ¶¶ 6, 17).) Furthermore, since January 1, 2000, more than 1,000 DVRs bundled with RCUs manufactured by Remote Solution were sold in Delaware at two retailers, specifically, 654 were sold at BestBuy and 406 were sold at Circuit City. (*Id.* (citing Declaration of Scott Jacobi at D.I. 287, Ex. 40 ¶ 7; Declaration of Mark Smucker at D.I. 287, Ex. 41 ¶ 9).)

### III. DISCUSSION

When a non-resident defendant's motion to dismiss challenges personal jurisdiction, the plaintiff has the burden to show the basis for the court's jurisdiction over that defendant. *Intel Corp. v. Broadcom Corp., 167 F.Supp.2d 692, 699 (D.Del.2001)* (citing *Wright v. American Home Products, 768 A.2d 518, 526 (Del.Super.2000)*). To satisfy this burden, Philips must make a *prima facie* showing that this court may

exercise personal jurisdiction over Remote Solution. *Id.* After discovery has begun, the plaintiff must sustain this burden by "establishing jurisdictional facts through sworn affidavits or other competent evidence." *Id.* (citing *Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n. 9 (3d Cir.1984)*).

Determining whether Remote Solution is subject to personal jurisdiction requires a two-part analysis. *Id. at 700; see also Siemens Aktiengesellschaft v. LG Semicon Co., Ltd., 69 F.Supp.2d 622, 624 (D.Del.1999)*. First, I must determine whether the language of Delaware's long-arm statute, 10 Del. C. § 3104(c), reaches Remote Solution. *Broadcom,* 167 F.Supp. at 700. Second, if I find that Remote Solution's conduct gives rise to personal jurisdiction under the long-arm statute, I must then determine whether subjecting Remote Solution to jurisdiction in Delaware would comport with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.* (citing *Intel Corp. v. Silicon Storage Tech, Inc., 20 F.Supp.2d 690, 694 (D.Del.1998)*).

A. Jurisdiction over Remote Solution is Proper Under § 3104(c)(1) of Delaware's Long-Arm Statute

Philips contends that Remote Solution is subject to jurisdiction under sections 3104(c)(1) and (c)(4) of the Delaware long-arm statute (D.I. 286 at 17, 20), which provide:

**\*4** (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:

* * *

(1) Transacts business or performs any character of work or service in the State;

* * *

(4) Causes tortious injury in the State or outside of the State by an act or omission outside of the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State....

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

10 Del. C. §§ 3104(c)(1) & (c)(4). Delaware state courts have interpreted the "transacting business" provision of § 3104(c)(1) as a specific jurisdiction provision that requires a nexus between the cause of action and the conduct used as a basis for jurisdiction. *See* LaNuova D & B S.p.A. v. Bowe Co., 513 A.2d 764, 768 (Del.1986). The Federal Circuit has held that, where a defendant has "purposefully shipped the accused [product] into [the forum state] through an established distribution channel ... [n]o more is usually required to establish specific jurisdiction." Beverly Hills Fan, 21 F.3d at 1564. Moreover, in order to meet the requirements of § 3104(c)(1), Remote Solution's actions must be directed at residents of Delaware and the protection of Delaware laws. *See* Thorn EMI N. Am., Inc. v. Micron Tech., Inc., 821 F.Supp. 272, 274 (D.Del.1993) (citing Sears, Roebuck & Co. v. Sears, 744 F.Supp. 1289, 1292 (D.Del.1990)).

Philips argues that Remote Solution has shipped the accused RCUs into an established distribution channel as part of a general business plan that results in sales of the accused products in Delaware. (D.I. 286 at 18.) In response, Remote Solution argues that it merely had a general plan to serve the national market and that its activities were not directed specifically toward Delaware. (D.I. 309 at 2, 4.)

I find that Philips has presented competent evidence that an established distribution channel exists through which accused RCUs manufactured by Remote Solution are shipped to, distributed, and sold in Delaware. First, the evidence shows that Remote Solution and Contec have enjoyed a close business relationship since at least as early as 1999, when, in a manufacturing and purchase agreement governed by New York law, Remote Solution agreed to defend one of Contec's predecessors against any claims of patent infringement. Furthermore, Remote Solution is seeking indemnification from Contec for Hango, Remote Solution's defunct subsidiary, in the event Hango is found liable for patent infringement in this case. Philips has also presented competent evidence that Remote Solution knew that Comcast, a major provider of cable television services in the State of Delaware, was one of Contec's customers for the accused RCU. Given all of these facts, and in light of

Remote Solution's ongoing business relationship with Contec, it was reasonably foreseeable that the accused RCUs would make their way into the Delaware market through Contec's customers. Documents obtained from Remote Solution show that Contec was selling the accused RCUs to Comcast, such that Remote Solution knew or should have known that the accused RCUs were being sold or distributed in Delaware. *See* Thorn EMI, 821 F.Supp. at 275-76.

**\*5** Finally, Philips has competent evidence that the accused RCUs are present in Delaware in large numbers, and were present in Delaware prior to its filing suit, as a result of Remote Solution manufacturing the accused RCUs for TiVo. Because Philips has presented competent evidence of an established distribution channel that caused the accused RCUs to be sold and distributed in Delaware, and that the accused RCUs are actually present in Delaware, I find that jurisdiction over Remote Solution is proper under § 3104(c)(1), and I need not address the issue of whether jurisdiction over Remote Solution is proper under § 3104(c)(4).FN5

> FN5. Remote Solutions relies upon Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp., 293 F.Supp.2d 423, *reconsideration denied,* 293 F.Supp.2d 430 (D.Del.2003) (granting defendant's motion to dismiss for lack of personal jurisdiction in patent infringement case) in support of its motion to dismiss. There are key factual distinctions between this case and *Commissariat.* First, unlike the plaintiff in *Commissariat,* Philips requested and conducted jurisdictional discovery which uncovered evidence of actual sales and the presence of the accused device in Delaware prior and subsequent to the date the complaint was filed, evidence that was lacking in *Commissariat.* Second, that Remote Solution (1) agreed to defend a predecessor of Contec from patent infringement and (2) is seeking indemnification from Contec should Hango be found liable for patent infringement is evidence of Remote Solution's close business relationship with Contec, and its knowledge of the established distribution channel through

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00540-GMS-MPT    Document 28-2    Filed 02/16/2007    Page 45 of 45

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

which its products were being sent into Delaware. Thus, the quantum of evidence upon which to rest personal jurisdiction in this case is significantly greater than in *Commissariat.*

B. Exercising Jurisdiction over Remote Solution in Delaware Comports With the Requirements of the Due Process Clause

Due process requires that sufficient minimum contacts exist between the defendant and the forum state to satisfy "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In considering whether jurisdiction may extend to a defendant, courts should primarily consider whether the defendant has purposely availed itself of the forum state's law, *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), and whether the defendant reasonably could have anticipated being haled into the courts of the forum state, *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291-92, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Courts should also consider the burden imposed on the defendant by having to litigate in a foreign forum, as well as the interests of the plaintiff and the forum state. *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

In this case, the accused RCUs arrived in Delaware through Remote Solution's purposeful shipment of them through an established distribution channel. See *Beverly Hills Fan,* 21 F.3d at 1565. Philips has "stated all of the necessary ingredients for an exercise of jurisdiction consonant with the requirements of due process," namely, that Remote Solution placed the accused products in the stream of commerce, that it knew the likely destination of the products, and that its conduct and connections with Delaware were such that they should reasonably have anticipated being brought into court here. *Id.* at 1566.

Finally, litigating this case in Delaware would not place such a burden on Remote Solution as to offend traditional notions of fair play and substantial justice, especially since Remote Solution has executed an agreement to defend Contec L.P. against all claims of patent infringement, which proves that Remote Solution was well aware of and prepared for the possibility of litigation where Contec did business, including Delaware. Nor has Remote Solution shown that it does not have the resources to fairly litigate this case in Delaware. *See Thorn EMI,* 821 F.Supp. at 276. Moreover, "Delaware has an abiding interest in protecting the property rights of its residents[,]" *id.,* including corporate citizens such as Philips. Thus, exercising jurisdiction over Remote Solution in this case comports with the requirements of the Due Process Clause.

IV. CONCLUSION

**\*6** For these reasons, it is hereby ORDERED that Remote Solution's Motion to Dismiss for Lack of Personal Jurisdiction (D.I.105) is DENIED.

D.Del.,2004.
Philips Electronics North America Corp. v. Contec Corp.
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2385623 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of the Joint Motion for Summary Judgment of Defendants Remote Solution Co, Ltd. and Hango Remote Solution, Inc. (Jul. 29, 2005) Original Image of this Document (PDF)
• 2005 WL 2385622 (Trial Motion, Memorandum and Affidavit) Answering Brief of Defendants Remote Solution Co, Ltd. and Hango Remote Solution, Inc. in Opposition to Plaintiffs' Motion for Summary Judgment (Jul. 20, 2005) Original Image of this Document (PDF)
• 1:02cv00123 (Docket) (Feb. 12, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.