IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROQUETTE FRERES, | ) | |
| | ) | C.A. No. 06-540-(***) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REDACTED VERSION** |
| | ) | |
| SPI PHARMA, INC., and | ) | |
| DRYTEC LTD. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS SPI PHARMA, INC. AND DRYTEC LTD.'S MEMORANDUM IN
OPPOSITION TO PLAINTIFF ROQUETTE FRERES' MOTION FOR LEAVE
TO AMEND ITS PLEADINGS TO JOIN ADDITIONAL PARTIES**

YOUNG CONAWAY STARGATT & TAYLOR LLP
John W. Shaw, Esq. (No. 3362)
Jeffrey T. Castellano (No. 4837)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
jcastellano@ycst.com
*Attorneys for SPI Pharma, Inc. and Drytec Ltd.*

OF COUNSEL:
Brian P. Murphy, Esq.
Daniel P. Murphy, Esq.
Oren D. Langer, Esq.
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178
(212) 309-6000

Dated: June 5, 2007

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................ii

INTRODUCTION ..............................................................................................................1

NATURE AND STAGE OF THE PROCEEDING............................................................1

SUMMARY OF ARGUMENT .........................................................................................1

FACTS ...............................................................................................................................2

ARGUMENT:

ROQUETTE'S MOTION FOR LEAVE TO AMEND SHOULD BE
DENIED BECAUSE JOINING THE ADDITIONAL PARTIES IS FUTILE ...................3

A.    Leave To Amend Standard .....................................................................................3

B.    This Court Lacks Personal Jurisdiction Over The Additional Parties ......................3

C.    None Of The Additional Parties Sold The Accused Product Within The
United States .........................................................................................................5

D.    None Of The Additional Parties Imports The Accused Product Into The
United States .........................................................................................................6

CONCLUSION...................................................................................................................9

DB02:6022174.1                                                                                   064409.1002

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Applied Biosystems, Inc. v. Cruachem, Ltd.*,
   772 F. Supp. 1458 (D. Del. 1991)................................................................................ 5

*Cybiotronics , Ltd. v. Golden Source Electronics, Ltd.*,
   130 F. Supp. 2d 1152 (C.D. Cal. 2001) ................................................................. 7, 8

*Eli Lilly & Co. v. Zenith Goldline Pharmas., Inc.*,
   172 F. Supp. 2d 1060 (S.D. Ind. 2001) ...................................................................... 6

*Jablonski v. Pan American World Airways*,
   863 F.2d 289 (3d Cir. 1988) ...................................................................................... 3

*Monsanto Co. v. Syngenta Seeds, Inc.*,
   Civ. No. 04-305-SLR, 2006 U.S. Dist. LEXIS 54534 (D. Del. Aug. 4, 2006) ............. 5

*Pellegrini v. Analog Devices, Inc.*,
   375 F.3d 1113 (Fed. Cir. 2004) ................................................................................. 6

*Pfizer Inc. v. Aceto Corp.*,
   853 F. Supp. 104  (S.D.N.Y. 1994) ........................................................................... 8

*Site Microsurgical Systems, Inc. v. The Cooper Companies, Inc.*,
   797 F. Supp. 333 (D. Del. 1992)................................................................................ 3

*Strawhecker v. Laurel School District*,
   100 F.R.D. 7  (W.D. Pa. 1983) .................................................................................. 3

*Telcordia Technologies, Inc. v. Alcatel S.A.*,
   Civ. No. 04-874-GMS, 2005 U.S. Dist. LEXIS 10194 (D. Del. May 27, 2005);........... 5

*Wassall PLC v. La Mirada Products Co., Inc.*,
   93 Civ. 4782 (CMM), 1993 U.S. Dist. LEXIS 16609 (S.D.N.Y. Nov. 24, 1993).......... 6

**Statutes**

10 Del. C. § 3104 (c).................................................................................................. 3, 4

35 U.S.C. § 271 ....................................................................................................... passim

**Rules**

Fed. R. Civ. P. 12(b)(2)............................................................................................... 2, 5

Fed. R. Civ. P. 15 ........................................................................................................... 3

## INTRODUCTION

Defendants SPI Pharma, Inc. ("SPI Pharma") and Anhydro U.K., Ltd. ("Anhydro U.K."), formerly known as Drytec Ltd., respectfully submit this Answering Brief in opposition to Plaintiff Roquette Freres' ("Roquette") Motion for Leave to Amend its Pleadings to Join Additional Parties.

## NATURE AND STAGE OF THE PROCEEDING

Roquette filed this patent infringement action against SPI Pharma on August 31, 2006, and then filed a First Amended Complaint adding Drytec Ltd. as a co-defendant on October 20, 2006. On December 6, 2006, Drytec Ltd. submitted a motion to dismiss Plaintiff's First Amended Complaint as to Drytec Ltd. for lack of personal jurisdiction. That motion is pending before this Court.

On May 21, 2007, the deadline for joinder of parties under the Court's Scheduling Order, Roquette filed the instant motion to join three additional parties as co-defendants: Drytec Contract Processing ("Drytec CP"), Anhydro U.K. and Anhydro Holding A/S ("Anhydro A/S") (collectively, the "Additional Parties"). D.I. 48. SPI Pharma and Drytec Ltd. submit this brief in opposition to Roquette's motion to join the Additional Parties.

## SUMMARY OF ARGUMENT

Roquette's motion for leave to amend its pleadings to join Drytec CP, Anhydro UK, and Anhydro A/S as party defendants should be denied because joinder is futile. This Court cannot exercise personal jurisdiction over the Additional Parties given their insufficient contacts with the State of Delaware. Because joinder cannot survive a

1

potential motion to dismiss pursuant to Rule 12(b)(2), Roquette's motion for leave to amend is futile and should be denied.

Even assuming *arguendo* that the Court could exercise personal jurisdiction, none of the Additional Parties ever made, used, offered to sell, sold or imported MANNOGEM™ EZ Spray Dried Mannitol ("the EZ product" or the "accused product") within or into the United States and, therefore, none could possibly be liable for patent infringement under 35 U.S.C. § 271.



Accordingly, on this basis, Plaintiff's motion for leave to amend its pleadings to join the Additional Parties is futile and should be denied.

## FACTS

Roquette's proposed Second Amended Complaint alleges that SPI Pharma, Drytec Ltd. and the Additional Parties infringe Roquette's United States Patent No. 5,573,777 ("the '777 patent"). D.I. 9. The '777 patent discloses a form of pulverulent mannitol and its properties. *See id.* Plaintiff alleges that SPI Pharma, Drytec Ltd. and the Additional Parties import and sell the EZ product in the United States thereby infringing one or more claims of the '777 patent. *Id.* ¶¶ 7-8.

Prior to 2007, Drytec CP and Drytec Ltd. were affiliated companies commonly owned by Drytec Holdings Ltd., a British corporation. On January 1, 2007, Drytec Ltd. underwent a name change to Anhydro U.K. In its proposed Second Amended Complaint,

Roquette avers that Drytec CP and Anhydro UK are British corporations and that Anhydro A/S is a Danish corporation. Roquette does not make any specific allegation about the Court's personal jurisdiction over Drytec CP, Anhydro UK or Anhydro A/S.

**ARGUMENT**

**ROQUETTE'S MOTION FOR LEAVE TO AMEND SHOULD BE DENIED BECAUSE JOINING THE ADDITIONAL PARTIES IS FUTILE**

### A.    Leave To Amend Standard

Fed. R. Civ. P. 15 provides that leave to amend "shall be freely given when justice so requires." "However, this liberal policy of granting leave to amend must not be interpreted to permit amendment without restraint." *Site Microsurgical Systems, Inc. v. The Cooper Companies, Inc.*, 797 F. Supp. 333, 336 (D. Del. 1992) (*citing Adams v. Gould, Inc.*, 739 F.2d 858, 864 (3d Cir. 1984); *Strawhecker v. Laurel School District*, 100 F.R.D. 7, 10 (W.D. Pa. 1983)). An amendment should not be permitted if countervailing considerations exist such as undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice, or futility. *Jablonski v. Pan American World Airways*, 863 F.2d 289, 292 (3d Cir. 1988); *Site Microsurgical*, 797 F. Supp. at 336. "Amendment of the complaint is futile if the amendment will not cure the deficiency in the original complaint or if the amended complaint cannot withstand a renewed motion to dismiss. *Jablonski*, 863 F.2d at 292; *Site Microsurgical*, 797 F. Supp. at 336.

### B.    This Court Lacks Personal Jurisdiction Over The Additional Parties

This Court must be authorized by the Delaware long-arm statute and also satisfy the Due Process Clause of the United States Constitution in order to exercise personal jurisdiction over the Additional Parties. All the arguments applicable to Drytec Ltd. with respect to Delaware's long-arm statute, 10 Del. C. § 3104 (c), as set forth in Drytec Ltd.'s previously-filed motion to dismiss, apply with equal force to the Additional Parties.

There are simply no facts that can support personal jurisdiction under the specific jurisdiction provisions of § 3104(c) because the Additional Parties have not transacted any business in Delaware with respect to the accused product (or any mannitol product or service).[1] Also, based on current information, the Additional Parties have no operations in the State of Delaware, no interest in real property or surety or insurance contracts within Delaware. Similarly, under the general jurisdiction provision, none of the Additional Parties regularly conducts business in, derives substantial revenue from or engages in a persistent course of conduct in the State of Delaware.[2] Accordingly, resort to Delaware's long-arm statute for an exercise of personal jurisdiction is unavailing.

The Additional Parties' lack of sufficient contacts with the State of Delaware also proves that an exercise of personal jurisdiction would not meet the dictates of the Due Process Clause. The Additional Parties do not have continuous and systematic contacts with the State of Delaware and do not purposefully direct their activities at residents of the forum resulting in alleged injuries that arise out of or relate to those activities.[3] Thus, this Court lacks constitutional power to exercise personal jurisdiction over the Additional Parties.

Finally, with specific reference to Anhydro A/S, this Court has held that personal jurisdiction over foreign holding companies in a patent infringement context cannot be exercised merely because of a corporate relationship with the allegedly infringing entity.

---

[1]    Please see Drytec Ltd.'s Opening Brief In Support Of Its Motion To Dismiss For Lack Of Personal Jurisdiction ("Opening Brief"), D.I. 20, pp. 6-8, for a more detailed discussion of specific jurisdiction provisions of Delaware long-arm statute.

[2]    Please see Opening Brief, D.I. 20, pp. 9-10, for a more detailed discussion of general jurisdiction provision of Delaware long-arm statute.

[3]    Please see Opening Brief, D.I. 20, pp. 10-16, for more detailed discussion of Due Process requirements.

*See Monsanto Co. v. Syngenta Seeds, Inc.*, Civ. No. 04-305-SLR, 2006 U.S. Dist. LEXIS 54534, at *32 (D. Del. Aug. 4, 2006)[4]; *Telcordia Technologies, Inc. v. Alcatel S.A.*, Civ. No. 04-874-GMS, 2005 U.S. Dist. LEXIS 10194, at *31 (D. Del. May 27, 2005); *Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1472 (D. Del. 1991). Thus, even if personal jurisdiction could properly be exercised over Anhydro UK (and it cannot be), the mere fact of Anhydro A/S's corporate parentage is not sufficient to require Anhydro A/S's participation in the litigation.

Because Roquette cannot possibly survive a future motion to dismiss for lack of personal jurisdiction, Roquette's motion for leave to amend is futile and should be denied.

### C.    None Of The Additional Parties Sold The Accused Product Within The United States

Even assuming *arguendo* that Roquette could withstand a future Rule 12(b)(2) motion to dismiss as to the Additional Parties, granting leave to join is ultimately futile because their liability for patent infringement under the patent laws cannot possibly be shown.

In relevant part, the patent infringement statute, 35 U.S.C. § 271, provides:

> (a) Except as otherwise provided in this title, whoever without authority **makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States** any patented invention during the term of the patent therefor, infringes the patent.

The Additional Parties have never sold the accused product to SPI Pharma within the United States (or anywhere in the world, for that matter).

---

[4] Unreported Opinions are attached hereto as Exh. C.



The Additional Parties are not amenable to suit by Roquette under the "offers to sell, or sells any patented invention, within the United States" language of 35 U.S.C. § 271

### D. None Of The Additional Parties Imports The Accused Product Into The United States

As noted above, 35 U.S.C. § 271 also provides that a party is liable for patent infringement if it "imports into the United States any patented invention during the term of the patent." Liability for patent infringement does not fall upon the exporter; the reason being that "[t]he United States patent laws do not, and are not intended to, operate beyond the limits of the United States." *Pellegrini v. Analog Devices, Inc.*, 375 F.3d 1113, 1117 (Fed. Cir. 2004).[7]

---

[5] Toll manufacturing is a "type of arrangement, where one party owns the input and the output of a manufacturing process undertaken by another party." *Eli Lilly & Co. v. Zenith Goldline Pharmas., Inc.*, 172 F. Supp. 2d 1060, 1068 n.9 (S.D. Ind. 2001); *see also Wassall PLC v. La Mirada Products Co., Inc.*, 93 Civ. 4782 (CMM), 1993 U.S. Dist. LEXIS 16609, at *4 (S.D.N.Y. Nov. 24, 1993) ("Under a toll manufacturing agreement, one party produces products owned by another party.").

[6] "Kennet Dep." refers to the deposition of Paul Kennet taken in this matter on Jan. 16, 2007. The complete transcript can be found at D.I. 27, Exh. 1.

[7] See also *Pfizer Inc. v. Aceto Corp.*, 853 F. Supp. 104, 106 (S.D.N.Y. 1994) (*quoting* H.R. Rep. No. 60, 100th Cong., 1st Sess. 6): "The House and Senate



The Additional Parties are, therefore, not amenable to suit under the provisions of 35 U.S.C. § 271, because none of them imports the EZ product into the United States.

In addition, case law is clear that a foreign manufacturer that *exports* goods into the United States cannot also be characterized as an importer of goods into the United States pursuant to 35 U.S.C. § 271.  In *Cybiotronics , Ltd. v. Golden Source Electronics, Ltd.*, 130 F. Supp. 2d 1152, 1173-1176 (C.D. Cal. 2001), the Court stated that it was:

---

    reports accompanying the Process Patents Amendments Act of 1987 are replete with commentary specifying that 'the offending act is the *importation* of a product made through the use of a protected process patent or its subsequent sale within the United States.'" (emphasis added).

[8]   "PIERS information is verified by the PIERS quality control staff, whom audits our records every month against a list, supplied by U.S. Customs, of vessels arriving at U.S. ports. In the event of a *discrepancy*, PIERS requests the appropriate documentation from either U.S. Customs or the ship line." *See* PIERS website at http://piers.com/about/DataCollection/, attached hereto as Exh. A (emphasis added).

[9]   See SPI 007625-26, SPI 007632, SPI 007637-38, SPI 007645, SPI 007649, SPI 007659, SPI 007661, SPI 007670-71, SPI 007688, SPI 007700, SPI 007705, SPI 007721, SPI 007735, SPI 007737, SPI 007739, SPI 007741, SPI 007743, SPI 007747, SPI 007756, SPI 007759, SPI 007770, SPI 007778, SPI 007781-82, SPI 007787-90, SPI 007800, SPI 0007803, attached hereto as Exh. B.

> wholly unpersuaded by Plaintiff's argument that because
> [defendant] is the "exporter from" Hong Kong, it must also be the
> "importer into" the United States. This is contrary to logic; the
> very division between the two words suggests division of roles.
> When [defendant] is an "exporter," it may also be an "importer,"
> but one does not necessarily imply the other.

*Cybiotronics*, 130 F. Supp. 2d at 1174.  The Court in *Cybiotronics* found that the

"shipments" in that case did not constitute "imports into the United States" for purposes

of liability under 35 U.S.C. § 271(a) because the defendant had not engaged in the

conduct prohibited by the statute and because the Court may not extend the patent

infringement statute to reach conduct which is not within its terms.  *Id.*

Similarly, in *Pfizer Inc. v. Aceto Corp.,* 853 F. Supp. 104,105 (S.D.N.Y. 1994), a

Chinese manufacturer, located and doing business solely in China, filed a motion to

dismiss on the ground that it did not itself import a product manufactured using an

allegedly infringing process into the United States.  The *Pfizer* Court, in granting the

foreign manufacturer's motion, made it clear that § 271 provides no remedy against

foreign manufacturers whose infringing acts do not occur within the United States.  *Id.*

(*quoting* 35 U.S.C. § 271(g) legislative history at S. Rep. No. 83, 100th Cong., 1st Sess.

48 (1987)).  Moreover, the Court in *Pfizer* found that "the terms 'importation' and

'import' in §271 (g) 'are to have their plain ordinary meaning of bringing goods into the

United States from another country.'"  *Id.* (*quoting Bristol-Myers Co. v. Erbamont Inc.*,

723 F. Supp. 1038, 1043 (D. Del. 1989)).  Because none of the Additional Parties ever

brought the EZ product into the United States from the United Kingdom,[10] none of them

may be considered an "importer" within the meaning of 35 U.S.C. § 271.

---

[10]     *See* FN 9.

Accordingly, granting leave to join the Additional Parties would be futile because Roquette cannot show that any of the Additional Parties are liable for patent infringement under 35 U.S.C. § 271.

## CONCLUSION

For the reasons set forth above, Roquette's motion to amend the pleadings to join the Additional Parties should be denied.

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

John W. Shaw, Esq. (No. 3362)
Jeffrey T. Castellano (No. 4837)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
jcastellano@ycst.com
*Attorneys for SPI Pharma, Inc., and Drytec Ltd.*

OF COUNSEL:
Brian P. Murphy, Esq.
Daniel P. Murphy, Esq.
Oren D. Langer, Esq.
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178
(212) 309-6000

Dated: June 5, 2007

## CERTIFICATE OF SERVICE

I, Jeffrey T. Castellano, hereby certify that on June 8, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Mary B. Graham, Esquire
> Julia Heaney, Esquire
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street
> Wilmington, DE 19801

I further certify that on June 8, 2007, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel of record and on the following in the manner indicated:

> **BY E-MAIL**
>
> Douglas V. Rigler, Esquire
> Young & Thompson
> 745 South 23rd Street, Suite 200
> Arlington, VA 22202

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Jeffrey T. Castellano*
John W. Shaw (No. 3362)
Jeffrey T. Castellano (No. 4837)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
jcastellano@ycst.com

*Attorneys for SPI Pharma, Inc. and Drytec Ltd.*

# EXHIBIT A



# PIERS
## Global Intelligence Solutions®

Find Out How Companies Use PIERS / Complete Product Catalogue / Become a Subscriber

**About PIERS | Customer Support | Contact PIERS | Newsroom | Trade Insights**

Register for Newsletter    Register for Market Tips    Register for More Info

PIERS Home > About PIERS > Data Collection

**PIERS Management**
**Authorized Resellers**
**Other CBM Links**
How We Collect Data

## Data Collection

PIERS has access to import /export data due to the Freedom of Information Act along with U.S. Customs Regulations which authorize press organizations to copy certain shipping documents available to the public.

### U.S. Import Products

Import information is obtained from vessel manifests and U.S. Customs Automated Manifest Systems (AMS) data tapes from all U.S. ports. Reporters throughout the country (including Alaska, Hawaii and Puerto Rico) collect import information from all U.S. ports.

PIERS information is verified by the PIERS quality control staff, whom audits our records every month against a list, supplied by U.S. Customs, of vessels arriving at U.S. ports. In the event of a discrepancy, PIERS requests the appropriate documentation from either U.S. Customs or the ship line. In addition, ship lines and importers that subscribe to PIERS verify their own shipments in our system and notify us of any discrepancies.

### U.S. Export Products

Reporters throughout the country (including Alaska, Hawaii and Puerto Rico) gather export information from bills of lading at all U.S. ports. The ship lines are obliged by law to submit documentation for every item on board the vessel. The PIERS quality control staff verifies PIERS export information against a list of vessels, supplied by U.S. Customs, exiting U.S. ports. Ship lines and exporters that subscribe to PIERS verify their own shipments and notify us of any disagreements among the shipment records.

### Global Imports

PIERS obtains Brazilian, Chilean, Colombian, Ecuadorian, Peruvian and Venezuelan import data by forming partnerships with companies that specialize in manifest collection. We enhance this data to meet our conventions through a rigorous quality control process that includes codification and standardization.

PIERS Mexican Import Data is obtained via a contract with the Coordinacion General de Puertos y

Marina Mercante who provide us with import documentation in the 11 Mexican ports we cover. For most of our import data we use ship manifests as documentation. However, import pedimentos are used for our data when no manifest is available. PIERS has 15 reporters covering 11 ports on the Pacific and Gulf Coasts. These ports are Ensenada, Mazatlan, Manzanillo, Acapulco, Lazaro Cardenas, Salina Cruz, Altamira, Tampico, Tuxpan, Veracruz and Progreso.

**Global Exports**

PIERS obtains export data for Brazil, Chile, Colombia, Ecuador, Peru, and Venezuela through the formation of partnerships with companies that specialize in manifest collection. We enhance this data to meet our conventions through a rigorous quality control process that includes codification and standardization.

PIERS Mexican Export Data is obtained via a contract with the Coordinacion General de Puertos y Marina Mercante who provide us with export documentation in the Mexican ports we cover. Export data is retrieved from pedimentos which is similar to U.S export declaration. PIERS has 15 reporters covering 11 ports on the Pacific and Gulf Coasts. These ports are Ensenada, Mazatlan, Manzanillo, Acapulco, Lazaro Cardenas, Salina Cruz, Altamira, Tampico, Tuxpan, Veracruz, and Progreso.

**EXHIBIT B REDACTED IN ITS ENTIRETY**

# EXHIBIT C

LEXSEE 2006 U.S. DIST. LEXIS 54534

**MONSANTO COMPANY, et al., Plaintiffs, v. SYNGENTA SEEDS, INC., et al., Defendants.**

**Civ. No. 04-305-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2006 U.S. Dist. LEXIS 54534**

**August 4, 2006, Decided**

**SUBSEQUENT HISTORY:** As Amended November 14, 2006.
Motion granted by, Motion denied by Monsanto Co. v. Syngenta Seeds, Inc., 2006 U.S. Dist. LEXIS 84963 (D. Del., Nov. 8, 2006)

**PRIOR HISTORY:** Monsanto Co. v. Syngenta Seeds, Inc., 2006 U.S. Dist. LEXIS 54515 (D. Del., Aug. 4, 2006)

**COUNSEL:** [*1] For Monsanto Company, Plaintiff: Richard L. Horwitz, David Ellis Moore, Potter Anderson & Corroon, LLP, Wilmington, DE.; John H. Bogart, John J. Rosenthal, Sean P. Beaty, Pro Hac Vice.

For Monsanto Technology LLC, Plaintiff: Richard L. Horwitz, David Ellis Moore, Potter Anderson & Corroon, LLP, Wilmington, DE.; John J. Rosenthal, Pro Hac Vice.

For DeKalb Genetics Corp, Plaintiff: David Ellis Moore, Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For Syngenta Seeds Inc., Syngenta Biotechnology, Defendants: John W. Shaw, Karen Elizabeth Keller, Young, Conaway, Stargatt & Taylor, Wilmington, DE.; Seth Jason Reidenberg, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE.

For Garst Seed Company, Golden Harvest Seeds, Inc., Defendants: John W. Shaw, Karen Elizabeth Keller, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Syngenta Seeds Inc., Syngenta Biotechnology, Counter Claimants: John W. Shaw, Young, Conaway,

Stargatt & Taylor, Wilmington, DE.

For Monsanto Company, Monsanto Technology LLC, Counter Defendants: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For Garwood Seed Co., Golden Seed Company, LLC, [*2] Sommer Bros. Seed Company, Thorp Seed Co., JC Robinson Seeds, Inc., Defendants: John W. Shaw, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Advanta USA Inc, Syngenta Corporation, Syngenta Participations AG, Counter Defendants: John W. Shaw, Karen Elizabeth Keller, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Garst Seed Company, Syngenta AG, Golden Harvest Seeds, Inc., Syngenta Corporation, Counter Defendants: John W. Shaw, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

**JUDGES:** Sue L. Robinson, Chief Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

MEMORANDUM OPINION

Dated: August 4, 2006
Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

2006 U.S. Dist. LEXIS 54534, *2

On July 28, 2004, Syngenta Seeds, Inc. filed this antitrust action against Monsanto Company and Monsanto Technology LLC (collectively called "Monsanto"), alleging that Monsanto has monopolized the markets for glyphosate-tolerant corn ("GA21 corn") traits and European corn borer-tolerant corn traits and has attempted to monopolize the foundation corn seed market. Monsanto filed an amended answer with counterclaims against Syngenta AG, Syngenta Participations AG, Syngenta Corporation, Syngenta Seeds, [*3] Inc., Syngenta Biotechnology, Inc., Advanta USA, Inc., Gartst Seed Co., and Golden Harvest Seed Inc. n1 In its counterclaims, Monsanto alleges that counterclaim defendants misappropriated Monsanto's GA21 event and are improperly selling Monsanto's event as their own. The counterclaims include: (1) Reverse passing off under the Lanham Act; (2) False advertising under the Lanham Act; (3) Violations of the Delaware Deceptive Trade Practices Act; and (4) Tortious interference with a contract. (D.I. 77)

> n1   Syngenta Corporation, Syngenta Biotechnology, Inc., Advanta USA, Inc., Garst Seed Co., and Golden Harvest Seeds, Inc., together with Syngenta Seeds, Inc., are collectively referred to as the "Syngenta U.S. Companies".

Before the court is a motion to dismiss by Syngenta AG and Syngenta Participations AG ("Participations") for lack of personal jurisdiction. n2 (D.I. 169)

> n2 If the motion is denied, Syngenta AG and Participations also move for dismissal for failure to state a claim upon which relief can be granted, adopting the arguments advanced by the Syngenta U.S. Companies in their motion. (D.I. 132)

[*4]

## II. BACKGROUND

### A. The Business of Syngenta AG and Participations

Syngenta AG is a holding company located in Basel, Switzerland, formed in 1999 under the laws of Switzerland. (D.I. 171 at P 3) Syngenta AG became a public company in November 2000. (Id.) Syngenta AG has no employees and its business consists primarily of owning shares in companies in the agriculture, seeds and chemicals businesses. (Id.)

Syngenta AG owns Syngenta Corporation, the parent company to all of the other Syngenta U.S. Companies engaged in the distribution, marketing and sale of genetically modified corn seeds. (D.I. 185 at P 5)

Participations is a Swiss company, located in Basel, Switzerland, which is a wholly owned subsidiary of Syngenta AG. (D.I. 171 at P 4) Like Syngenta AG, Participations is a holding company with no employees. (Id.) Participations owns interests in companies located outside of Switzerland that are in the agriculture, seeds and chemicals businesses. (Id.) Participations also owns intellectual property rights, which it licenses principally to affiliated companies. (Id.)

### B. Business of the Sygnenta U.S. Companies

Syngenta Corporation is a Delaware [*5] corporation with its principal place of business in Wilmington, Delaware. (D.I. 172 at P 3) It is a holding company that owns, either directly or indirectly, Syngenta Seeds, Inc., Syngenta Biotechnology, Inc., and Garst Seed Company. n3 (Id.) Syngenta Corporation is a wholly-owned subsidiary of Participations and it is only one of more than 100 subsidiaries worldwide ultimately owned by Syngenta AG. (D.I. 171 at P 18)

> n3 The other Syngenta U.S. Companies are majority owned, directly or indirectly, by GH Holding, Inc., a wholly-owned subsidiary of Participations. (D.I. 172 at P 18)

Syngenta Seeds, Inc. was formed under the laws of Delaware and is headquartered in Golden Valley, Minnesota. (D.I. 172 at P 5) It is engaged, among other things, in the production, marketing and sale of commercial seeds, including hybrid corn seeds. (Id.)

### C. Contacts With Delaware

Syngenta AG's Executive Committee is based at corporate headquarters in Basel, Switzerland. (D.I. 185 at ex. 8) The Executive Committee is [*6] "responsible for the operational management of the Company." (Id.) The

2006 U.S. Dist. LEXIS 54534, *6

Executive Committee consists of a Chief Executive Officer ("CEO"), the Chief Operating Officers ("COO") of the Crop Protection and Seed business, and the heads of Syngenta AG's global functions. (Id.) Individual members of the Executive Committee include: (1) Michael Mack, who is based in Basel and is Chairman and President of Syngenta Corporation in Delaware and the COO of Syngenta Seeds in Minnesota; (2) Jeff Beard, who is the COO of Syngenta Seeds; (3) John Atkin, who is the COO of Syngenta Corporation in Delaware and the COO of Syngenta Crop Protection in North Carolina; (4) David Lawrence, who is the head of Research and Technology for Syngenta AG and sits on the board of directors of Syngenta Biotechnology, Inc.; (5) Richard Steiblin, a former member of the Executive Committee, who also served as a board member of Syngenta Corporation in Delaware. (Id. at exs. 8, 9, 11, 12, 14, 15)

Each of the Syngenta U.S. Companies has its own board of directors, which is separate from the boards of Syngenta AG and Participations, as well as from the Syngenta AG Executive Committee. (D.I. 171 at P 21; D.I. 172 [*7] at P 12) There are no overlapping members on the boards of Syngenta AG and the Syngenta U.S. Companies. (D.I. 171 at P 21) A few of the Participations directors and some Executive Committee members serve on the boards of certain of the Syngenta U.S. Companies. (D.I. 171 at ex. B) The board of directors of Syngenta AG has its own meetings, at times and locations separate and apart from the meetings of any Syngenta U.S. Companies' boards and the board of directors of Participations generally acts by written consent. (D.I. 171 at P 12, 21)

Syngenta AG and Participations are not authorized to, and do not, direct the day-to-day operations of the Syngenta U.S. Companies. (D.I. 171 at P 19) The Syngenta U.S. Companies are managed by their own officers and employees, who have responsibility for the day-to-day operation of the business. (D.I. 172 at P 10) For example, Syngenta Seeds, Inc. and its United States affiliates in the seeds business develop and implement the United States sales and marketing strategy for GA21 corn seed. (Id.) These companies make the day-to-day decisions on what, where, when, and how to sell GA21 corn seed. (Id.) They hire and fire their own sales forces, [*8] adopt their own branding strategies, set their own prices, run their own promotions, and decide on their own which customers to target. (Id.)

The Syngenta U.S. Companies maintain office, production, research, sales and distribution facilities in the United States, separate from the operations of Syngenta AG and Participations, neither of which has any facilities in the United States. (D.I. 171 at P 22; D.I. 172 at P 11) Syngenta Corporation and its subsidiaries also maintain their own books and records and prepare their own financial statements. (D.I. 171 at P 24; D.I. 172 at P 13) Syngenta Corporation files its own United States tax returns. (D.I. 172 at P 13) In accordance with Swiss law and international accounting standards, Syngenta AG does prepare a consolidated financial statement for it and its subsidiaries, which includes the results of Syngenta Corporation and its subsidiaries. (D.I. 171 at P 24) However, Syngenta Corporation and its U.S. affiliates are responsible for preparing their own financial statements, which are then consolidated with Syngenta AG's results. (D.I. 171 at P 24; D.I. 172 at P 13)

### D. Syngenta AG and Participations' Strategy to Misappropriate [*9] GA21 for Sale in the United States

A four day meeting was held in Washington, D.C. to orchestrate a "strategy for bringing Syngenta branded GA21 to the [U.S.] market." (D.I. 185 at ex. 1) The meeting was attended by Adrian Dubock, the head of mergers and Acquisitions for Participations in Basel; Marian Flattery, the head of Global IP and Licensing for Participations in Basel; Ed Resler, Vice President and General Counsel, Plant Science, of Syngenta Seeds, Inc. in Minnesota; Jeff Stein, Regulatory Director at Syngenta Biotechnology, Inc. in North Carolina; and Erik Dunder, Regulatory Manager for GA21 for Syngenta Biotechnology, Inc. (D.I. 185 at ex. 1)

To implement its strategy, Syngenta AG assembled a unit called the Corn Business Team. (D.I. 185, ex. 16 at 17) Until 2004, the Corn Business Team was formally a part of Syngenta AG and reported directly to Syngenta AG's Business Development Leadership and Technical Review Committees. (D.I. 185, ex. 16 at 152) The Corn Business Team was comprised of employees from Syngenta AG, Syngenta International AG, Syngenta Seeds, Syngenta Crop Protection, Syngenta Biotechnology, and Syngenta Corporation. n4 (D.I. 185, ex. 32 at 3, 5.1) The [*10] Corn Business Team required Syngenta AG's approval for important business decisions, such as deciding on a logo for the Agrisure trademark. (D.I. 185, ex. 37 at 3)

2006 U.S. Dist. LEXIS 54534, *10

n4 One member, Bill Dickheiser, was located in Delaware. (D.I. 185 at ex. 32)

### E. Syngenta AG's Control Over Business Decisions n5

#### 1. Delaware meeting

A meeting took place in May of 2002 in Wilmington, Delaware. (D.I. 310, ex. A at 1) David Jessen did not attend the meeting, but testified regarding a Power Point presentation given at the meeting. (D.I. 310, ex. A at 1) In attendance and participating in the meeting were members of Syngenta AG's management and various employees of the Syngenta U.S. Companies. (D.I. 310, ex. A at 1) The goal of the meeting was to "gain a better understanding of the competitive threat we face from [the Monsanto product]." (Id.) The presentation sets forth other specific goals of the meeting, including: (1) Review a number of short-term actions that Syngenta n6 can take to reduce the penetration of Monsanto's [*11] product; (2) Consider the long term strategic options available to Syngenta to redefine its competitive position in the marketplace; and (3) Discuss obstacles to impact, how to overcome these obstacles, and next steps. (D.I. 310, ex. A at 2) The "Five Pillars" of the meeting were discussed: (1) "Create doubt about claims - Syngenta disputing Monsanto's claims about the performance and safety of its Roundup Ready trait;" (2) "Offer compelling alternatives -Syngenta offering its conventional seed along with its selective herbicide rather than Monsanto's Roundup Ready trait along with Roundup;" (3) "Drive up switching costs - Syngenta offering its customers financial incentives not to switch to Roundup Ready;" (4) "Non-market activities - Syngenta initiating legal action to impede Roundup Ready's growth;" and (5) "Redefine the playing field - Syngenta would counter Monsanto's and Pioneer's strategy of marketing their products as a complete package." (D.I. 407, ex. 1 at 10) A Steering Committee was set up to "provide overall direction" and "make decisions" regarding the project. (D.I. 310, ex. A at 2) A number of Syngenta AG employees attending the Delaware meeting are on the Steering [*12] Committee. (D.I. 310, ex. A at 2)

n5 The court denies Monsanto's request for jurisdictional discovery due to its two supplemental record submissions and the extensive discovery already performed. However, the court will consider the supplemental record produced and, therefore, grants Monsanto's two motions to supplement the record. (D.I. 310, 407)

n6 The record is unclear as to whether the presentation was directed to Syngenta AG or the Syngenta U.S. Companies. The facts were derived from a business presentation and there is no clarification from Monsanto regarding what entities are encompassed by the term "Syngenta."

#### 2. Syngenta AG's Executive Committee

Syngenta AG's Executive Committee had the "final say" over whether a product was commercialized. n7 (Id. at 7) Approval was also required before going forward in a development stage. (Id.) The final budget for a product required approval from the Executive Committee of Syngenta AG. Before Syngenta Seeds could invest in a capital item or commit [*13] to a capital item, it had to get the approval of the Executive Committee in Switzerland. (D.I. 310, ex. A at 8) The CEO of Syngenta AG and the Executive Committee also made decisions regarding the acquisition of Garst and Golden Harvest. (D.I. 310, ex. A at 9, 10)

n7 However, related specifically to GA21, the approvals in place were not addressed in the testimony. (D.I. 310, ex. A at 7)

Syngenta AG's Executive Committee was allegedly involved in the development, approval and execution of a strategy to: (1) Acquire certain rights to GA21 from Bayer AG; (2) Acquire seed companies (Garst and Golden Harvest) with access to Monsanto's GA21; (3) Obtain Monsanto GA21 from those seed companies; and (4) Sell the Monsanto GA21. (D.I. 407, ex. 1 at 2) Various Syngenta AG employees including David Jones (member of Syngenta AG's Executive Committee), Adrian Dubock (head of Mergers and Acquisitions for Syngenta AG), and Marian Flattery (head of Global IP and Licensing for Participations) participated in internal meetings leading [*14] up to the Bayer AG agreement. (D.I. 407, ex. 1 at 4-5) Furthermore, Syngenta AG had ultimate approval over the acquisition and licensing of Bayer's GA21 rights, Syngenta AG signed the Agreement for Scientific Evaluation of Transgenic Material transferring certain GA21 material to Syngenta AG, and

2006 U.S. Dist. LEXIS 54534, *14

Participations' Marian Flattery and Adrian Dubock signed the Acquisition Agreement with Bayer AG relating to certain rights in GA21 owned by Bayer AG. (D.I. 407, ex. 1 at 5) Mr. Dubock and Ms. Flattery also executed the subsequent Amendment to the Agreement for Scientific Evaluation of Transgenic Materials with Bayer AG. (D.I. 407, ex. 1 at 5) Syngenta AG was involved in the communications surrounding the public announcement of the Agreement. (D.I. 407, ex. 1 at 6)

Dr. Sorenson, head of Syngenta's n8 United States corn and soybean business, reported directly to Syngenta AG Executive Committee member Jeff Beard and his successor Michel Mack on many issues, including marketing strategy and financials of the business. (D.I. 407, ex. A1, 113-14) Dr. Sorenson spoke to Mr. Beard (and later Mr. Mack) an average of once a week or once every two weeks. (D.I. 407, ex. A1 at 115) Dr. Sorenson provided [*15] the Executive Committee with regular written reports on the United States corn seed business. (D.I. 407, ex. A1 at 138-39) Dr. Sorenson would fly to Switzerland to have in-person meetings to discuss, among other things, the strategy to enter into the glyphosate tolerant seed business. (D.I. 407, ex. A1 at 115-16)

> n8 Again, due to the excerpting of the deposition testimony, the record is unclear as to what entity "Syngenta" encompasses in this context.

Dr. Sorenson made several presentations to Syngenta AG's Executive Committee regarding the United States corn and soy business, the Garst and Golden Harvest acquisitions, possibilities of joint ventures, and five year business plans, including one for the United States corn seed business. n9 (D.I. 407, ex. A1 at 16-7) Leadership teams with responsibilities for corn seed strategy in the United States included Syngenta AG employees. (D.I. 407, ex. A1 at 17)

> n9 Tom Klevorn, head of NK Brands, made a presentation on GA21 to the Executive Committee. Jeffrey Stein, director of Regulatory Affairs for North America, made a presentation to the Executive Committee on the regulatory assessment of GA21. (D.I. 407 at 17)

[*16]

## III. STANDARD OF REVIEW

When reviewing a motion to dismiss pursuant to Rule 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor. Once a jurisdictional defense has been raised, the plaintiff bears the burden of establishing with reasonable particularity that sufficient minimum contacts have occurred between the defendant and the forum state to support jurisdiction. Provident Nat'l Bank v. California Federal Sav. & Loan Asso., 819 F.2d 434, 437 (3d Cir. 1987). To establish personal jurisdiction, a party must allege facts sufficient to satisfy two requirements, one statutory and one constitutional. See Reach & Assocs., P.C. v. Dencer, 269 F. Supp. 2d 497, 502 (D. Del. 2003). With regard to the statutory requirement, the court must determine whether there is a statutory basis for jurisdiction under the forum state's long arm statute. Id. As for the constitutional basis, the court must determine whether the exercise of jurisdiction comports with the defendant's right to due process. Id. In cases involving foreign parties, the Supreme [*17] Court has stated that "[g]reat care and reserve should be exercise when extending our notions of personal jurisdiction into the international field." Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 115, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)

## IV. DISCUSSION

The Delaware long arm statute permits the exercise of personal jurisdiction over a nonresident who, in person or through an agent:

> (1) Transacts any business or performs any character of work or service in the State;
> (2) Contracts to supply service or things in this State;
> (3) Causes tortious injury in the State by an act or omission in this State;
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the

2006 U.S. Dist. LEXIS 54534, *17

State;
(5) Has an interest in, uses or possesses real property in the State; or
(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is [*18] made, unless the parties otherwise provide in writing.

10 Del. C. § 3104(c). Pursuant to subsection (c)(1)-(3) and (5)-(6), specific jurisdiction may be established if the cause of action arises from contacts with the forum. Applied Biosystems, Inc. v. Cruachem, LTD, 772 F.Supp. 1458, 1466 (D. Del. 1991). Subsection (c)(4) provides for general jurisdiction, which requires a greater extent of contacts, but which provides jurisdiction even when the claim is unrelated to the forum contacts. Id.

It is apparent from the record that the individual conduct of Syngenta AG and Participations does not satisfy the jurisdictional requirements cited above. Syngenta AG and Participations are holding companies that do not conduct business in Delaware. They are not registered to do business in Delaware. They do not produce, market or sell corn seed or any product in Delaware. They do not have a bank account, a telephone number or an address in Delaware. They do not have "contacts with this state that are so extensive and continuing that it is fair and consistent with state policy to require that the defendant appear here and defend a claim. [*19] " Red Sail Easter Ltd Partners, L.P. v. Radio City Music Hall Productions, Inc., 1991 Del. Ch. LEXIS 113, *8, 1991 WL 129174, at *3 (Del. Ch. July 10, 1991).

The only personal contact these parties have had with Delaware is the meeting that took place in this State in May 2002. Certainly such a limited activity is insufficient to establish general jurisdiction. Likewise, this court cannot assert specific jurisdiction over Syngenta AG and Participations based on their conduct at the 2002 meeting. Although general marketing strategies were discussed, there is no record evidence that the acts identified in Monsanto's counterclaims took place in Delaware at that meeting.

The question remains whether the Syngenta U.S. Companies should be considered "agents" of Syngenta AG and Participations and, if so, whether the activities of

the Syngenta U.S. Companies within the State of Delaware satisfy the requirements of the Delaware long arm statute.

**A. Agency**

Monsanto asserts that the Syngenta U.S. Companies are general agents of Syngenta AG and Participations and, therefore, their acts confer personal jurisdiction in Delaware. As explained in Applied Biosystems, Inc. v. Cruachem, LTD, 772 F.Supp. 1458 (D. Del. 1991), [*20] the agency theory

> examines the degree of control which the parent exercises over the subsidiary. . . . The factors relevant to this determination include the extent of overlap of officers and directors, methods of financing, the division of responsibility for day-to-day management, and the process by which each corporation obtains its business. No one factor is either necessary or determinative; rather it is the specific combination of elements which is significant. . . .
>
> If any agency relationship is found to exist, courts will not ignore the separate corporate identities of parent and subsidiary, but will consider the parent corporation responsible for specific jurisdictional acts of the subsidiary.

Id. at 1463. "An agency relationship alone, however, is not sufficient to confer jurisdiction. Rather, the result of finding such an agency relationship is simply that we may attribute certain of [the Syngenta U.S. Companies'] acts to [Syngenta AG and Participations] in assessing whether the requirements of the Delaware long-arm statute have been satisfied." Id. at 1464.

Monsanto relies on several aspects of the relationship between [*21] the parties to establish that the Syngenta U.S. Companies are general agents of Syngenta AG and Participations. More specifically, Monsanto asserts that there is: (1) An overlap of some officers and directors; (2) Transferring of employees; and (3) Syngenta AG's involvement in formulating and approving strategic policy (e.g., meetings with the Executive Committee

2006 U.S. Dist. LEXIS 54534, *21

regarding the United States strategy and budgetary issues), major capital expenditures (e.g., acquiring GA21 rights), and key decisions (e.g., the Garst and Golden Harvest acquisitions).

Under Delaware case law, however, the facts asserted by Monsanto are not sufficient to establish an agency relationship. See Akzona Inc. v. E.I. Du Pont Nemours & Co., 607 F.Supp. 227 (D. Del. 1984); n10 Sears, Roebuck & Co v. Sears, 744 F.Supp. 1297 (D. Del. 1990). n11 The facts of record do not reflect a situation where the parent company is involved in manufacturing or production activities and the subsidiary is acting as the parent's distributor or sales agent. See C.R. Bard Inc. v. Guidant Corp, 997 F.Supp. 556, 561 (D. Del. 1998). The Syngenta U.S. Companies make their own decisions [*22] about day-to-day activities, and design, manufacture, market and distribute the GA21 corn. See Akzona Inc., 607 F.Supp. at 238. n12 No agency relationship has been demonstrated.

N10 The Akzona court found no agency relationship between a parent and its wholly owned subsidiary, where there was some overlap between the board of directors, references to subsidiaries as divisions of the parent in the annual report, requirement that parent approve capital expenditures by subsidiaries exceeding $ 850,000, references in board meetings and reports to the development of products as the parent company's "decision" or "project," parent company taking credit for the product project in its annual report, parent company's negotiation with an agency of the Dutch government to set up a joint venture, parent company's guarantee of 50% of the Dutch government loans to the subsidiaries, and parent company's participation in the decision to bring a declaratory judgment.

n11 The Sears court found no agency relationship when there was no evidence that the subsidiary could enter into negotiations or binding agreements for the parent or act for the parent in any other way in Delaware.

[*23]

n12 The meeting in Delaware is the only event that could arguably reflect an agency

relationship if, at that meeting, the details of the alleged misappropriation plan were explored. As noted above, the record is devoid of any evidence that suggests the participants at the Delaware meeting discussed a misappropriation plan or any actions that are alleged to constitute the misappropriation.

**B. Delaware Long Arm Statute**

Even if an agency relationship were shown, Monsanto has not carried its burden to demonstrate that the activities directed or controlled by Syngenta AG and Participations are the jurisdictional acts of Syngenta AG and Participations. n13 See C.R. Bard Inc, 997 F.Supp. at 560 ("The agency theory requires not only that the precise conduct shown to be instigated by the parent be attributable to the parent, but also that such conduct satisfy § 3104(c)(1)."). "When applying the agency theory, a court should focus its inquiry on the arrangement between the parent and the subsidiary, the authority given in that arrangement, and the relevance of that arrangement [*24] to the . . . claim." Id. at 560. The counterclaims at issue are: (1) Reverse passing off under the Lanham Act; (2) Violations of the Delaware Deceptive Trade Practices Act; (3) False advertising under the Lanham Act; and (4) Tortious interference with a contract.

n13 For this reason, the court need not reach the constitutional analysis.

**1. Specific Jurisdiction § 3104(c)(1), (2), (3)**

Jurisdiction under § 3104(c)(1) or (2) can be obtained if, through the Syngenta U.S. Companies, Syngenta AG and Participations have conducted any business or contracted to supply services or things in Delaware. Section 3104(c)(3) provides for jurisdiction when a nonresident or its agent has caused tortious injury in Delaware by an act or omission that occurred in this State. Applied Biosystems, 772 F.Supp. at 1467.

It is established that the incorporation of the Syngenta U.S. Companies in Delaware would provide specific jurisdiction over any tort causes of action related to the act of incorporation. [*25] See Applied Biosystems at 1467. However, "the mere fact that a

2006 U.S. Dist. LEXIS 54534, *25

non-Delaware corporation owns a Delaware subsidiary is not sufficient in itself to justify Delaware's exercise of personal jurisdiction over the non-Delaware parent." Ace & Co. v. Balfour Beatty PLC, 148 F.Supp.2d 418, 422-23 (D. Del. 2001). None of the counterclaims rise from the act of incorporation.

The reverse passing off claim and deceptive trade practices claim are based on the sale and marketing of GA21 corn seed without acknowledging Monsanto as the source of the GA21 event. There is no evidence that Syngenta AG and Participations direct or control sales or marketing in Delaware. To the contrary, the evidence that the Syngenta U.S. Companies report to and update the Executive Committee regarding these decisions tends to substantiate the opposite conclusion. The 2002 meeting is equally unavailing to establish jurisdiction. The 2002 meeting in Delaware is not related to and does not give rise to any of the counterclaims. In fact, the meeting took place several years prior to the relevant time period of the counterclaims. Finally, the tortious interference claim is based on a contract between [*26] Syngenta Seeds, Inc. and Advanta USA, Inc. and has no relationship to Delaware, as it was neither negotiated nor signed in Delaware.

Monsanto also asserts a stream of commerce theory, citing A.V. Imports, Inc. v. Col De Fratta, 171 F.Supp.2d 369 (D.N.J. 2001). n14 However, as the court in A.V. Imports clearly states, "the mere placement of a product into the stream of commerce with an awareness that it may end up in a specific state is not enough to establish minimum contacts." Id. at 372 (citing Asahi Metal Industry Co., 480 U.S. at 107). Monsanto has produced no evidence that Syngenta AG or Participations, or any of the Syngenta U.S. Companies, "purposefully availed" themselves of the forum state.

> n14 The court is not confident this precedent is applicable to the case at bar, but need not decide this issue as there is no showing that Delaware was in any way targeted, as is required under this theory.

Press releases and similar communications do not give [*27] rise to personal jurisdiction unless they are "expressly aimed" at the relevant forum. See IMO Indus. v. Kiekert AG, 155 F.3d 254, 265 (3d Cir. 1998). Syngenta International AG issued a press release on May 12, 2004 from its Swiss headquarters, but it was not "specifically directed toward Delaware residents" nor was it "part of a 'sustained promotional campaign'" in Delaware. Applied Biosystems, 772 F.Supp. at 1467; Virgin Wireless, Inc. v. Virgin Enters., Ltd., 201 F. Supp. 2d 294, 299 (finding a single press release attributed to English company cannot justify personal jurisdiction in Delaware).

Finally, Monsanto asserts that the filing of the antitrust litigation in Delaware serves as a basis for personal jurisdiction. The court finds this argument unpersuasive. The holding in Mobil Oil Corp. v. Advanced Envtl. Recycling Techs., 833 F.Supp. 437 (D. Del. 1993), establishes that the filing of a lawsuit may be relevant to establishing jurisdiction when the claim at issue is sham litigation. Again, the filing of the lawsuit bears no relevance to the counterclaims at issue and, therefore, cannot serve as a basis for personal jurisdiction.

## 2. General [*28] Jurisdiction § 3104(c)(4)

Section 3104(c)(4) provides for general jurisdiction in tort cases. Jurisdiction is authorized if Syngenta AG or Participations, through its agents, "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State."

That the subsidiaries are incorporated in Delaware is not imputed to Syngenta AG and Participations. See Applied Biosystems, 772 F.Supp. 1458, 1469. The act of incorporating a subsidiary in Delaware is not enough to confer general jurisdiction in this instance because it does not appear that Syngenta AG and Participations have engaged in a pattern of corporate dealings under Delaware law. See Sears, 744 F.Supp. at 1306 (finding that the defendant only owned one Delaware subsidiary and had not engaged in a pattern of corporate dealings in Delaware). In Altech Indus., Inc. v. Al Tech Speciality Steel Corp., 542 F.Supp. 53 (D. Del. 1982), the court held it could exercise jurisdiction over a non-Delaware corporation under § 3104(c)(4) where: (1) The defendant owned eighty-two [*29] subsidiaries and a "vast majority" of these were incorporated in Delaware; and (2) The defendant had "utilized the benefits of the Delaware corporation law in various ways," including conducting mergers and acquisitions with, and amending the articles of incorporation of, its many subsidiaries. Id. at 55. The court does not find that Syngenta AG and Participations

have availed themselves of the general jurisdiction of Delaware.

### C. Fed. R. Civ. P. 4(k)(2)

When a foreign defendant does not have sufficient minimum contacts with any single forum to comport with due process, Rule 4(k)(2) allows an alternate jurisdictional basis to pursue a claim arising under federal law, where defendant has sufficient nationwide contacts.

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service of process is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed. R. Civ. P. (4)(k)(2) [*30] . The court must first determine that: (1) The case arises under federal law, and is not pending before the court pursuant to the court's diversity jurisdiction; and (2) The foreign defendant lacks sufficient contacts with any single state to subject it to personal jurisdiction there. United States v. International Bhd. of Teamsters, 945 F. Supp. 609, 617 (D. Del. 1997). The court can then ascertain whether plaintiff has demonstrated that defendant has sufficient aggregate contacts with the United States to comport with constitutional notions of due process. Id.

The court's analysis stops at the first step. The court finds that Monsanto has not satisfied its burden of proving the lack of state-specific contacts. See CFMT, Inc. v. Steag Microtech, Inc., 965 F. Supp. 561, 1997 WL 313161 (D. Del. 1997). Rule 4(k)(2) "provides a narrow exception which may subject an alien defendant to a federal court's personal jurisdiction." Id. at *7. "To satisfy this requirement, plaintiffs are required to make an affirmative representation that the defendant is not subject to the general jurisdiction of any state court." Id.; Telcordia Techs. v. Alcatel S.A., 2005 U.S. Dist. LEXIS 10194, *17, 2005 WL 1268061, [*31] at *5 (D. Del. May 27, 2005)("The court agrees with the Third Circuit district court courts that have addressed the negation requirement and concludes that [the plaintiff] bears the burden of demonstrating that [the defendant] is not

subject to jurisdiction in any state."). While Monsanto asserts that it can argue Rule 4(k)(2) in the alternative of arguing that Delaware has personal jurisdiction, the court finds that Monsanto has not affirmatively represented that Syngenta AG and Participations are not subject to the jurisdiction of any state. Instead, Monsanto has tried only to shift the burden to Syngenta AG and Participations by arguing that, if the court finds no jurisdiction lies in Delaware, then no jurisdiction lies in any other state and Rule 4(k)(2) applies. See In re Lupron Marketing & Sales Practices Litig., 245 F. Supp. 2d 280, 302-03 (D. Mass. 2003). The only basis asserted by Monsanto that no jurisdiction lies in any other state is that Monsanto is unable to find any basis for jurisdiction through review of the discovery record and publicly available sources. Unfortunately, Monsanto does not elaborate on these bald assertions. Furthermore, since the filing [*32] of its original brief, Monsanto has submitted two motions to supplement the record with extensive deposition testimony. Yet, no evidence was presented in furtherance if its argument that Syngenta AG and Participations are not subject to jurisdiction in any state. Rather, Monsanto has extensively asserted that jurisdiction is proper in Delaware. Monsanto has also produced some tangential evidence that meetings have taken place in the United States other than Delaware, offices exist in states other than Delaware, and the GA21 corn is sold in the United States other than Delaware. The court is unwilling to merely take Monsanto's assertion that if jurisdiction does not lie in Delaware, jurisdiction does not lie anywhere else in the country. Monsanto has not fulfilled its burden in showing this element of Rule 4(k)(2); as a result, the court need not perform further analysis.

### V. CONCLUSION

For the reasons discussed above, Syngenta AG and Syngenta Participations AG's motion to dismiss for lack of personal jurisdiction is granted. An order consistent with this memorandum opinion shall issue.

### ORDER

At Wilmington this 4th day of August, [*33] 2006, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Syngenta's motion to dismiss (D.I. 132) is granted

2006 U.S. Dist. LEXIS 54534, *33

with respect to counterclaims I and III.

    2. Syngenta's motion to dismiss (D.I. 132) is denied with respect to counterclaim II.

United States District Judge

Sue L. Robinson

LEXSEE 2005 U.S. DIST. LEXIS 10194

**TELCORDIA TECHNOLOGIES, INC., Plaintiff, v. ALCATEL S.A. and ALCATEL USA, INC., Defendants.**

**Civil Action No. 04-874 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2005 U.S. Dist. LEXIS 10194**

**May 27, 2005, Decided**

**COUNSEL:** [*1] For Telcordia Technologies Inc., Plaintiff: Steven J. Balick, John G. Day, Ashby & Geddes, Wilmington, DE.

For Alcatel S.A., Defendant: Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Alcatel USA Inc., Defendant: Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE; Kevin M. Baird, Connoly Bove Lodge & Hutz, Wilmington, DE.

For Alcatel USA Inc., Counter Claimant: Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE; Kevin M. Baird, Connoly Bove Lodge & Hutz, Wilmington, DE.

For Telcordia Technologies Inc., Counter Defendant: Steven J. Balick, Ashby & Geddes, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory Moneta Sleet

**OPINION:**

MEMORANDUM

**I. INTRODUCTION**

On July 16, 2004, the plaintiff, Telcordia Technologies, Inc. ("Telcordia"), filed this patent infringement action against Alcatel S.A. ("Alcatel S.A.") and Alcatel USA, Inc. ("Alcatel USA"). Presently before the court is Alcatel S.A.'s motion to dismiss for lack of personal jurisdiction. For the following reasons, the court will grant the motion.

**II. BACKGROUND**

Alcatel S.A. is a French corporation [*2] with its principal place of business in Paris, France. Alcatel S.A. is the parent company of Alcatel USA, a Delaware corporation with its principal place of business in Plano, Texas. (D.I. 18 Ex. 2 PP 2-3.). It is a holding company that does not manufacture, sell, advertise, offer to sell, trade or import any goods or services in the United States or anywhere in the world. (*Id.* PP 3-5.) It does not maintain any offices or other facilities in Delaware, or the United States. (*Id.* P 7.) It neither owns nor leases any real property in Delaware or the United States, but it does own United States patents. (*Id.* P 8.) Alcatel S.A. does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States. (*Id.* PP 9-10.)

Telcordia, a Delaware Corporation with its principal place of business in Piscataway, New Jersey, is the assignee and owner of the patent-in-suit, U.S. Patent No. 4,893,306 (the "'306 patent"). n1 The '306 patent relates to a method and apparatus for multiplexing circuit and packet traffic. The patent discloses a data transmission technique, [*3] or Dynamic Time Division Multiplexing ("DTDM"), that is compatible with the digital circuit transmission format, as well as the packet transmission format, thereby providing "a flexible migration strategy between present circuit networks and future broadband packet networks." (U.S. Patent No. 4,893,306 Abstract.) The complaint alleges that Alcatel S.A. and Alcatel USA have infringed, induced infringement of, and/or

2005 U.S. Dist. LEXIS 10194, *3

contributorily infringed one or more claims of the '306 patent by making, using, offering for sale, selling and/or importing into the United States communication network products embodying the patented invention. (D.I. 1 PP 13-14.)

> n1 The '306 patent was issued on January 9, 1990 and assigned to Bell Communications Research, Inc. ("Bellcore"), which became Telcordia in 1999.

## III. STANDARD OF REVIEW

Alcatel S.A. moves to dismiss the complaint for lack of personal jurisdiction over the defendant. "Rule 12(b)(2) of the Federal Rules of Civil Procedure [*4] requires a court to dismiss a case when the court lacks personal jurisdiction over the defendant[]." *E.I. DuPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates,* 197 F.R.D. 112, 119 (D.Del.2000). In determining whether personal jurisdiction exists, courts engage in a two step analysis. First, the court must decide whether jurisdiction is authorized by the long-arm statute of the state in which the court sits. *Transportes Aereos de Angola v. Ronair, Inc.,* 544 F. Supp. 858 at 864-65 (D. Del. 1982). If jurisdiction is proper per the long-arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment. *Id.* (noting, however, "intent of the legislature to exercise jurisdiction over non-residents whenever feasible"); *Compaq Computer Corp. v. Packard Bell Elecs.,* 948 F. Supp. 338, 342 (D. Del. 1996) (citation omitted). To satisfy the second prong of this analysis, the court must find the existence of "minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend 'traditional notions [*5] of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945) (citation omitted). Specifically, Telcordia must show that Alcatel S.A. "purposefully availed itself of the privilege of conducting activities within the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958)); *see also Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 108-09, 94 L. Ed. 2d 92,

107 S. Ct. 1026 (1987). Unless the contacts are continuous and systematic, they must be related to the present cause of action. *Helicopteros Nacionales de Colombia, S. A. v. Hall,* 466 U.S. 408, 414-15, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984).

In determining the jurisdictional question, the court must accept as true the allegations in the complaint. *Altech Indus., Inc. v. Al Tech Specialty Steel Corp.,* 542 F. Supp. 53, 55 (D. Del. 1982). However, Telcordia, the plaintiff, bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over Alcatel S.A. *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.,* 147 F. Supp. 2d 268, 270-71 (D. Del. 2001). [*6] To meet this burden, Telcordia must adduce facts which "establish with reasonable particularity" that jurisdiction over Alcatel S.A. exists. *Id.* (quoting *Joint Stock Soc'y v. Heublein, Inc.,* 936 F. Supp. 177, 193 (D. Del. 1996)).

## IV. DISCUSSION

### A. Delaware's Long-Arm Statute

The first step in the court's analysis is to determine whether any of the provisions of Delaware's long-arm statute, Del. Code Ann. tit. 10 § 3104, warrant the exercise of jurisdiction over Alcatel S.A. Alcatel S.A. contends that the court has no basis to assert jurisdiction, while Telcordia maintains that the conduct of Alcatel S.A. satisfies the requirements of subsections (c)(1) and (c)(3) of the long-arm statute.

Under subsection (c)(1), the court may exercise jurisdiction over a nonresident or agent of a nonresident who "transacts any business or performs any character of work or service in the State." DEL. CODE ANN. tit. 10 § 3104(c)(1). Subsection (c)(3) gives the court the authority to exercise jurisdiction over a nonresident or agent of a nonresident who "causes tortious injury in the State by an act or omission [*7] in this State." DEL. CODE ANN. tit. 10 § 3104(c)(3). Delaware courts construe the long-arm statute broadly to confer jurisdiction to the maximum extent possible so as to "provide residents a means of redress against those not subject to personal service within the state." *Boone v. Oy Partek Ab,* 724 A.2d 1150, 1156-57 (Del. Super. 1997). The Delaware Supreme Court has interpreted subsections (c)(1) and (c)(3) as specific jurisdiction provisions that require a "nexus" between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for

jurisdiction. *See La Nuova D & B, S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del. 1986). In order to meet the requirements of subsections (c)(1) and (c)(3), Alcatel S.A.'s actions must be directed at residents of Delaware and the protection of Delaware laws. *Thorn EMI N. Am. v. Micron Technology,* 821 F. Supp. 272, 274 (D. Del. 1993).

Telcordia asserts that the court should exercise jurisdiction under § 3104(c)(1) and/or (c)(3) because Alcatel S.A.'s contacts with Delaware are attributable to its subsidiary, Alcatel USA, under the principles of [*8] agency. n2 The principles of agency allow a court to establish jurisdiction over the parent based upon its jurisdiction over a subsidiary. Under the agency theory, "the court may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction." *C.R. Bard Inc. v. Guidant Corp.,* 997 F. Supp. 556, 559 (D. Del. 1998) (citing *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F. Sup. 260, 266 (D. Del. 1989)). Thus, the agency theory "examines the degree of control which the parent exercises over the subsidiary." *Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F. Supp. 1458, 1463 (D. Del. 1991). The factors relevant to the court's examination include: (1) "the extent of overlap of officers and directors"; (2) "methods of financing"; (3) "the division of responsibility for day-to-day management"; and (4) "the process by which each corporation obtains its business. No one factor is either necessary or determinative; rather it is the specific combination of elements which is significant." *Id.* If the court determines that an agency relationship exists, it may attribute certain [*9] actions of the subsidiary, Alcatel USA, to the parent corporation, Alcatel S.A., in assessing whether Telcordia has satisfied the requirements of the long-arm statute. *See id.* However, the mere existence of an agency relationship is not sufficient to confer jurisdiction. The court must still apply the Delaware long-arm statute. *See id.* at 1465 ("[A] finding of agency does not render the long-arm statute inapplicable, but simply implicates its 'or through an agent' provision.")

n2 Delaware law provides two theories that allow a court to exercise jurisdiction over a parent corporation based on its jurisdiction over a subsidiary: the alter ego theory and the agency theory. *Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F. Supp. 1458, 1463 (D. Del. 1991).

Under the alter ego theory, the party showing jurisdiction must show fraud or inequity in the use of the corporate form for a court to "pierce the corporate veil," or attribute the actions of a subsidiary to the parent corporation. *Id.; see Mobil Oil Corp. v. Linear Films, Inc.,* 718 F. Supp. 260, 266 (D. Del. 1989). Telcordia has neither asserted the existence of any fraud in the corporate structure of Alcatel S.A. and Alcatel USA nor introduced evidence that would support a finding of fraud. Accordingly, the court will not address this jurisdictional theory.

[*10]

Telcordia contends that Alcatel S.A. should be subject to jurisdiction under the agency theory because "Alcatel S.A. and Alcatel USA are closely knit together, effectively operating as one." (D.I. 20, at 10.) Telcordia alleges the following to support its contention of an agency theory of jurisdiction: (1) Alcatel S.A. makes it abundantly clear that the United States market is very important to it and raises funds in the United States; (2) it owns patents, *i.e.* property, in the United States; (3) it fails to distinguish among its multinational subsidiaries - that is, it consolidates descriptions of its activities with those of its subsidiaries; (4) it chose to incorporate Alcatel USA in Delaware; (5) its Senior Vice President, Mike Quigley ("Quigley") is the CEO of Alcatel USA; and (6) its website solicits requests for information concerning its products, including allegedly infringing products from Delaware residents. (*Id.* at 3-5, 10.) Telcordia further contends that,"at the very least," Alcatel USA has offered to sell in Delaware products accused of infringing the '306 patent and, therefore, transacts business in the state. In addition, because Alcatel USA committed these [*11] acts as Alcatel S.A.'s agent, they are attributable to Alcatel S.A. (D.I. 20, at 10.)

Before the court can determine whether it should attribute Alcatel USA's alleged acts in Delaware to Alcatel S.A., it must determine whether an agency relationship exists between the two corporations. As previously stated, in order to make this determination, the court must consider the extent of overlap of officers and directors between Alcatel USA and Alcatel S.A., the methods of financing with respect to the two corporations, the division of responsibility for day-to-day management between the two, and the process by which each corporation obtains its business. After having

2005 U.S. Dist. LEXIS 10194, *11

considered these factors, the court concludes that Telcordia has not carried its burden. As to the first factor, Telcordia points to one overlap in officers between the two corporations: Quigley is Senior Executive Vice President of Alcatel S.A. and CEO of Alcatel USA. According to Alcatel S.A., there is a second overlap between the two corporations: its President and COO, Philippe Germond, is a member of the Board of Directors of Alcatel USA. (D.I. 23, at 3; D.I. 22 P 6.) This minor overlap, however, is not dispositive, [*12] as "it is entirely appropriate for directors of a parent corporation to serve as directors of a subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *United States v. Bestfoods,* 524 U.S. 51, 69, 141 L. Ed. 2d 43, 118 S. Ct. 1876 (1998) (citations omitted) (noting that it is "well established principle . . . that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership"). As such, this factor does not weigh in favor of a finding of agency.

Likewise, the remaining factors do not weigh in favor of applying the agency theory in the present case. First, Alcatel S.A. is merely a holding company that does not manufacture, sell, or advertise in the United States, or anywhere in the world. (D.I. 18 PP 3-5.) Thus, this is not a case in which Alcatel S.A. manufactures a product and uses an independent distributor to sell its product. *Cf. C.R. Bard,* 997 F. Supp. at 561. In addition, Alcatel USA maintains its own executive team, which is responsible for the day-to-day management of Alcatel USA, and no employee of [*13] Alcatel S.A. is a member of the executive team of Alcatel USA. (D.I. 22 P 5.) It also maintains its own financial statements, separate from those kept by Alcatel S.A. (D.I. 22 P 10.) Alcatel USA files a consolidated United States federal income tax return that is separate from tax returns filed by Alcatel S.A. (*Id.* P 12.) Alcatel USA finances its day-to-day activities through funds generated from its business activities, including the manufacture, marketing and distribution of the accused infringing products. (*See id.* P 13.) Accordingly, the court finds that while there is a minor overlap of officers and directors between the parent and subsidiary, Telcordia has not produced sufficient evidence for the court to conclude that the specific combination of agency factors militates in favor of a finding that Alcatel USA was acting as Alcatel S.A.'s agent. Thus, sections (c)(1) and (c)(3) do not warrant the exercise of jurisdiction over Alcatel S.A. n3

n3 The court need not address whether jurisdiction in Delaware comports with the requirements of the Due Process Clause because it has no statutory authority under the Delaware long-arm statute to exercise jurisdiction over Alcatel S.A.

[*14]

**B. Federal Rule of Civil Procedure 4(k)(2)**

Telcordia next asserts that, even if the Delaware long-arm statute does not apply in the present case, the court should not grant Alcatel S.A.'s motion to dismiss because it has the authority to exercise personal jurisdiction over Alcatel S.A. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure. Rule 4(k)(2) provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

FED. R. CIV. P. 4(k)(2). In order to establish jurisdiction pursuant to Rule 4(k)(2), (1) Telcordia's claim must arise under federal law; (2) Alcatel S.A. must lack sufficient contacts with any state to subject it to personal jurisdiction; and (3) Alcatel S.A. must have sufficient contacts with the United States [*15] as a whole to satisfy due process. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.,* 229 F.3d 254, 258-59 (3d Cir. 2000). Telcordia contends that all three requirements of Rule 4(k)(2) are satisfied. The court disagrees.

First, the parties do not dispute, nor could they, that Telcordia's claims arise under federal law. The complaint alleges that Alcatel S.A. has infringed, induced infringement of, and/or contributorily infringed the '306 patent. Patents and the protection of patent rights are the subject of Title 35 of the United States Code. 35 U.S.C. § 271 specifically provides the elements of patent infringement. Additionally, 28 U.S.C. § 1338 gives district courts original jurisdiction over patent actions. A patent infringement action, therefore, is one that arises

under federal law. Telcordia has thus satisfied the first requirement of Rule 4(k)(2).

Having found that the first requirement of Rule 4(k)(2) is satisfied, the court next must determine whether Alcatel S.A. is not subject to jurisdiction in any state. *See United States v. Offshore Marine Ltd.,* 179 F.R.D. 156, 160, 38 V.I. 422 (D.V.I. 1998); *Revak v. Locatum A.B.,* 2005 U.S. Dist. LEXIS 11076, No. Civ. A. 03-4822, 2005 WL 1017771, at *2 (E.D. Pa. Apr. 28, 2005). [*16] As a preliminary matter, the court must determine whether Telcordia or Alcatel S.A. bears the burden of proving that Alcatel S.A. is not subject to the jurisdiction of any state. In *Offshore Marine Ltd.,* the United States District Court for the District of the Virgin Islands noted that "the question [of] which party bears the burden of proving. . . that the defendant is not subject to jurisdiction in any state appears to be an issue of first impression in this Court and in this Circuit, probably because it is generally the plaintiff's duty to allege and prove personal jurisdiction." *Offshore Marine Ltd.,* 179 F.R.D. at 160. Indeed, it appears that the Third Circuit has not yet addressed whether the plaintiff or defendant bears the burden of proving that the defendant is beyond the jurisdictional reach of any state court of general jurisdiction, or what is known as the negation requirement. *See* Base Metal Trading Ltd. v. OJSC "Novokuznetsky Aluminum Factory", 47 Fed. Appx. 73, 75 (3d Cir. 2002) (unpublished) (determining that negation issues need not be reached because the Due Process requirement of Rule 4(k)(2) was [*17] not satisfied). n4 Various district courts of the Third Circuit, however, have addressed the negation requirement and concluded that the plaintiff bears the burden of demonstrating that the defendant is not subject to jurisdiction in any state. *See Offshore Marine Ltd.,* 179 F.R.D. at 160 ("Accordingly to survive a motion to dismiss for want of personal jurisdiction, the plaintiff bears the burden to prove that [the defendant] is not otherwise subject to service of process in any state."); *see also Commissariat A L 'Energie Atomique v. Chi Mei Optoelectronics Corp.,* 293 F. Supp. 2d 423, 430 (D. Del. 2003), *vacated on other grounds by* 395 F.3d 1315 (Fed. Cir. 2005) (issue abandoned on appeal) ("Plaintiffs must also demonstrate that defendant is 'not subject to the jurisdiction of *any* state' under Rule 4(k)(2). Therefore, Rule 4(k)(2) "provides 'a narrow exception which may subject an alien defendant to a federal court's jurisdiction.'") The court agrees with the Third Circuit district courts that have addressed the negation

requirement and concludes that Telcordia bears the burden of demonstrating that Alcatel S.A. is not subject [*18] to jurisdiction in any state.

> n4 Likewise, it appears that the Federal Circuit has not had occasion to address the negation issue.

Here, Telcordia addresses the negation requirement only by asserting that, based on the information provided by Alcatel S.A. in its opening brief and the publicly available information regarding Alcatel S.A., an analysis of whether any other state has personal jurisdiction over Alcatel S.A. would not be "significantly different" from the analysis regarding Alcatel S.A.'s personal jurisdiction under the Delaware long-arm statute. (D.I. 20, at 13.) According to Telcordia, if the court cannot exercise jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute then Rule 4(k)(2) applies. (*Id.*) The court is not persuaded by this argument, however, and concludes that Telcordia's conclusory statement does not support a finding that Alcatel S.A. lacks sufficient contacts with any state to subject it to personal jurisdiction. Thus, Telcordia has not satisfied the second requirement [*19] of Rule 4(k)(2).

Even assuming Telcordia was able to show that Alcatel S.A. was not subject to jurisdiction in any other state, it cannot satisfy the third requirement of Rule 4(k)(2) because the record evidence demonstrates that Alcatel S.A. lacks sufficient contacts with the United States as a whole to satisfy due process. The Due Process Clause requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "has certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of justice and fair play.'" *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)(citations omitted). In order for the court to find that Alcatel S.A. has "minimum contacts" with the United States, Telcordia must demonstrate either specific or general personal jurisdiction. *Helicopteros Nacionales de Columbia v. Hall,* 466 U.S. 408, 414 (1984). The court can assert specific jurisdiction over a nonresident defendant that has "purposefully directed his activities at residents of the forum and the litigation [*20] results from alleged injuries that 'arise out of or related to' those activities."

*Burger King,* 471 U.S. at 472 (citations omitted). The court can assert general jurisdiction over a defendant when its contacts with the forum, regardless of their relation to the litigation, are "continuous and systematic." *Helicopteros Nacionales,* 466 U.S. at 416. The court will address the reasons it cannot exercise specific or general jurisdiction over Alcatel S.A. in turn.

When determining whether a defendant's contacts give rise to specific jurisdiction, "it is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum . . . thus invoking the benefits and protections of its laws." *BP Chems.,* 229 F.3d at 259 (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286). In other words, the defendant's contact must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980). [*21] Thus, a court usually must determine the character of the defendant's activity in the forum, and whether the plaintiff's claim arises out of or has a substantial connection with that activity. *See Burger King,* 471 U.S. at 475-76. In the present case, however, the court need not make this determination because Telcordia bases its argument on the specific jurisdiction subsections of the Delaware long-arm statute which, as discussed in Section IV.A., *supra,* do not warrant the exercise of jurisdiction over Alcatel S.A. because Alcatel USA is not its United States agent.

The court also concludes that Alcatel S.A.'s contacts with the United States that are unrelated to the present litigation are not "continuous and systematic" so as to give rise to general jurisdiction. Telcordia contends that general jurisdiction exists because there is "ample evidence of Alcatel S.A.'s contacts with the United States." (D.I. 20, at 12.) According to Telcordia, this evidence includes the following: (1) Alcatel S.A. is listed on the New York Stock Exchange; (2) Alcatel S.A. owns property in the United States, specifically hundreds of patents; (3) Alcatel S.A.'s website fails to distinguish [*22] among its multinational subsidiaries and uses its name in the name of its subsidiaries; (4) Alcatel S.A.'s website describes its worldwide activities, including its activities in the United States, but never discloses that its United States activities are performed by one of its subsidiaries; and (5) Alcatel S.A. incorporated its subsidiary, Alcatel USA in Delaware. The court does not

find the evidence sufficient to support Telcordia's assertion.

First, as previously discussed, Alcatel S.A. is a French holding company that does not make, sell, export or import any products into the United States. Alcatel S.A. does not maintain any offices in the United States, or lease or own any real property in the United States. It does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States. Alcatel S.A.'s employees also all reside outside of the United States.

Moreover, while Alcatel S.A. is listed on the New York Stock Exchange as an American Depository Receipt ("ADR"), this factor alone does not justify the exercise of jurisdiction. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F. Supp. 2d 289, 330 (S.D.N.Y. 2003); [*23] *Doe v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir. 2001)("The Court is not persuaded that Congress intended for the courts to assert jurisdiction under Rule 4(k)(2) whenever a corporation lists its stock on a United States exchange."). Likewise, "ownership of a United States patent, without more, cannot support the assertion of personal jurisdiction over a foreign patentee in any state besides the District of Columbia." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,* 1996 U.S. Dist. LEXIS 11696, No. C-95-3577 DLJ, 1996 WL 467293, at *6 n. 5 (N.D. Cal. July 24, 1996) (citing 35 U.S.C. § 293). Furthermore, incorporating a subsidiary in the United States does not give rise to jurisdiction unless the litigation is related to the act of incorporation and, here, it is not related. *See Applied Biosystems,* 772 F. Supp. at 1468. Additionally, "the mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant 'purposefully availed' itself of conduct activity in the forum, knowingly interacting with residents of the forum state via [*24] its web site." *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 454 (3d Cir. 2003). Here, Telcordia has not adduced evidence to support a finding that Alcatel S.A.'s web site was intended to reach customers in Delaware, or any other state in the United States. n5

n5 Telcordia asserts that there can be "no question that Alcatel S.A.'s website solicits requests for information concerning its products (including allegedly infringing products) from Delaware residents, pointing to a "website page

Case 1:06-cv-00540-GMS-MPT     Document 58-2     Filed 06/08/2007     Page 23 of 31

Page 7
2005 U.S. Dist. LEXIS 10194, *24

concerning the possible purchase of Alcatel products" with Delaware chosen as the potential buyer's state. (D.I. 20, at 5; Ex. 11.) Telcordia misses the point, however, as the record does not support any documented sales to persons in Delaware (or any other state in the United States). Nor does it support any interaction between Alcatel S.A. and Delaware residents, as the web site page, in Telcordia's own words, demonstrates only the *possible* purchase of Alcatel products.

The court also disagrees with [*25] Telcordia's assertion that Alcatel's website "never discloses that its U.S. activities are performed by some entity (or entities) other than Alcatel S.A." (D.I. 20, at 4.) First, when one enters the Alcatel website and clicks on "United States" as its country/region the web address changes from "www.alcatel.com" to "www.usa.alcatel.com." Further, when one clicks on the "About Alcatel" dropdown menu and selects "Alcatel in the U.S.A.," he or she is provided with information regarding Alcatel USA, including its business locations. Moreover, the web page states "it is the policy of *Alcatel USA* to satisfy the expectation of our customers." www.usa.alcatel.com/company/ausa_info.jhtml (last visited May 23, 2005)(emphasis added). Thus, the Alcatel web site does distinguish Alcatel S.A. from Alcatel USA. This fact does not support the exercise of jurisdiction over Alcatel S.A. Accordingly, Alcatel S.A.'s alleged contacts with the United States do not provide a basis for the court to conclude that it has a "continuous and systematic" presence in the United States.

Nor does the combination of Alcatel S.A.'s alleged contacts with the United States provide the court with a sufficient basis [*26] to conclude that the requirements for general jurisdiction are met. *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254 (3d Cir. 2000) is instructive on this point. In *BP Chemicals,* the Third Circuit found that a foreign defendant did not have sufficient contacts with the United States as a whole to justify the exercise of Rule 4(k)(2) jurisdiction, even though the defendant exported its products to the United States, held a small ownership interest in a Delaware corporation, and entered into contracts requiring its personnel to travel to the United States for training. *Id.* at 263. The Court of Appeals also found that the cumulative effect of the defendants contacts did not meet the requirements for general jurisdiction. In the present case,

Alcatel S.A.'s alleged contacts fall short of those alleged by the plaintiff in *BP Chemicals.* As such, the court finds that there is no basis for exercising Rule 4(k)(2) jurisdiction over Alcatel S.A.

## C. Jurisdictional Discovery

Lastly, Telcordia asserts that if the court does not conclude that Alcatel S.A. "is subject to personal jurisdiction under the *Delaware long-arm statute,* [*27] " it should permit limited jurisdictional discovery rather than granting Alcatel S.A.'s motion to dismiss. (D.I. 20, at 11)(emphasis added). Telcordia asserts that its claims against Alcatel S.A. are not clearly frivolous, and that discovery is necessary due to the "limited publicly available information" that it has gathered without discovery. (D.I. 20, at 11.) Telcordia further asserts that the case will not be delayed as a result of any discovery on the personal jurisdiction issue.

Conversly, Alcatel S.A. contends that Telcordia's claims against it are clearly frivolous, because Telcordia has not carried its burden of making "a *prima facie* showing that Alcatel S.A. is subject to personal jurisdiction in Delaware." (D.I. 23, at 17.) In addition, Alcatel S.A. contends that it "strains belief that Plaintiff (1) did not know which entities in the Alcatel Family to sue, and (2) that Alcatel S.A. was not one of them." (*Id.* at 17.) According to Alcatel S.A., Telcordia has had prior business interactions with Alcatel entities regarding the patent-in-suit, as well as other communications technology. (*Id.* at 2.) Alcatel S.A. further contends that Telcordia is "arguably the most [*28] knowledgeable company in the telecommunications field with respect to what products are sold by the various players in the market." (*Id.* at 1.) Thus, it "is hard to believe that it [Telcordia] does not know exactly who the relevant players in the market are." (*Id.*) Lastly, Alcatel S.A. contends that Telcordia is engaging in a fishing expedition, noting that the United States Supreme Court has held that courts should "exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." (*Id* at 18-19 (citing *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern Dist. Iowa,* 482 U.S. 522, 546, 96 L. Ed. 2d 461, 107 S. Ct. 2542 (1987)). The court is persuaded by Alcatel S.A.'s argument.

"Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction,

2005 U.S. Dist. LEXIS 10194, *28

courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'" *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir. 2003) (internal citations omitted). Thus, resolution of Telcordia's request [*29] "begins with the presumption in favor of allowing discovery to establish personal jurisdiction." *Hansen v. Neumueller GmbH,* 163 F.R.D. 471, 474 (D. Del. Oct. 5, 1995). However, "the court must be satisfied that there is some indication that this particular defendant is amenable to suit in this forum." *Id.* at 475. For example, "a plaintiff may not rely on the bare allegations in his complaint to warrant further discovery." *Id.* at 476. Likewise, "a mere unsupported allegation that [a] defendant 'transacts business' in an area is 'clearly frivolous.'" *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir. 1997); *see B.L. Poe v. Babcock Int'l,* 662 F. Supp. 4, 7 (M.D. Pa. Mar. 14, 1985) ("Since plaintiff has met defendants' affidavit evidence with mere speculation, plaintiff's request for an opportunity to conduct discovery on the matter must be denied. It would be inappropriate for this court to allow plaintiff to conduct a fishing expedition in order to construct a basis for jurisdiction."). Rather, "there must be *some* competent evidence to demonstrate that personal jurisdiction [*30] over [a] defendant might exist before allowing discovery to proceed." *Hansen,* 163 F.R.D. at 475. Furthermore, "when the lack of personal jurisdiction is clear, . . . further discovery serves no purpose and should be denied." *Hockerson-Halberstadt, Inc. v. Propet USA, Inc.,* 62 Fed. Appx. 322, 338 (Fed. Cir. 2003) (unpublished).

Here, as previously discussed in Section IV.A., *supra,* the record evidence regarding Telcordia's agency theory of specific jurisdiction is insufficient to support the conclusion that Alcatel USA was acting as Alcatel

S.A.'s agent. In addition, Telcordia did not assert that the court could exercise personal jurisdiction over Alcatel S.A. based on the general jurisdiction subsection of the Delaware long-arm statute. For these reasons, the court believes it is clear that it may not exercise personal jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute. Thus, further discovery would not be worthwhile. In other words, granting Telcordia's request for jurisdictional discovery would amount to allowing it to conduct a fishing expedition in order to form a basis for jurisdiction. The court, therefore, will deny [*31] Telcordia's request for jurisdictional discovery.

Dated: May 27, 2005

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. Alcatel S.A.'s Motion to Dismiss for Lack of Personal Jurisdiction (D.I. 17) is GRANTED.

2. Telcordia's request for jurisdictional discovery is DENIED.

Dated: May 27, 2005

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

LEXSEE 1993 U.S. DIST. LEXIS 16609

**WASSALL PLC, Plaintiff, v. LA MIRADA PRODUCTS CO., INC. and USG CORP., Defendants.**

**93 Civ. 4782 (CMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1993 U.S. Dist. LEXIS 16609**

**November 24, 1993, Decided**
**November 24, 1993, Filed**

**JUDGES:** [*1] Metzner

**OPINION BY:** CHARLES M. METZNER

**OPINION:**

OPINION

METZNER, Senior District Judge.

Plaintiff, Wassall PLC (Wassall), seeks an injunction to restrain the defendants, USG Corp. (USG) and La Mirada Products Co., Inc. (La Mirada), from manufacturing and selling certain products that compete with products manufactured and sold by DAP Products, Inc. (DAP), a subsidiary of Wassall. Plaintiff also seeks damages arising out of the defendants' actions.

In 1991 Wassall purchased most of the assets of DAP Inc. from USG. In connection with that purchase, several agreements were signed. This lawsuit concerns the interpretation to be given two of these agreements.

**I. FACTUAL BACKGROUND**

In 1987 USG acquired DAP Inc., a corporation that developed, manufactured, and marketed products for the residential and commercial construction, repair, and remodeling markets. DAP Inc.'s products included caulks and sealants, glazing and filling compounds, ceramic tile adhesives, wood treatment products, specialty paints and coatings, and coating resins.

Asset Purchase Agreement

In September 1991, USG sold to Wassall "substantially all" of DAP Inc.'s assets, including its manufacturing facilities and equipment, patents [*2] and trademarks, technical know-how, customer and supplier lists, and goodwill. The terms of the sale are set forth in an Asset Purchase Agreement, which the parties signed on September 20, 1991 (the Closing Date). The parties negotiated the terms of the contract over a period of five months, and both parties were assisted by attorneys, accountants, and other advisers.

The Asset Purchase Agreement is not a model of what should have been negotiated in a sale of this kind, especially since USG and DAP Inc. manufactured competing products. The Agreement simply stated that Wassall was purchasing "substantially all" of DAP Inc.'s assets, and listed only an incomplete selection of assets that DAP Inc. was transferring to Wassall. Before Wassall signed the Agreement it requested only a list of the DAP Inc. products produced DAP Inc.'s plant located in La Mirada, California; it did not request a complete list of past or current USG products or product lines.

Wassall created a subsidiary known as DAP Products, Inc. (DAP), which continued the DAP Inc. business that Wassall acquired from USG. n1 USG retained certain assets of DAP Inc., including the plant located in La Mirada. The DAP Inc. assets [*3] that USG retained continued to do business under a new name, the "La Mirada Products Co., Inc."

n1 In this opinion "DAP Inc." refers to the subsidiary of USG. "DAP" refers to the subsidiary

1993 U.S. Dist. LEXIS 16609, *3

of Wassall.

Non-Competition Agreement

On September 20, 1991, the parties also executed a Non-Competition Agreement. This agreement stated that "an important part of the benefits which [Wassall] will receive in connection with the [sale] is the ability to carry on the Business in the United States free from competition by [USG and La Mirada]." The parties agreed that, for a period of five years, USG and La Mirada would not, "directly or indirectly, alone or in association with any other person . . . enter into new product lines that compete . . . with products of DAP existing on the Closing Date."

The Non-Competition Agreement also bars USG and La Mirada from soliciting or otherwise attempting to do business with any customer of DAP "for the purpose of conducting or engaging in any Competitive Business." The Agreement defines [*4] a Competitive Business as the type of business prohibited by the first provision of the Agreement: a business involving "new product lines that compete within the United States with products of DAP existing on the Closing Date."

Toll Manufacturing Agreement

Three of the DAP products that Wassall purchased were being produced at the La Mirada plant on the Closing Date. On September 20, 1991, DAP and La Mirada entered into a "Toll Manufacturing Agreement." Under a toll manufacturing agreement, one party produces products owned by another party. In this case La Mirada agreed to continue to produce the three DAP products at its La Mirada plant for a limited amount of time until DAP was able to make alternative manufacturing arrangements.

The Toll Manufacturing Agreement granted La Mirada a nontransferable license to use DAP's intellectual property to prepare those products for DAP. The contract acknowledged that, although DAP owned the rights to produce the products that were the subject of the agreement, USG and La Mirada had retained all rights to their "Durock" trademark, and stated that USG and La Mirada had retained their rights in the "Know-How unique to the production of [*5] the Durock [products]

currently produced at the La Mirada Plant."

Products at Issue

A. Type I Mastic

One of the most successful DAP Inc. products that Wassall bought from USG is called "Durabond D-2001." This product is a type of adhesive, or "mastic," used to attach ceramic tile to walls and other surfaces. DAP Inc. had manufactured and sold Durabond D-2001 since at least 1988. DAP now sells this product primarily to general contractors, builders, and installers in "the ceramic tile segment of the construction industry."

USG began manufacturing and selling an identical ceramic tile mastic under its "Durock" brand name in 1985. Consequently USG was in competition with its subsidiary in this product. USG's Durock mastic was produced solely at the La Mirada plant from at least 1987 until mid-1990. USG marketed and sold the Durock mastic in 1991 -- and included it in its 1991 product brochure and product bulletins -- but did not manufacture it in that year. In 1992 USG resumed manufacture of this product. USG's primary market for its Durock mastic is retail stores and "the building materials trade;" in 1993, however, it began offering the product to ceramic tile distributors. [*6]

Both of these adhesives are called "Type I" mastics, meaning that they are of high quality and are water-resistant.

B. Floor Patching Compound

DAP also produces two types of gypsum-based floor patching compound, "Durabond WEB-patch 90" and "Durabond D-9001." These products are used to repair uneven floor surfaces before installing floor covering. These products were among the assets Wassall purchased from USG; DAP Inc. had been producing both products since at least 1988, marketing the products to floor covering distributors.

USG has made and sold floor patching products under toll manufacturing agreements with unaffiliated companies continuously for over thirty years. It has never sold floor patching products under its own brand names. In June 1993, La Mirada began to manufacture two floor patching compounds for a company called the W.F. Taylor Company. La Mirada produced these two

1993 U.S. Dist. LEXIS 16609, *6

compounds from formulas that the Taylor Company had developed earlier in that year. The Taylor floor patching compounds, called "Touchdown 600" and "Touchdown 610," are different in composition from DAP's Durabond patching compounds, but the products compete with each other.

## II. DISCUSSION

Wassall [*7] claims that by manufacturing and selling Durock Type I mastic in competition with DAP's Durabond D-2001 mastic, and by manufacturing the Touchdown floor patching products that compete with DAP's two Durabond floor patching compounds, USG and La Mirada are breaching the Non-Competition and Toll Manufacturing Agreements that the parties signed in September 1991.

Interpretation of the Two Agreements as a Whole

Wassall concedes that USG had been producing a competing mastic at the La Mirada plant until 1990, and was marketing the mastic until 1991. Consequently, the defendants' continued production and sale of their Durock mastic do not appear to violate the Non-Competition Agreement's prohibition against entering "new product lines" in competition with DAP.

However, Wassall contends that the Non-Competition Agreement must be read in conjunction with the Toll Manufacturing Agreement, claiming that the parties intended the agreements to constitute a single transaction and be mutually dependent. Wassall therefore argues that the Toll Manufacturing Agreement limits the scope of the Non-Competition Agreement.

When the agreements are read together, they not only prohibit USG from introducing [*8] new competing product lines, as stated in the Non-Competition Agreement: they permit USG to continue to manufacture existing competing product lines only if those lines were "currently produced at the La Mirada Plant" as of the Closing Date -- a phrase imported from the Toll Manufacturing Agreement -- and the formulas for the products were "unique to the production of those products." This interpretation of the agreements would permit USG and La Mirada to continue manufacturing only the Durock products that were in production at the La Mirada plant in September 1991: namely, Durock coating products, latex grout, and an acoustical sealant product.

Since the Durock mastic was not being produced at the La Mirada plant in September 1991, and since its formula is identical to DAP's Durabond mastic, Wassall argues, the two agreements bar USG from recommencing manufacture of the Durock mastic after the sale.

If the individuals who drafted the agreements had simply been more specific as to what the agreements would encompass, this entire dispute could have been avoided.

Under New York law, n2

Two separate written agreements executed at the same time may be considered in law as one agreement, [*9] but only if the parties so intended. Whether the parties intended that the two agreements should be interdependent is a question of fact which turns upon the circumstances of each case.

National Union Fire Ins. Co. v. Turtur, 892 F.2d 199, 204 (2d Cir. 1989) (quoting Lowell v. Twin Disc, Inc., 527 F.2d 767, 769-70 (2d Cir. 1975) (citations omitted)). In determining the parties' intent, the test is "whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out." Lowell, 527 F.2d at 770 (quoting 6 Williston on Contracts § 863, at 275 (3d ed. W. Jaeger 1962)).

n2 New York law governs in this diversity action, in accordance with the agreement of the parties.

The record reveals no evidence that the negotiating parties intended the agreements to be interdependent. Representatives of Wassall and USG testified that, when [*10] the parties signed the Non-Competition Agreement, they were satisfied that it constituted a full embodiment of their understanding.

Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is

1993 U.S. Dist. LEXIS 16609, *10

taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression.

Restatement (Second) of Contracts § 209(3) (1982).

Further evidence that the Non-Competition Agreement is fully integrated is its Section 5(A), which provides that:

> This Agreement contains, and is intended as, a complete statement of all the terms of the arrangements between the parties with respect to the matters provided for, supersedes any previous agreement and understanding between the parties with respect to those matters and cannot be changed or terminated orally.

In addition, the purposes of the two contracts were entirely different. The Non-Competition Agreement was intended to prevent USG from entering into new, competing product lines. The sole purpose of the Toll Manufacturing Agreement was to provide DAP with a temporary source of supply of [*11] certain DAP products. Kevin Doyle, Wassall's chief negotiator, conceded that the Toll Manufacturing Agreement was not an essential element of the sale transaction, testifying that "[Wassall] did not absolutely need it, no."

The Toll Manufacturing Agreement expired in February 1993, more than three years before the scheduled expiration of the Non-Competition Agreement. The drafters' failure to make the obligations imposed by the agreements run concurrently further indicates that the agreements are separate and independent.

Finally, the Toll Manufacturing Agreement makes no reference to the Non-Competition Agreement, and the Non-Competition Agreement simply states that "nothing herein shall restrict in any way [USG and La Mirada] from engaging in business as contemplated by the Supply and Technology Agreements," which the parties assume include the Toll Manufacturing Agreement. Wassall contends that this provision requires the court to interpret the two contracts as a whole. A more reasonable reading of this language suggests, however, that it merely clarifies that the Non-Competition Agreement does not restrict La Mirada's right to produce products for DAP under the Toll Manufacturing [*12] Agreement.

After examining the circumstances and the relations among the parties in this case, I find that the Toll Manufacturing Agreement does not limit the scope of the Non-Competition Agreement. The Non-Competition Agreement is an independent and integrated contract, and its terms are not modified by the requirements of the Toll Manufacturing Agreement.

Definition of "Product Line"

Wassall argues that even if the court rejects its theory that the two contracts are interdependent, USG and La Mirada violated the Non-Competition Agreement by launching new competing product lines after September 1991. It states that the Durock mastic is a "new product line" because USG began selling the mastic to ceramic tile distributors after it sold DAP Inc. in 1991. Wassall contends that if a product is sold in a different form, or through different channels of distribution to different types of users for different purposes, that variation in marketing creates a new "product line."

As for the floor patching compounds, Wassall asserts that each type of floor patching compound produced under a toll manufacturing arrangement with a different company constituted a separate "product line" for [*13] USG, as products manufactured for other companies "cannot be part of the same product line for purposes of the Non-Competition Agreement." Consequently, Wassall claims, when USG began manufacturing floor patching compound for the Taylor Company in 1993, using Taylor's recently-developed formula, "because the Taylor formulas had not previously been produced by USG, they [were] clearly a 'new product line' under the Non-Competition Agreement."

None of the agreements at issue or the documents in evidence define the term "product line," and the negotiators of the Non-Competition Agreement offered varying definitions of the term. Kevin Doyle, a Director of Wassall and Chairman of DAP, testified that a product line is "an offering of the same product in various sizes and colors." Two other DAP executives maintained that a product line is defined in terms of the types of customers to whom a product is sold. USG's witnesses countered that functionality and chemical technology determine the definition of a product line, not the channels of distribution. For example, DAP Inc.'s former Director of Manufacturing testified that USG considers "caulks and sealants," "wood preservatives," and "adhesives" [*14]

1993 U.S. Dist. LEXIS 16609, *14

to be separate product lines.

Contract language is ambiguous if it is

> capable of more than one meaning when
> viewed objectively by a reasonably
> intelligent person who has examined the
> context of the entire integrated agreement
> and who is cognizant of the customs,
> practices, usages and terminology as
> generally understood in the particular
> trade or business.

Pantone, Inc. v. Esselte Letraset, Ltd., 878 F.2d 601, 606 (2d Cir. 1989) (quoting Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F. Supp. 987, 994 (S.D.N.Y. 1968)). Where, as here, "the text of an agreement reasonably allows for varying interpretations . . . the need for judicial construction cannot, and may not, be avoided." Wards Co., Inc. v. Stamford Ridgeway Assoc., 761 F.2d 117, 120 (2d Cir. 1985) (citations omitted).

Under New York law, where a contract is ambiguous because it is susceptible to two or more reasonable interpretations, courts look to the acts and circumstances surrounding the execution of the ambiguous term to ascertain the parties' intent. Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 529 (2d Cir. 1990); [*15] Pantone, Inc. v. Esselte Letraset Ltd., 691 F. Supp. 768, 774 (S.D.N.Y. 1988).

After reviewing the testimony and other evidence before me in this case, I find that in the context of the Non-Competition Agreement a "product line" is defined by the products' functionality and chemical composition.

Next we turn to the problem of whether a dormant line that has been revived is "new," and whether a toll manufacturing agreement to manufacture an existing product for a new customer using a slightly different formula results in a "new product line."

In this case, USG had produced its Type I mastic for six years, then ceased manufacturing the product from 1991 until 1992, when it recommenced manufacturing the mastic. The parties, apparently failing to anticipate this situation, did not address this issue in their negotiations or in the resulting agreements. The parties have submitted several internal memoranda in which USG or DAP

employees offer conflicting interpretations of one or more of the agreements at issue, but these documents are not conclusive evidence of the negotiating parties' intent.

In view of the purposes of the agreements and the surrounding circumstances, [*16] I find that the most reasonable interpretation of the contract language indicates that, by reviving a product line that had been briefly dormant, USG was not entering a new product line, and USG's efforts to sell its existing mastic product through new channels of distribution did not constitute entry into a new product line.

Similarly, only a strained interpretation of the term "new product line" could produce the conclusion that, when USG had produced floor patching compound for various companies for three decades under toll manufacturing agreements, then began producing floor patching compound for an additional unaffiliated company using a slightly different formula, USG was entering a "new product line."

Duty Not to Impair Goodwill

After USG sold the DAP Inc. assets to Wassall, USG and La Mirada continued to do business with and solicit certain DAP customers in connection with the product lines that USG and La Mirada retained after the sale.

The Non-Competition Agreement prohibits USG and La Mirada from soliciting DAP customers "in any way, directly or indirectly, for the purpose of engaging in any Competitive Business." As noted above, the Agreement defines a "Competitive [*17] Business" as a business involving "new product lines" that compete "with products of DAP existing on the Closing Date." The Agreement permits USG and La Mirada to continue to solicit customers in connection with product lines that existed as of the Closing Date.

Wassall contends that, even if the Non-Competition Agreement permits USG and La Mirada to attempt to retain former customers' patronage, the defendants' solicitations constitute a breach of their duty, implied under New York law, not to impair the goodwill of the business they conveyed to Wassall. Wassall's statement of New York law is generally correct, but it is not relevant to this case because Wassall contracted to permit this activity by defendants.

### III. CONCLUSION

1993 U.S. Dist. LEXIS 16609, *17

Because USG had produced Durock Type I ceramic tile mastic and gypsum-based floor patching compounds continuously for years before it signed the Asset Purchase Agreement, USG and La Mirada's continued production of those products does not constitute entry into "new product lines" within the meaning of the Non-Competition Agreement. Under the terms of the agreements the parties signed, USG and La Mirada are entitled to continue manufacturing and selling [*18] those products.

This dispute is regrettable because it could have been so easily avoided. It would have been a simple matter to include contract language that anticipated the problems in this case. In enforcing these contracts, this court is restrained by the terms of the agreements the parties negotiated and signed.

Complaint dismissed.

SO ORDERED.

Dated: New York, N.Y.
November 24, 1993

Charles M. Metzner

U. S. D. J.