# YOUNG CONAWAY STARGATT & TAYLOR, LLP

JEFFREY T. CASTELLANO
DIRECT DIAL: 302-571-3587
DIRECT FAX:   302-576-3551
jcastellano@ycst.com

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(302) 571-1253 FAX
(800) 253-2234 (DE ONLY)
www.youngconaway.com

June 12, 2007

**BY E-FILING**

The Honorable Mary Pat Thynge
United States District Court
844 North King Street
Wilmington, DE 19801

> Re:   Roquette Freres v. SPI Pharma, Inc. and Drytec Ltd.,
>       C.A. No. 06-540-***

Dear Judge Thynge:

Defendants SPI Pharma, Inc. and Drytec Ltd. hereby respond to Plaintiff Roquette Freres' ("Roquette") June 11, 2007 letter requesting additional jurisdictional discovery from Defendants in connection with Roquette's motion for leave to amend its pleadings to join additional parties. As explained below, and which we can address more fully as necessary during tomorrow's teleconference with Your Honor, Roquette's request for additional jurisdictional discovery is both improper and unnecessary. We respectfully request that Your Honor deny Roquette's request.

## I.   Background

Roquette filed this patent infringement action against SPI Pharma on August 31, 2006, and then filed a First Amended Complaint adding Drytec Ltd. as a co-defendant on October 20, 2006. On December 6, 2006, Drytec Ltd. submitted a motion to dismiss Plaintiff's First Amended Complaint as to Drytec Ltd. for lack of personal jurisdiction. In connection with that motion, the parties agreed to exchange jurisdictional discovery and Roquette deposed Mr. Paul Kennet, the managing director of Drytec Ltd. During Mr. Kennet's deposition on January 16, 2007, Roquette learned that Drytec Ltd.'s name had been recently changed to Anhydro UK Ltd. ("Anhydro UK") on January 1, 2007. *See* Exhibit A, p. 8:13-21. Roquette also learned that Anhydro UK's corporate parent was Anhydro Holdings A/S ("Anhydro A/S") and Drytec Contract Processing Ltd. ("Drytec CP") – not Drytec Ltd. - was the toll manufacturer of the allegedly infringing product in the United Kingdom. *See Id.*, p. 19:6-17; 13:14-20; 21:22 – 22:3; 26:18 – 27:6; 29:4-17. Roquette's counsel questioned Mr. Kennet extensively about these matters during the deposition. Roquette's counsel never once indicated that it would be necessary to conduct a follow-up deposition. The parties fully briefed Drytec Ltd.'s motion to dismiss and that motion presently awaits Your Honor's decision.

More than four months later, on May 21, 2007, the deadline under the Court's Scheduling Order, Roquette filed a motion for leave to join Drytec CP, Anhydro UK and Anhydro A/S

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Mary Pat Thynge
June 12, 2007
Page 2

(collectively, "the Additional Parties"). On June 5, 2007, Defendants filed their answering brief, contending that Roquette's motion for leave to amend is futile because the Court lacks personal jurisdiction over these additional parties and liability for patent infringement cannot be shown because none of them sells or imports the allegedly infringing product within the United States. On June 7, Roquette's counsel telephoned to ask whether Defendants would consent to additional jurisdictional discovery – *viz.*, another deposition of Mr. Kennet in the United Kingdom, but this time in connection with assertions made by Defendants in opposition to Roquette's motion for leave to amend its pleadings to join the Additional Parties. Defendants did not consent to Roquette's request.

II.  **Argument**

For brevity's sake, we list below the primary reasons why Roquette's request for additional jurisdictional discovery from Defendants or the Additional Parties should be denied:

- The Defendants already provided jurisdictional discovery in connection with Drytec Ltd.'s motion to dismiss the complaint as to Drytec Ltd. for lack of personal jurisdiction. Roquette had the opportunity nearly five months ago during Mr. Kennet's deposition to explore fully the roles and relationships of the Additional Parties. If Roquette failed to take advantage of that opportunity, that is no one's fault but Roquette's. Defendants or the Additional Parties should not be subject to another round of expensive and burdensome depositions in Europe because Roquette did not question Mr. Kennet to its own satisfaction the first time around.

- Roquette mischaracterizes Defendants' answering brief as containing "contradictory assertions and inconsistent and incomplete information." *See* Roquette's letter, p. 1. Roquette concedes that Defendants produced the Commercial Letter Agreement between SPI Pharma and Drytec CP showing that Drytec CP was toll manufacturer of the accused product. *Id.*, p. 2. This document is completely consistent with Mr. Kennet's deposition testimony. *See* Exhibit A, 13:14-20; 21:22 – 22:3; 26:18 – 27:6; 29:4-17. Pursuant to Roquette's first set of document requests, Defendants also produced United States Customs documents that confirm Mr. Kennet's testimony stating that the Drytec entities did not ever sell or import the accused product within the United States. *See Id.*, p. 23:4-20. There is nothing at all contradictory or inconsistent about Defendants' assertions in its answering brief that requires additional discovery.

- Roquette asserts that additional jurisdictional discovery is "relevant and important" in order for Roquette to reply to Defendants' brief opposing Roquette's motion for leave to amend, but offers no justification for this assertion. Roquette has <u>already</u> been provided with the pertinent jurisdictional information related to Drytec Ltd. (now Anhydro UK) and Drytec CP.[1] Roquette fails to explain how additional testimony from Mr. Kennet on this issue would serve any purpose. At best, such testimony would be merely duplicative or cumulative

---

[1] For its part, Anhydro A/S is merely a holding company and has had <u>no</u> involvement with the manufacture or import of the accused product

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Mary Pat Thynge
June 12, 2007
Page 3

and Roquette is not entitled to such discovery. *See Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999) ("The Federal Rules of Civil Procedure expressly allow a district court to use its discretion and deny discovery requests if the material sought is 'unreasonably cumulative.' Fed. R. Civ. P. 26(b)(2).").

- Roquette's request for additional jurisdictional discovery is premature. If the Court grants leave for Roquette to join the Additional Parties, a motion to dismiss pursuant to Rule 12(b)(2) may then be filed on behalf of those parties. At that time, the Additional Parties would consider any request for additional jurisdictional discovery by Roquette (though we think none is necessary). On the present motion, however, there is no need for such additional discovery because a different standard applies. Roquette should not be allowed to delay submission of its reply brief on its motion to amend based on the pretext that it requires additional jurisdictional discovery, when such discovery is not warranted here.

- Finally, Roquette's motion for leave to amend to join the Additional Parties is based on a false premise that Drytec Ltd. (if not dismissed for lack of personal jurisdiction) will try to avoid discovery "through artificial claims that Drytec Ltd. is not responsible for or cannot provide discovery regarding the infringing activities of its closely affiliated companies [*viz.*, Drytec CP]." Drytec Ltd. has never given any indication that it would behave in that manner or make such claims. Roquette's entire premise for its motion for leave to amend is misplaced and so are its reasons for additional discovery.

Based on the foregoing, we respectfully request that Your Honor deny Roquette's request for additional jurisdictional discovery.

Respectfully submitted,

Jeffrey T. Castellano (I.D. No. 4837)

JTC:mmeeh
Enclosure

cc: Clerk, U.S. District Court (By E-filing and Hand Delivery)
    Mary B. Graham, Esquire (By E-filing and Hand Delivery)
    Julia Heaney, Esquire (By E-filing and Hand Delivery)
    Douglas V. Riger, Esquire (By E-mail)

# EXHIBIT A

Page 1

1       IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE
2                   Civ No 06-540

3   ─────────────────────────────────────────

    ROQUETTE FRERES,
4
                                    Plaintiff,
5   v SPI PHARMA, INC., and DRYTEC LTD.,

6                                   Defendants.

7   ─────────────────────────────────────────

8           ORAL DEPOSITION OF PAUL KENNET

9   Taken at Morgan Lewis & Bockius,
    2 Gresham Street, London EC2V 7PE, England,
10  on Tuesday 16 January 2007 at 12.00 pm

11  Reported by Mrs. Claire Hill.

**Capital Reporting Company**

Page 6

1  Q   What was the nature of the litigation?
2  A   It was confidentiality of technical data.
3  Q   And were you personally a defendant in
4  the action?
5       MS. HOLTHAM: Objection, the scope of this
6  deposition is limited to the facts and matters set out
7  in Mr. Kennet's statement.
8       MR. RIGLER: I'm aware that this is a
9  jurisdictional deposition; nonetheless, I'm entitled to
10 inquire into the background of the witness, with respect
11 to any prior litigation in which he has been a party.
12      Q   You may answer.
13      A   I wasn't personally a defendant, no.
14      Q   A company with which you were associated
15 was accused of violating a confidentiality agreement?
16      A   The company that I was working for was
17 named as a defendant, not me personally, I was defending
18 the company, representing the company.
19      Q   What company was that, please?
20      A   It was Drytec.
21      Q   Who was the other party to the
22 litigation?

Page 7

1  A   The other party was -- the plaintiff, you
2  mean?
3  Q   Yes.
4  A   The plaintiff was Borozene (?) Inc.
5  Q   And can you tell me the year in court?
6  A   The year was -- that the deposition was
7  made, or that the file was suited, the litigation was
8  filed? The litigation was filed in 2006.
9  Q   And the court was?
10 A   It's still proceeding, the litigation.
11 Q   Can you tell me a little bit about your
12 background, what is your educational background?
13 A   I am a chartered engineer, a graduate
14 chemical engineer, and a member of the Institute of
15 Chemical Engineers in the U.K.
16 Q   May I ask which universities?
17 A   Which universities?
18 Q   Yes, please.
19 A   University of Cape Town, which is not in
20 America.
21 Q   And not in any great detail, but can you
22 briefly tell me about your employment history?

Page 8

1  A   Certainly, I have worked for a number of
2  -- only in the U.K., for a number of U.K. companies,
3  always in engineering. In the last company I worked
4  for, I was initially senior process engineer, and then
5  rose to sales director, transferred in 2001 to Drytec as
6  sales director, and became managing director in 2004.
7  Q   Do you have any other employment?
8       MS. HOLTHAM: Objection, question vague as to
9  form.
10 A   Any other employment, you say?
11 Q   Yes.
12 A   Other than with Drytec? No, I don't.
13 Q   I notice on your card that your card says
14 Anhydro.
15 A   Anhydro, yes. Drytec Limited changed its
16 name as of 1 January to Anhydro U.K. Limited, so the
17 card's not even right, it was done by our parent
18 company, Anhydro, in Denmark. They jumped the gun
19 slightly. But formally, Drytec Limited is -- as of 1
20 January this year, is Anhydro U.K. Limited. No other
21 changes have been effected.
22 Q   Did you bring any documents with you

Page 9

1  today?
2  A   I have not brought any documents with me
3  today.
4  Q   Were you asked to search for any
5  additional documents?
6  A   I was requested to bring some documents,
7  if I could find any, yes.
8  Q   Were you able to locate any documents?
9  A   No.
10 Q   I won't clutter up the record with
11 needless paper, since this is before the court, but let
12 me show you the declaration of Paul C. Kennet and ask if
13 you recognize this document. (Handed).
14 A   Yes.
15 Q   And you read it and subscribed to it?
16 A   I have and do.
17 Q   And I take it you had the assistance of
18 counsel when the document was prepared?
19 A   Yes, I did.
20 Q   Were you asked to search for any
21 documents in connection with the declaration you signed
22 in this action?

3 (Pages 6 to 9)

Page 10

1   MS. HOLTHAM: Objection, the instructions and
2 interaction between Mr. Kennet and counsel are
3 privileged.
4   MR. RIGLER: I agree with that, I just asked
5 if he was asked to search for any documents.
6   A   I was asked to search for some documents,
7 yes.
8   Q   I would like to have the reporter mark as
9 Drytec exhibit 1 a cover letter of December 27, 2006,
10 from Mr. Langer at Morgan Lewis, and it is followed by
11 documents with the series of numbers which we refer to
12 in America as Bates numbers, and this goes with a series
13 commencing 1 through 35.
14   (Exhibit Drytec 1 marked for identification)
15   Q   Were those the documents which you
16 located in response to the search request?
17   A   No, I have not located those documents.
18   Q   You have not seen these documents
19 previously?
20   A   I have seen the documents -- sorry, let
21 me correct that. The last of the documents I located
22 and submitted, which is this, from D 11 onwards. The

Page 11

1 remainder were obtained elsewhere, I had no involvement
2 in those.
3   Q   Tell me what the document beginning at
4 page D 11 and continuing through D 35 is, please.
5   A   It is a quotation submitted through our
6 North American office for equipment supply, key parts
7 and engineering equipment supply for spray dryer system.
8   Q   And who was the intended customer?
9   A   SPI were, Pharma.
10   Q   SPI Pharma Inc.?
11   A   I believe so, yes. (Pause). Yes, in
12 Grand Haven.
13   Q   Grand Haven is merely a manufacturing
14 location of SPI Pharma Inc., correct?
15   A   It is a manufacturing location.
16   Q   But it is not the exclusive location in
17 the United States of SPI Pharma?
18   A   I believe not.
19   Q   What was the purpose of the estimate?
20   A   The purpose of the estimate was to
21 provide SPI Pharma with information, sufficient
22 information in order for them to purchase the key parts

Page 12

1 and engineering of that spray drying system, as a
2 competitive bid, as a competitive quotation.
3   Q   Was the quotation accepted?
4   A   It was.
5   Q   Was the installation made?
6   A   I believe it was, yes.
7   Q   You're not sure?
8   A   I am not sure, I have never been there,
9 and it was done exclusively through our American company
10 at the time, so I understand it has been installed, yes.
11   Q   Where was the equipment manufactured?
12   A   The equipment was manufactured at various
13 locations in Europe and in America, and supplied through
14 our Drytec North America.
15   Q   Was any of the equipment manufactured in
16 the U.K.?
17   A   I believe it was.
18   Q   Which components and where, please?
19   A   I don't know where, generally. Which
20 components, I believe it was only the atomizer assembly.
21   Q   Which parties executed the contract?
22   A   Drytec North America.

Page 13

1   Q   So this is not a contract between Drytec
2 Limited and SPI Pharma?
3   A   No, it's not.
4   Q   What is the business of Drytec Limited?
5   A   Drytec Limited designs, supplies,
6 installs and commissions drying equipment.
7   Q   Did I understand correctly that your only
8 employment is as the managing director of Drytec
9 Limited?
10   A   It's not only Drytec Limited, no.
11   Q   What other companies?
12   A   Drytec Contract Processing Limited and
13 Drytec Holdings Limited.
14   Q   And what are the activities of each of
15 those companies?
16   A   Drytec Holdings Limited is purely an
17 administrative holding company for Drytec Limited and
18 Drytec Contract Processing. Drytec Contract Processing
19 Limited spray dries -- toll spray dries various
20 materials for clients.
21   Q   Do those materials include Mannitol?
22   MS. HOLTHAM: Objection, again, the scope of

4 (Pages 10 to 13)

**Capital Reporting Company**

Page 18

1  Anhydro U.K. Limited, as part of Anhydro's efforts
2  to unify the world market or world representation.
3      Q  So there has been no actual sale of
4  any of these companies or their assets?
5      MS. HOLTHAM: Objection, this is way
6  beyond the scope of the jurisdiction, I'm
7  instructing you not to answer.
8      MR. RIGLER: I am going to ask you to
9  reconsider, because this kind of thing I'll take
10  to the court. You're going to be able to make
11  your instructions today, and the witness, I'm
12  sure, will follow your instructions, but
13  ultimately the issue is going to be decided before
14  the judge in the United States, and I'm trying to
15  confine my questions to what I consider to be
16  relevant, and I think the court is going to agree
17  with me. Now do you wish to maintain your
18  instruction?
19      MS. HOLTHAM: In relation to specific
20  questions that are focused on the corporate
21  identities, you may answer.
22      A  Could you repeat the question? (Read

Page 19

1  back)
2      A  The sale of any of the companies
3  that we have been discussing or naming, no, that
4  is correct, there been no sales of those
5  companies.
6      Q  And is it correct that the ultimate
7  parent corporation is named Dedert Corporation,
8  and that is an entity formed under the laws of the
9  State of Illinois in the United States?
10      A  I believe the ultimate owning
11  company is Anhydro Holding A.S. in Denmark, but
12  I'm not privy to the legal structure, that's as
13  I understand it, Anhydro Holdings A.S. owns
14  100 percent of all Anhydro companies, which
15  includes Dedert, now Anhydro Inc., it includes
16  Drytec Limited, which is now Anhydro U.K. Limited
17  as well as other companies.
18      Q  Do you know who the ultimate
19  managing director of the group of companies is, at
20  highest holding company level?
21      A  Yes, I know both the CEO and the
22  chairman of the board; the chairman of the board,

Page 20

1  whose name I can't remember, but the CEO I do.
2  I only know his nickname.
3      Q  Which is?
4      A  His nickname is Ziggy somebody or
5  other, bizarre as it may seem, but the CEO is
6  Allan Jorgensen, who is chairman of the Drytec
7  board as well.
8      Q  What is the role of Mr. Dedert?
9      A  I don't know what the role of
10  Mr. Dedert is, he's a shareholder of Anhydro
11  Holdings. More than that, I don't know.
12      Q  Does Drytec Limited have any drying
13  facilities?
14      A  No.
15      Q  Does it hold itself out as willing
16  to do drying projects in support of either sales
17  or to accommodate its clients on a short-term
18  basis?
19      A  It does have the ability to
20  undertake small scale drying trials, and in that
21  respect, we have a number of test facilities only,
22  so I correct my previous statement.

Page 21

1      Q  And that would include the ability
2  to dry Mannitol products, would it not?
3      A  Depending on your definition of it,
4  Drytec Limited has the ability to design spray
5  dryers for the production of Mannitol, yes, or to
6  test the drying of Mannitol.
7      Q  So physically, it dries Mannitol?
8      A  Drytec Limited does not dry
9  Mannitol, no.
10      Q  And that ability would also apply
11  to Mannogem EZ, would it not?
12      A  It would.
13      Q  What is the relationship between
14  Drytec Limited and SPI Pharma Incorporated?
15      A  There's no direct association or
16  relationship.
17      Q  What is the indirect association?
18      A  We have supplied through Drytec
19  North America L.L.C. key parts for spray drying
20  for -- spray drying system for Mannitol, or
21  Mannogem, whatever it's called.
22      Q  Drytec Contract Processing dries

6 (Pages 18 to 21)

Page 22

1  both Mannitol and Mannogem EZ, correct?
2  A   It doesn't currently dry either of
3  those products, but has in the past.
4  Q   In the recent past?
5  A   It depends on your definition of
6  recent.
7  Q   Give me a timeframe, please.
8  A   In the past, it has, in the recent
9  past it has.
10 Q   Do you know if there are any
11 customers in the United States for either of those
12 products?
13 A   Do I know if there are customers in
14 the United States?
15 Q   Yes, you are the managing director
16 of the company, right?
17 A   I am indeed the managing director
18 of the company, we have established that.
19 I believe there are customers in the United States
20 for those products.
21 Q   And the products are dried here in
22 the U.K. and then imported by the customer or

Page 23

1  exported by Drytec to the United States, correct?
2  MS. HOLTHAM: Objection, question vague
3  and compound.
4  Q   Do you need it broken down? I'm
5  happy to do it in parts, but I thought it was
6  fairly straightforward.
7  A   Drytec Contract Processing has in
8  the past manufactured Mannitol based products
9  under strict instructions of clients, clients
10 prescribing every aspect of the process.
11 Q   And those products have been
12 shipped to the United States?
13 A   I believe Drytec haven't shipped
14 any products, but I understand products have been
15 ultimately despatched by someone to the
16 United States.
17 Q   By whom?
18 A   Normally by our clients, Drytec
19 doesn't normally get involved in shipping of
20 products.
21 Q   Let's mark as Drytec exhibit 2 four
22 pages which are from a compilation by Piers

Page 24

1  Imports, they have been marked confidential
2  because although the information is public, it's
3  an import record, the company that accumulates the
4  information has proprietary interest in the
5  report. I'm certainly free to give it to you, but
6  I do remind you that they --
7  A   It's under confidentiality.
8  MS. HOLTHAM: I'd like to make
9  an objection certainly for the record at least,
10 I'm not going to instruct Mr. Kennet not to look
11 at these documents, but in the confidentiality
12 agreement pursuant to which disclosure of these
13 documents was made, you specifically agreed that
14 the documents were not to be disclosed if marked
15 confidential, as they had been by you, to Drytec's
16 personnel.
17 That agreement was on letter from Morgan
18 Lewis dated December 21st 2006, and specifically
19 provides:
20 "Outside counsel for Roquette and Drytec
21 agree to hold the confidential information in the
22 strictest confidence and not disclose it or

Page 25

1  otherwise permit it to become available to any
2  person, including but not limited to Roquette and
3  Drytec personnel."
4  MR. RIGLER: Yes, and now I was the
5  producing party, or Roquette, the plaintiff, was
6  the producing party, and it is willing to waive
7  that confidentiality. The only reason it was
8  marked confidential is because of the proprietary
9  interest in the accumulation. This is not even
10 a full accumulation, and I believe that this is
11 within the legitimate scope of the information,
12 and since my client is the one who produced,
13 I believe that I can waive that confidentiality.
14 (Exhibit Drytec 2 marked for identification)
15 MS. HOLTHAM: Would you give Mr. Kennet
16 a moment to look through the document?
17 MR. RIGLER: Sure. (Pause).
18 Q   Have you seen Drytec exhibit 2
19 previously?
20 A   No, I have not.
21 Q   I see it has no Bates numbers. May
22 I have it, please?

Page 26

1  A  Sure. (Handed).
2  Q  I'm going to mark page 1, page 2,
3  page 3, page 4, page 5. Maybe I'll ask your
4  counsel to initial that as marked, so when that
5  becomes part of the record, we'll know that's the
6  correct document and correct page.
7      MS. HOLTHAM: Thank you.
8  Q  Could you turn to page 2 of Drytec
9  exhibit 2?
10 A  Yes.
11 Q  Does this refresh your recollection
12 as to whether Drytec has ever imported any
13 Mannitol powder into the United States?
14 A  It seems from this documentation
15 that Drytec Contract Processing has imported --
16 exported material to the United States, Mannitol
17 material.
18 Q  And why do you say Drytec Contract
19 Processing?
20 A  Because Drytec Contract Processing
21 is the only company with any Mannitol association,
22 with any client in the United States that produces

Page 27

1  Mannitol.
2  Q  But Drytec Limited does have the
3  test facility where it is able to dry Mannitol
4  powder?
5  A  Yes, to my knowledge, Mannitol
6  powder has never been produced on the test unit.
7  Q  But we do agree, I think, the
8  document speaks for itself, that the exporter is
9  described as Drytec?
10 A  It is described in this document as
11 Drytec.
12 Q  Without distinction as between
13 Drytec Contract Processing and Drytec Limited?
14 A  It would be Drytec Contract
15 Processing Limited as the legal name of the
16 company who has undertaken that exporting,
17 although this document doesn't identify that,
18 you're correct.
19 Q  Let's turn to what I think is going
20 to be page 4.
21 A  Yes.
22 Q  You've not seen this document

Page 28

1  previously?
2  A  I have not, no.
3  Q  This indicates that 35,540 pounds
4  of Mannitol in 300 drums were shipped -- were
5  exported by Drytec Limited to SPI Pharma, correct?
6  A  So this document seems to indicate,
7  yes.
8  Q  And then if we turn to page 5, we
9  see that 298 kegs weighing 35,301 pounds of
10 Mannitol powder were exported by Drytec Contract
11 Processing, again to SPI Pharma, correct?
12 A  Yes, so it seems.
13 Q  Do you have any reason to believe
14 that Piers Imports, the compilation service, would
15 have misread the shipping documents?
16 A  I don't have any reason -- I have
17 no knowledge whether the system could result in
18 errors. However, it significantly surprises me
19 that Drytec Limited is listed there, because
20 Drytec Limited did not have any contractual
21 relationship with SPI Pharma, and they do not
22 normally from the U.K. export anything since they

Page 29

1  don't produce anything. But the documentation
2  seems to contradict this, so it comes as
3  a surprise to me.
4  Q  SPI Pharma certainly believes that
5  it is purchasing Mannogem EZ spray dry Mannitol
6  from Drytec Limited, does it not?
7      MS. HOLTHAM: Objection, the question
8  invites speculation on behalf of the witness.
9  Q  You may answer.
10 A  I do not believe that Drytec
11 Limited, whose activities is purely the design and
12 supply of spray drying equipment, had any Mannitol
13 production contract or obligation, whatever you
14 want to call it, with SPI Pharma. It is Drytec
15 Contract Processing Limited which is the toll
16 manufacturing facility that Drytec has, or company
17 that Drytec has.
18 Q  And those are sister companies both
19 owned by Drytec Holdings, and you're the chief
20 executive officer of all three, or the managing
21 director of all three?
22 A  I am managing director of all