# YOUNG CONAWAY STARGATT & TAYLOR, LLP

BEN T. CASTLE
SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
FREDERICK W. IOBST
RICHARD H. MORSE
DAVID C. MCBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
JOSY W. INGERSOLL
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DIPRINZIO
JAMES L. PATTON, JR.
ROBERT L. THOMAS
WILLIAM D. JOHNSTON
TIMOTHY J. SNYDER
BRUCE L. SILVERSTEIN
WILLIAM W. BOWSER
LARRY J. TARABICOS
RICHARD A. DILIBERTO, JR.
MELANIE K. SHARP
CASSANDRA F. ROBERTS
RICHARD J.A. POPPER
TERESA A. CHEEK
NEILLI MULLEN WALSH

JANET Z. CHARLTON
ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON
CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
MARTIN S. LESSNER
PAULINE K. MORGAN
C. BARR FLINN
NATALIE WOLF
LISA B. GOODMAN
JOHN W. SHAW
JAMES P. HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
MAUREEN D. LUKE
ROLIN P. BISSELL
SCOTT A. HOLT
JOHN T. DORSEY
M. BLAKE CLEARY
CHRISTIAN DOUGLAS WRIGHT
DANIELLE GIBBS
JOHN J. PASCHETTO
NORMAN M. POWELL
ELENA C. NORMAN

JOSEPH M. BARRY
SEAN M. BEACH
SANJAY BHATNAGAR
DONALD J. BOWMAN, JR.
MICHELE SHERRETTA BUDICAK
JEFFREY T. CASTELLANO
KARA HAMMOND COYLE
KRISTEN SALVATORE DEPALMA
MARGARET M. DIBIANCA
MARY F. DUGAN
ERIN EDWARDS
KENNETH J. ENOS
IAN S. FREDERICKS
JAMES J. GALLAGHER
SEAN T. GREECHER
STEPHANIE L. HANSEN
PATRICK A. JACKSON
DAWN M. JONES
KAREN E. KELLER
JENNIFER M. KINKUS
EDWARD J. KOSMOWSKI
JOHN C. KUFFEL

SPECIAL COUNSEL
JOHN D. MCLAUGHLIN, JR.
KAREN L. PASCALE
PATRICIA A. WIDDOSS

TIMOTHY E. LENGKEEK
ANDREW A. LUNDGREN
MATTHEW B. LUNN
ADRIA B. MARTINELLI
KATHALEEN MCCORMICK
MICHAEL W. MCDERMOTT
TAMMY L. MERCER
MARIBETH L. MINELLA
EDMON L. MORTON
D. FON MUTTAMARA-WALKER
JENNIFER R. NOEL
ADAM W. POFF
SETH J. REIDENBERG
SARA BETH A. REYBURN
CHERYL A. SANTANIELLO
      (NJ & PA ONLY)
MONTÉ T. SQUIRE
MICHAEL P. STAFFORD
CHAD S.C. STOVER
JOHN E. TRACEY
TRAVIS N. TURNER
MARGARET B. WHITEMAN
SHARON M. ZIEG

SENIOR COUNSEL
CURTIS J. CROWTHER

OF COUNSEL
BRUCE M. STARGATT
STUART B. YOUNG
EDWARD B. MAXWELL, 2ND

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(800) 253-2234 (DE ONLY)
FAX: (302) 571-1253

110 WEST PINE STREET
P.O. BOX 594
GEORGETOWN, DELAWARE 19947
(302) 856-3571
(800) 255-2234 (DE ONLY)
Fax: (302) 856-9338

WWW.YOUNGCONAWAY.COM

DIRECT DIAL: (302) 576-3587
DIRECT FAX: (302) 576-3551
jcastellano@ycst.com

October 17, 2007

**BY CM/ECF**

The Honorable Mary Pat Thynge
United States District Court
844 North King Street
Wilmington, DE 19801

Re:    Roquette Freres v. SPI Pharma, Inc., et al., C.A. No. 06-540-***

Dear Judge Thynge:

I am writing on behalf of SPI Pharma, Inc. ("SPI") to request that the Court grant SPI an extension of time to answer the contention interrogatories propounded by Roquette Freres ("Roquette") in the above-captioned case.

In a discovery teleconference on August 28, 2007, the Court directed the parties to exchange contention interrogatory responses by October 22, 2007, on the assumption that SPI would have had an opportunity by that date to depose key Roquette witnesses. The testimony of these witnesses will allow SPI to answer the contention interrogatories more fully and accurately.

During a subsequent discovery teleconference, on September 14, 2007, the Court directed Roquette to produce its witnesses for deposition in the United States rather than in Paris, France. Roquette offered November 13-16, 2007 as the earliest available deposition dates for its three noticed witnesses and Rule 30(b)(6) designee, which SPI accepted. The Court indicated during the September 14 teleconference that if SPI was not able to depose these key witnesses prior to October 22, the Court would grant SPI more time to answer Roquette's contention interrogatories. *See* Transcript of September 14, 2007 Teleconference, at 23 (attached hereto as Exhibit A).

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Mary Pat Thynge
October 17, 2007
Page 2

       SPI has not had an opportunity to depose any Roquette witnesses, and will not have such an opportunity until mid-November. SPI respectfully requests, therefore, that the Court grant the parties until November 30, 2007 to exchange their contention interrogatory responses, which will allow a reasonable time for SPI to obtain and review the transcripts from the mid-November depositions.

Respectfully submitted,

Jeffrey T. Castellano (#4837)

JTC:mcm
Attachment

cc:    Clerk, U.S. District Court (By CM/ECF and Hand Delivery)
       Mary B. Graham, Esquire (By CM/ECF and Hand Delivery)
       Julia Heaney, Esquire (By CM/ECF and Hand Delivery)
       Douglas V. Rigler, Esquire (By E-mail)

# EXHIBIT A

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              -  -  -
      ROQUETTE FRÈRES,                        CIVIL ACTION
 4                                       :
                   Plaintiff,            :
 5                                       :
            v.                           :
 6                                       :
      SPI PHARMA, INC. and DRYTEC LTD.,  :
 7                                       :    NO. 06-540 (MPT)
                   Defendants.
 8                              -  -  -

 9                         Wilmington, Delaware
                    Friday, September 14, 2007 at 12:32 p.m.
10                        TELEPHONE CONFERENCE

11                              -  -  -

12    BEFORE:      HONORABLE MARY PAT THYNGE, Magistrate Judge

13                              -  -  -
      APPEARANCES:
14

15             MORRIS NICHOLS ARSHT & TUNNELL, LLP
               BY:  JULIA HEANEY, ESQ.
16
                    and
17
               YOUNG & THOMPSON
18             BY:  ANDREW J. PATCH, ESQ., and
                    JEFFREY R. SNAY, ESQ.
19                  (Arlington, Virginia)

20                       Counsel for Plaintiff

21
               YOUNG CONAWAY STARGATT & TAYLOR, LLP
22             BY:  JEFFREY T. CASTELLANO, ESQ.

23                  and

24
                              Brian P. Gaffigan
25                            Registered Merit Reporter
```

```
 1    APPEARANCES: (Continued)

 2

 3                MORGAN LEWIS & BOCKIUS, LLP
                 BY:  BRIAN P. MURPHY, ESQ., and
 4                    DANIEL P. MURPHY, ESQ.
                      (New York, New York)
 5
                        Counsel for Defendants
 6

 7

 8

 9

10                        - oOo -

11              P R O C E E D I N G S

12              (REPORTER'S NOTE:  The following telephone

13    conference was held in chambers, beginning at 12:32 p.m.)

14              THE COURT:  Good afternoon, counsel.  This is

15    Judge Thynge.  Who do I have on the line for Roquette

16    Freres?

17              MS. HEANEY:  Your Honor, this is Julie Heaney.

18    And I have, from Young & Thompson, Andrew Patch and Jeffrey

19    Snay.

20              THE COURT:  I'm sorry, Julie.  The last name of

21    Jeffrey?

22              MS. SNAY:  Snay.

23              THE COURT:  Thank you.  And who do I have on the

24    line on behalf of SPI?

25              MR. CASTELLANO:  Good afternoon, Your Honor.
```

1    This is Jeff Castellano from Young Conaway.  John Shaw is

2    also here; and I have Dan Murphy and Brian Murphy from

3    Morgan Lewis on the line.

4              MR. B. MURPHY:  Good afternoon, Your Honor.

5              THE COURT:  Good afternoon.  I understand there

6    is a little problem that has arisen between the parties

7    concerning our last teleconference, so let's get to the

8    issues about the mannitol.

9              MR. B. MURPHY:  Yes, Your Honor.  This is Brian

10   Murphy on behalf of SPI.  I think the fundamental problem

11   we have is the court-ordered production of samples of two

12   ingredients.  These ingredients are not commercial products,

13   they're trade secret ingredients and the compositions of the

14   trade secret ingredients are not known to our customers.  In

15   fact, customers are also required to execute confidentiality

16   agreements in any event as a precaution and so our intention

17   is to designate these products confidential under the

18   protective order.

19             Now, the protective order permits one level of

20   confidentiality.  The immediate problem is that pursuant to

21   those agreed terms, one of the Roquette in-house attorneys

22   who I believe resides in France is permitted to have access

23   to the samples, and so we requested that he be excluded from

24   the parties authorized to have any access to the samples and

25   also that he and, of course, anyone else from Roquette be

1   prohibited from having access to any documents or test

2   results that are generated after the plaintiff tests these

3   ingredients.  And so, if we could stop there, that is the

4   first issue.

5           THE COURT:  Okay.  Why don't we address it point

6   by point?  It would be easier for me.  Thank you.

7           Okay.  What is the response from Roquette?

8           MR. PATCH:  Your Honor, it's Andrew Patch.

9   Well, the response from Roquette is that the day before

10  yesterday is the first time we've heard that this mannitol

11  HS and mannitol HSE is considered to be any kind of a

12  confidential product or a trade secret.  That's contrary to

13  what we've been told up to this point in the interrogatory

14  answers.  It also doesn't really make sense to say that the

15  mannitol is not a commercial product in the same breath and

16  saying it's sold to customers.

17          Now, whatever might be restrictions placed on

18  the customers who buy it from SPI, what hasn't been revealed

19  is what those customers then do with it.  I mean this is a

20  powdered sugar alcohol and it's an excipient for pills and

21  so it's going to be something that is out there in the

22  public ultimately.

23          MR. B. MURPHY:  Your Honor, that's incorrect.

24  It's an excipient for pharmaceutical products; it's not sold

25  to customers as a single ingredient.

```
 1              THE COURT:  Okay.  I'm going to express my
 2   ignorance with the word "excipient," all right?
 3              MR. PATCH:  Additive, Your Honor.
 4              THE COURT:  Additive.
 5              MR. PATCH:  If we take the example of a pill, we
 6   have got an active ingredient, and then we have got the rest
 7   of the stuff in there that lets you shape it as a pill that
 8   holds together until you eat it.
 9              THE COURT:  Okay.  So what you are saying, for
10   me to understand -- and just let me take it step by step
11   counsel, please -- for SPI, what you are saying to me is
12   that this additive or excipient is blended together or mixed
13   with something else; it is not sold separately to the
14   customers?
15              MR. B. MURPHY:  Yes, Your Honor.
16              THE COURT:  And the customers then, do you have
17   any idea what the customers do with this once they get it?
18   Or is what you are saying, they don't do anything with this
19   separately; it's part and parcel to being part of something
20   else?
21              MR. B. MURPHY:  Yes, they simply take it and
22   blend it with other active and inactive ingredients; things
23   like binders, adhering agents, microspheres, whatever you
24   want to put in your pills and tablets and you compress them.
25   You sell it as an end-product pharmaceutical.
```

6

1            THE COURT:  Now, do you know what type of
2    confidentiality the customers are required to have for this
3    mannitol HS, that is, an additive to something else that you
4    sell and that they're together?  Are they restricted, for
5    example, from breaking down and trying to find the chemical
6    composition and breaking it down?  I'm trying to understand
7    what type of confidentiality is expected from them, the
8    extent of it.
9            MR. B. MURPHY:  Right.  Yes.  I'm just
10   conferring with my colleague Daniel Murphy, Your Honor.
11           THE COURT:  That's fine.  Take your time, if you
12   need to.
13           MR. B. MURPHY:  Yes.  I'm just trying to make
14   sure I get the information correctly.
15           THE COURT:  Do you want to put us on mute so you
16   can talk for a bit?
17           MR. B. MURPHY:  No, no.  We're good.
18           THE COURT:  All right.
19           MR. B. MURPHY:  And I will say now that if we
20   get into this in any detail, I may have to declare the
21   transcript confidential under the protective order.  I won't
22   do that yet but, in any event, the client advises that the
23   confidentiality provisions for the customers do in fact
24   prohibit the customers from reverse engineering what they
25   receive.

1      THE COURT:  Thank you.  I didn't think that we

2 were getting into territory that was necessarily extremely

3 confidential.

4      MR. B. MURPHY:  No, no.  Not yet, Your Honor.

5      THE COURT:  Okay.

6      MR. PATCH:  Your Honor, if I could respond

7 briefly for Roquette?  It's Andrew Patch again.

8      As I understand; and I invite Brian to correct

9 me if I'm wrong; the mannitol HS and the mannitol HSE,

10 these two products are sold as such to SPI by its customers

11 subject to whatever restrictions were just being described,

12 but then its customers are the ones that then combine them

13 with other ingredients to make the final pill or drug which

14 is sold to the ultimate distributors or customers.  We're

15 not aware of any restrictions whatsoever that are placed on

16 it once it actually gets out there in the public.

17      MR. B. MURPHY:  Your Honor, that is incorrect.

18      THE COURT:  What is incorrect about it, please?

19      MR. B. MURPHY:  Well, those are not sold

20 individually as ingredients.

21      THE COURT:  That's what I thought you had said

22 originally.

23      MR. B. MURPHY:  It is.

24      THE COURT:  Even to your own customers?

25      MR. B. MURPHY:  Correct.

```
 1                    THE COURT:  So that is what is incorrect in the

 2       assumption?

 3                    MR. B. MURPHY:  Yes.

 4                    THE COURT:  All right.  Thank you.

 5                    I'm ruling that it's considered to be highly

 6       confidential and will only allow Roquette's outside counsel

 7       and the independent expert to have access to it, which would

 8       exclude -- and I hope I pronounce his name correctly --

 9       well, I'll just indicate anybody from Roquette, including

10       Roquette's in-house counsel, from having access to either

11       the product or the test analysis.  Now, I'm going to

12       include, at least at this stage, test results in that.  We

13       could address it later, but I think the test results would

14       also be included in them and leave it at that for now as a

15       ruling.

16                    Let's go on to the next one as to whether an

17       inter partes testing of mannitol HS should occur.

18                    MR. B. MURPHY:  Yes, Your Honor.  SPI's position

19       on that is, as you know, the one product that is in issue

20       in the case is called Mannogem EZ.  That product has been

21       tested by the plaintiff Roquette.  We have requested the

22       documents reflecting that testing and not a single page of a

23       single document indicates the protocol or method they used

24       to test it.  There is simply conclusory results.

25                    THE COURT:  Well, that may affect whether they
```

1  can produce anything at trial but the question we're talking

2  about now is on the discovery level.

3          MR. B. MURPHY:  Understood, Your Honor.

4  Absolutely understood.  But the point is because that is

5  the situation with Mannogem EZ, we now have an opportunity

6  to avoid exactly that situation with these other ingredients

7  that they are considering bringing into the case.  We

8  submitted the case law, and I'm sure Your Honor is aware

9  that the strong preference and the basic rule is any such

10  testing should be done on an inter partes basis with the

11  opportunity for the adversary to be present and record the

12  information.

13          We just need to be given notice and the right to

14  appear with, if we want to, one of our experts who can view

15  and have access to the test as it's conducted; but more

16  importantly, even the case relied on by Roquette in their

17  responsive letter points out that, regardless, the other

18  party is entitled to receive a written protocol to test

19  method, which I emphasize we still don't have in this case

20  even for the product that is in suit.  And that's what the

21  patent is all about.

22          So I say they can't have it both ways.

23  We're not at the beginning of the case.  We're not before

24  the case started.  This is the middle of discovery which,

25  unfortunately, we have been forced to agree to extend

1    because we can't get the discovery we need promptly enough,

2    and so we're in the middle of it.  We're trying to get to

3    it.  We can't take depositions without the documents, and

4    now they want to bring in the new ingredient that they need

5    to test.  Fine, but they want to hide the information.  We

6    say that is improper and that the case law is very strongly

7    in favor, particularly under these kinds of circumstances,

8    to allow both sides to have prior notice, understand what

9    the protocol is that is going to be used and observe the

10   tests and have access to whatever results are generated.  We

11   don't want to influence in any way what they do.  We just

12   want to observe it, be present and understand it.

13                  THE COURT:  I understand what you are saying.

14                  What is Roquette's position?

15                  MR. PATCH:  Your Honor, Roquette's position is

16   that inter partes testing, this has nothing to do with Rule

17   34 of the Rules of Evidence because this isn't about

18   generating evidence to be necessarily introduced at trial.

19   This is about figuring out whether these products should be

20   accused or not.  It has nothing whatsoever to do with Rule

21   34.  Unless or until we decide any of these products should

22   be accused, it is frankly none of their business how we test

23   and what we do with it.

24                  The little canard about destruction of documents

25   and failure to produce regarding the testing that we've done

1    already is also neither here nor there.  That was done

2    internally.  According to the ruling you just made, we're

3    not going to be able to do that anyway and it's going to

4    be our outside expert, so it's clearly not something that

5    calls for inter partes testing.  The call for that is just

6    misplaced.

7                 THE COURT:  How much mannitol did you ask for

8    to test to determine whether or not the product should be

9    accused?

10                MR. PATCH:  We asked for 10 kilograms of each of

11   mannitol HS and HSE and SPI counsel agreed to provide that

12   in the previous telephone conference.

13                THE COURT:  Well, at this stage, I understand

14   what SPI is saying about an inter partes testing of mannitol

15   HS and HSE.  This normally would have been done hopefully

16   prior to the lawsuit or would have been done during the

17   lawsuit to determine whether or not either of these products

18   are subject to claims of infringement.  Obviously, testing

19   that is not done inter partes without indication of what the

20   protocol is prior to the testing has a different value or

21   standard, but if Roquette intends to rely upon this testing

22   to support any claim for infringement, they are going to

23   have to produce all of the documents related to the testing.

24                MR. PATCH:  That's understood, Your Honor.

25                THE COURT:  More importantly, I really do think

1    that Roquette should also film this testing.

2            MR. PATCH:  Well, we hadn't thought about it but

3    we will definitely take that under advisement.

4            THE COURT:  No, no.  I don't think it's under

5    advisement, I think I said "should."

6            MR. PATCH:  I see.

7            THE COURT:  Okay?

8            MR. PATCH:  Okay.

9            THE COURT:  Film the testing as to what is being

10   done.  I have no idea what it necessarily entails.  I don't

11   know how long the process necessarily is.  But you have got

12   to keep a record that is going to pass muster as to Rules of

13   Evidence later on; and if you don't maintain that record and

14   this information is discoverable, the court will definitely

15   look at it as spoilation of evidence.  So that is the

16   conundrum that you find yourself in.

17           So I am going to deny the idea of inter partes

18   testing, at least at this stage.  It does not mean that I

19   would not reconsider it in this forum, in this case for

20   another purpose or for a different aspect.  So I'm saying

21   for the purpose now that Roquette has represented to

22   determine whether or not the allegation of infringement is

23   going to be raised against either of these products, I'm

24   not going to require inter partes testing.  For any other

25   purpose, I will reconsider SPI's request and require inter

1    partes testing; but, you know, what is good for SPI to

2    request is also good for plaintiff to request.

3              MR. B. MURPHY:  Understood, Your Honor.  This is

4    Brian Murphy.

5              THE COURT:  Now, I wanted to understand, was

6    there a question that you had to me about just this ruling?

7              MR. B. MURPHY:  Yes, Your Honor.

8              THE COURT:  Okay.  What was the question?

9              MR. B. MURPHY:  I wanted to ask -- and this

10   comes right out of the *Congoleum* case that they relied on.

11             THE COURT:  Yes.

12             MR. B. MURPHY:  That you also order that we be

13   provided with a detailed description of the test procedure

14   before it's conducted.

15             MR. PATCH:  For Roquette, Your Honor, again we

16   think that misses the point and is uncalled for.  The first

17   order of business is for us to determine whether or not

18   these are going to be accused products.  If they end up

19   being accused products, then obviously it's in our own

20   interest to describe what we did and how we came to the

21   conclusion that they're within the scope of the patent.  If

22   they're not accused products, then it's just none of SPI's

23   business what we did or how we did it.

24             THE COURT:  Well, I'm going to require you

25   not to disclose it to SPI but you had better well maintain

1    a detailed test protocol or procedure that was done.  Again,

2    because it goes to the issue of potentially destroying

3    evidence.  And you're right, if it's not accused, it doesn't

4    make a bit of difference.

5              MR. PATCH:  Right.  That's the point.

6              THE COURT:  If they are accused, it does make

7    a huge difference, and SPI will be back with the issue

8    concerning an inter partes testing, which I will consider.

9              MR. PATCH:  Understood.

10             MR. B. MURPHY:  Just so I'm clear, Your Honor,

11   if they accuse these ingredients and try to inject them into

12   this case and take further discovery, at the time of trial

13   we will be moving in limine to exclude any evidence of this

14   sort that they try to rely on.

15             THE COURT:  I understand that.  I understand

16   what you are saying.  But if they're going to just rely on

17   these tests alone, you're right, they may have some serious

18   problems.

19             MR. B. MURPHY:  Thank you, Your Honor.

20             THE COURT:  They may have some serious problems.

21   Now, I wanted to ask why did you need 10 kilograms?

22             MR. PATCH:  Well, that's what we felt would be a

23   safe quantity to make sure we can do what we need to do.

24             MR. B. MURPHY:  Your Honor, this is Brian Murphy

25   again.  We don't particularly care about the amount.

 1              THE COURT:  Okay.

 2              MR. B. MURPHY:  When we relayed that to the

 3     client, they kind of looked at us like we were nuts.

 4              THE COURT:  Yes.

 5              MR. B. MURPHY:  They said, "Isn't one kilo

 6     more than enough for whatever they need?"  So I think we

 7     went back and somebody communicated that to our adversary.

 8     I just don't think we ever quite agreed on the amount.  And

 9     as I say, I don't particularly care as long as counsel for

10     Roquette considers what they need and want to do with it and

11     asks for an appropriate amount, no more than 10 kilos.  If

12     it's less, that's what my client would prefer.  If they

13     really think they need more, that's fine, just tell us.

14              THE COURT:  Well, the question I have to

15     Roquette and Andrew is this:  Is this what counsel is

16     estimating or is this what is indicated to you that is

17     necessary by discussions with whoever is going to be doing

18     the testing?

19              MR. PATCH:  The former, Your Honor, to be quite

20     candid.

21              THE COURT:  Okay.

22              MR. PATCH:  I think we really need more than one

23     kilo but I doubt we need 10.

24              THE COURT:  Well, I'll give you the right to

25     have up to 10, but why don't we start off with a lower

1    amount because you are going to be the one responsible.

2    Let's put it this way.  Counsel for Roquette is going to be

3    responsible for what happens to this product.  And to the

4    extent that it's more that you have, it's kind of like the

5    way I look at it like uranium and plutonium when you hear

6    about plutonium and uranium and all these other products

7    being lost by government.  Counsel is going to be facing the

8    same problem.  The more you have, the more you have the

9    opportunity to lose.

10              MR. PATCH:  Okay.

11              THE COURT:  And it's your responsibility because

12   you're going to have to treat the sample material and any

13   documents generated as highly confidential.  If it's in

14   your possession or your expert's possession, it's going to

15   have to be in a locked cabinet.  You will maintain a log as

16   to who you distribute it to.  I'm not saying you have to

17   produce that log right now.  I'm just saying that these

18   are steps that you are going to have to do to maintain the

19   confidentiality of it, along those lines, so that we know;

20   and you will also maintain who the independent expert is.

21   Now, I'm not going to require you right now to produce under

22   the protective order who's testing the material, but you are

23   probably going to have to produce it in the future.

24              MR. PATCH:  Okay.

25              THE COURT:  And as I said, maintain any and all

 1    documents that would deal with the protocol, how the test

 2    procedure was being done, including raw data, test

 3    materials, protocol and results.  I'm asking you to hold on

 4    to this stuff because it may be something that is going to

 5    be relevant later on.  And once the court has cautioned in

 6    this regard, if any of this material gets lost, it's going

 7    to be your head on the chopping block.  Do you understand?

 8            MR. PATCH:  Sure.

 9            THE COURT:  Let's talk about production of

10    witnesses for depositions in the United States.

11            MR. B. MURPHY:  Your Honor, just one

12    clarification.

13            THE COURT:  Sure.

14            MR. B. MURPHY:  Roquette also must film the

15    tests?

16            THE COURT:  Oh, yes.  I apologize.  Yes.

17    Roquette also must film the test.  That was assumed before.

18    Yes.

19            MS. HEANEY:  Your Honor this is Julie Heaney.  I

20    didn't hear your ruling on whether the testing expert must

21    be identified.

22            THE COURT:  I said the testing expert does not

23    need to be identified presently under the protective order

24    but probably will be required to be identified in the

25    future.

```
1              MR. B. MURPHY:  Your Honor, then I have a
2    question about that.  The protective order requires it.
3              THE COURT:  Oh, I couldn't remember if it did.
4              MR. B. MURPHY:  No, it does.
5              THE COURT:  Okay.  Then fine, that person is
6    identified.  I apologize.  I couldn't remember if it had
7    been.
8              MR. B. MURPHY:  Yes.
9              THE COURT:  I didn't mean to modify the
10   protective order in that regard.
11             MR. B. MURPHY:  Okay.
12             THE COURT:  That was my confusion, counsel.  I
13   apologize.  Yes.  The short answer to it, Julie, is yes, in
14   light of that.
15             The next issue is whether or not Roquette
16   should produce the witnesses for deposition in the United
17   States.  And I'm not exactly certain, counsel, based upon
18   the reading of both parties submissions, whether this was a
19   misunderstanding between counsel or not.
20             MR. B. MURPHY:  Yes, Your Honor.  Brian Murphy.
21   Oren Langer is on a holiday today.  I did speak with him.
22             THE COURT:  Good for him.
23             MR. B. MURPHY:  He is a good man.  But I said,
24   look, here is what is stated in the letter.  Did you ever
25   have a conversation like that with Mr. Rigler?  He said
```

1    never.

2                  THE COURT:  And Mr. Rigler is not here either.

3                  MR. PATCH:  That's right.  He is traveling as

4    well, Your Honor.

5                  MR. B. MURPHY:  So let's just characterize it

6    as a clear misunderstanding.  And let me further say that

7    taking depositions in France, for anybody who has been

8    litigating for any period of time, knows that is very, very

9    inconvenient and difficult because we must, we do not have a

10   choice, we must get the consent of the French government.

11   That is in the Hague Convention, and I have had a great deal

12   of difficulty in my life getting French depositions lined

13   up, even with the parties consent.  We are not permitted to

14   consent.

15                  THE COURT:  Well, in light of a matter that

16   I'm presently considering about certain things regarding

17   French production of documents, I understand that it can be

18   a tedious, drawn out, long process, despite the fact that

19   the French entity has subjected itself to this court's

20   jurisdiction for enforcement of its patent.  And that's

21   sometimes true of other entities in Europe as well, not just

22   France, other countries in Europe as well.

23                  What do you do about location of depositions,

24   subparagraph B in the standard scheduling order that I have,

25   that any party or representative of a party filing a civil

1    action in this District Court must ordinarily be required,

2    upon request, to submit to a deposition at the place

3    designated within this District?

4              MR. PATCH:  Your Honor, it's Andrew.  We think

5    that would apply clearly to the 30(b)(6) witness for

6    Roquette.  We are trying to figure out what works.

7              THE COURT:  Well, the way I look at it, it

8    doesn't say that it's limited to 30(b)(6).  My standard

9    language also indicates that a defendant who brings an

10   action or becomes a counterclaimant or cross-claimant; and I

11   guess to some degree the argument could be made that SPI, by

12   raising invalidity-type defenses or inequitable conduct or

13   the such, could fall into that category; are also considered

14   to have filed the action in this court for the purpose of

15   this provision.  So, technically, all the depositions are

16   supposed to happen here.  I didn't look at it as just only

17   30(b)(6).  I really didn't.

18             MR. PATCH:  I kind of did, Your Honor, in that

19   it says "any party or representative" and then

20   representative is officer, director or managing agent.  It

21   does seem like it's 30(b)(6).

22             In any case, what we're trying to do is just --

23             THE COURT:  Well, the word is "or" not "and."

24             MR. PATCH:  Excuse me?

25             THE COURT:  The word is "or," not "and."

1              MR. PATCH:  Any party "or" representative.

2              THE COURT:  Yes.

3              MR. PATCH:  Yes.  In any event, we're trying to

4    propose what we thought would work.  Roquette is in a small

5    town in the north of France called Lestrem.  We're willing

6    to bring all the witnesses to Paris, which is a significant

7    hike from Lestrem and a significantly more convenient

8    location, for the sake of being able to line them up and get

9    a time window in the reasonably near future.  Doug has been

10   working on that and he has been working really hard to do

11   it.

12             To get them all over here is another proposition

13   entirely.  SPI has noticed not only 30(b)(6) depositions

14   with multiple topics but also three individuals, so we're

15   talking at least four and probably five or more witnesses.

16             With respect to Brian's comment about conducting

17   depositions in France, that may or may not be technically

18   true under the Hague Convention but I mean we did a week or

19   two of depositions in Paris earlier this summer.  It was no

20   more difficult than scheduling them at any other location.

21   That is, whether or not this requirement is a letter, it's

22   not something that is enforced.  When the parties agree to

23   it, they just do it.

24             MR. B. MURPHY:  That's not my experience, Your

25   Honor, one.  And, two, I don't understand his whole

```
 1    position.  They filed this case as the plaintiff in August

 2    of 2006.  Here we are in September of 2007.  My client is

 3    trying to get to the bottom of this case in a relatively

 4    inexpensive way, which is not easy given the New York law

 5    firm's rates and they want us to fly to France?  They have

 6    got to be out of their mind, Your Honor, to ask for that.

 7              THE COURT:  Well, I don't consider that they're

 8    out of their minds to ask for that.

 9              MR. B. MURPHY:  Well --

10              THE COURT:  I think their argument is that, as

11    a matter of convenience to all, you have a central location

12    for all the witnesses to be taken within hopefully an

13    abbreviated time frame requiring counsel from both sides of

14    the fence to go over to France rather than the reverse.

15              However, I'm going to be ordering that Roquette

16    produce its people here in the United States.  And it can

17    be at a location that is more convenient than Delaware,

18    certainly.

19              MR. B. MURPHY:  We're happy to take them at

20    counsel's firm, if that is easier.  It's all the same to us.

21              THE COURT:  Well, I'm ruling that any place in

22    the United States they can be taken to the extent that it's

23    more convenient.  It's going to be more convenient for some

24    of the witnesses as to the location; and it could be that

25    some of these witnesses may be scheduled to come over to the
```

1  United States in any event.  I don't know.  If they're not,

2  they're still going to have to come over here and have their

3  depositions taken.  We'll leave it at that.

4          MR. B. MURPHY:  Your Honor, one point of

5  clarification.

6          THE COURT:  Yes.

7          MR. B. MURPHY:  If you recall, at our last

8  conference, the depositions were ordered to take place

9  before our supplemental contentions are due which are

10 currently due on October 22nd.

11         THE COURT:  I hope that you can get the

12 depositions done by then.  I don't know whether you can.

13         MR. B. MURPHY:  Okay.

14         THE COURT:  Try to get them done, and I will

15 address it if you can't get them done before that time.

16 Obviously, if you can't, then the court will give you a

17 little bit more time to get the contention responses done,

18 but I would suggest that plaintiff work very hard to get

19 the depositions set up so the contention interrogatories can

20 be answered promptly.  I know that Doug was very concerned

21 about those; and I would expect the parties would work

22 cooperatively together to get the depositions done so that

23 discovery can move along.

24         We have other cutoff dates that you have in your

25 first amended scheduling order which the court will probably

24

1    be entering today that are coming up pretty fast, too; and

2    if there is going to be a problem, serious problem with

3    this, maybe I ought to know about it now before I actually

4    sign the first amended scheduling order so you can tell me

5    if there is going to be a problem with meeting those dates

6    as well.

7              MR. B. MURPHY:  Well, from SPI's perspective,

8    Your Honor, we fully intend to meet those dates because we

9    want discovery over.  And we're the defendant.

10             THE COURT:  Well, we've got a lot to discuss on

11   December 13th.  Counsel, I just want to confirm while I'm on

12   the phone with you, for our status conference, am I actually

13   dealing with multiple time zones or are we all in the same

14   time zone?

15             MR. B. MURPHY:  Same time zone, Your Honor.

16             THE COURT:  Okay.  I'll just be issuing the

17   order and indicating a time.  You can get it from the order.

18             Thank you.  Have a great weekend.

19             (The attorneys respond, "Thank you, Your

20   Honor.")

21             THE COURT:  Good-bye now.

22             (Telephone conference ends at 1:03 p.m.)

23

24

25