```
 1                 IN THE UNITED STATES DISTRICT COURT
                   IN AND FOR THE DISTRICT OF DELAWARE
 2                           - - -

 3     ROQUETTE FRERES,            )      Civil Action
                                   )
 4            Plaintiff,           )
                                   )
 5         v.                      )
                                   )
 6     SPI PHARMA, INC.,           )      No. 06-540(GMS)
                                   )
 7            Defendant.           )

 8                           - - -
                       Wilmington, Delaware
 9               Thursday, September 9, 2010
                         9:30 a.m.
10                   Pretrial Conference
                           - - -
11
       BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
12
       APPEARANCES:
13
               MARY B. GRAHAM, ESQ., and
14             JULIA HEANEY, ESQ.
               Morris, Nichols, Arsht & Tunnell LLP
15                     -and-
               DOUGLAS V. RIGLER, ESQ., and
16             JEFFREY R. SNAY, ESQ.
               Young & Thompson
17             (Alexandria, VA)

18                         Counsel for Plaintiff

19             KAREN PASCALE, ESQ., and
               JEFFREY T. CASTELLANO, ESQ.
20             Young Conaway Stargatt & Taylor, LLP
                       -and-
21             BRIAN P. MURPHY, ESQ., and
               DANIEL P. MURPHY, ESQ.
22             Edwards Angell Palmer & Dodge
               (New York, N.Y.)
23                     -and-
               JENNIFER L. DEREKA, ESQ.
24             Morgan, Lewis & Bockius
               (New York, N.Y.)
25
                           Counsel for Defendant
```

1          THE COURT:  Good morning.

2          (Counsel respond "Good morning.")

3          THE COURT:  This is an office conference, so you

4    can take your seats, please.  We are going to dispense with

5    the formalities of court.  I always invite counsel at these

6    affairs to sit or stand as you feel most comfortable.  It

7    really doesn't much matter to me one way or the other.  I am

8    going to sit.

9          Let's start with introductions, please,

10   beginning with plaintiff.

11         MS. HEANEY:  Your Honor, Julie Heaney for

12   plaintiff.  With us from Young & Thompson are Douglas Rigler

13   and Jeffrey Snay, and Mary Graham from my office as well.

14         THE COURT:  Good morning.

15         MS. PASCALE:  Good morning, Your Honor.  Karen

16   Pascale from Young Conaway for the defendant SPI Pharma,

17   together with my colleague, Jeffrey Castellano.

18         I will reintroduce Brian Murphy, now with the

19   firm of Edwards Angell Palmer & Dodge, Jennifer Dereka,

20   Morgan, Lewis & Bockius, and Dan Murphy also with the

21   Edwards Angell firm.

22         THE COURT:  Good morning.

23         Counsel, I have been advised by my Chief Deputy

24   that it might be helpful if I were to use a mike, that one

25   of you may have a hearing challenge.  Is that correct?

1          MR. RIGLER:  In this courtroom environment,

2     sometimes it's a little hard for me to hear.  I actually was

3     going to request LiveNote at the trial.  But I can hear you

4     fine right now.

5          THE COURT:  You can hear me.  You will remind me

6     or, actually, remind Ms. Walker, of any accommodations we

7     need to make at the time of trial, we will try to do that.

8          So let me just give a brief outline as to how I

9     intend to proceed.  My pretrial conferences can be at times

10    stream-of-consciousness affairs, you will forgive me for

11    that, in the sense that sometimes the subject matter is

12    relatively random, as the thoughts occur to me.

13          What we will do is begin with the various

14    motions in limine that have been filed by the parties.  And

15    we will discuss them in a moment.

16          Then my intention is to walk through the

17    proposed pretrial order.  I have tabbed a number of items

18    that have come to my attention.  We will discuss those.  And

19    then I will open the floor for conversation with you.

20          Likely, we are not going to get to the

21    differences of view between you as to the final jury

22    instructions or the verdict form today.  I think there were

23    some differences, small differences in the preliminary

24    instructions.  We will talk a little bit about that and see

25    if we can't resolve those things.

 1                    So with that, let's get started.

 2                    Let's talk first about Roquette's first motion

 3       in limine, that is styled as a motion to exclude any

 4       testimony from Dr. Rajesh -- is it?

 5                    MR. B. MURPHY:  Yes, Your Honor.  Rajesh.  He

 6       goes by Raj.  Rajesh N. Dave.

 7                    THE COURT:  -- relating to indefiniteness.

 8       Okay.  Who is going to handle this one?

 9                    MR. RIGLER:  I will.

10                    THE COURT:  All right.

11                    MR. RIGLER:  First of all, we are not trying to

12       eliminate his testimony altogether.  It pertains strictly to

13       his untimely testimony and what we consider his unreliable

14       testimony, proposed testimony, regarding the choice of a

15       drum.  You may recall from claim construction --

16                    THE COURT:  I recall very little from claim

17       construction, counsel.  Let's just be honest about it.

18       Okay?  We will do what we can to refresh my recollection.

19                    MR. RIGLER:  We have a patent with 28 claims.

20       The patent is for something called a pulverulent form of

21       mannitol, which is used as an excipient in pharmaceuticals a

22       lot with pills.  27 of those claims are product claims.  One

23       of them is a process claim, a method for manufacture.

24                    Dr. Dave is their chosen expert for invalidity

25       issues, and basically I think their technical expert on the

1    27 product claims.  That's fine.  They have an invalidity

2    challenge on obviousness, and they timely asserted

3    invalidity challenges on indefiniteness, and they were very

4    specific on that.  That was the only invalidity challenge

5    they made, indefiniteness related to the sieving technique

6    for the pellet.

7            They were asked interrogatories.  They had

8    repeated opportunities to address the issue.  They found out

9    late in the day, their expert didn't realize that when you

10   do the friability test -- there is one independent claim,

11   Claim 1, that basically says this mannitol is special, it's

12   different from other mannitols.  It just has certain

13   qualities that make it superior, and many companies are

14   going to choose this because it suits their need.  And it

15   lays out four elements.  One of those elements, the one we

16   are going to argue the most during trial, is friability,

17   meaning the capacity to crumble.

18           Friability is determined by a test, which is

19   specified in the patent.  And basically, you take a particle

20   size cut and you get a certain weight of powder.  Then you

21   put it in what is called a coagulator, a machine that spins

22   with a wheel, with five little steel balls like marbles, and

23   they go around and crush.

24           We get friability values that show them right in

25   the center of the patented claimed range.  They say, no, no.

1    Our friability values are below the bottom of the range.

2    And in deposing their expert, we asked if he knew how many

3    drums there were that you could use in a friability test.

4    He said no.  He said without further investigation, I don't

5    know.  We asked if there were more than one drum.  And he

6    simply didn't know the answer.

7         Our expert during the discovery period said,

8    Hmm, let me think about this.  He ran a test using a drum

9    that is used for testing the abrasion of tablets.  And his

10   suspicion was correct.  He got the low value that they were

11   reporting.

12        Discovery closed.  Dr. Dave, without leave of

13   Court, filed a supplemental expert report and purports to

14   try to explain -- what he tried to explain is that the

15   patent was indefinite because it didn't specify which drum,

16   and simultaneously anybody with ordinary skill in the art

17   understood perfectly well what kind of drum.

18        So he had conflicting conclusions there.  But he

19   never sought, they never sought leave of Court.  They just

20   filed the report late.

21        One of the excuses which they made in their

22   opposition is that they were surprised, they couldn't

23   understand --

24        THE COURT:  That was by Dr. Brittain's --

25        MR. RIGLER:  Yes.  The fact is, they had

1    documents depicting the two different types of drum from the

2    manufacturer.  And they used that document in deposing one

3    of our witnesses.

4              The further fact is that there was a dispute

5    over one of their products as to whether or not it

6    infringed.  That was within the scope of the referral to

7    Judge Thynge.  And she ruled that we are entitled to verify

8    our concern that it did infringe.  She ordered them to give

9    us a sample.  But she said, if you do that, make a video

10   when you test it and give it to them, which we did.

11             The drum issue was right in front of them, the

12   drum that we contend is the proper drum, the powder abrasion

13   drum.  They knew.  They knew for 18 months by documents that

14   we furnished that there were two different types of drum.

15             So we see no excuse whatsoever for an

16   unauthorized filing.  If they want to challenge Dr.

17   Brittain, they are welcome to do so on cross-examination.

18   But the idea that they can come in now and suddenly add a

19   new indefiniteness defense, we think, is improper.  And that

20   is why we made the motion.

21             MR. B. MURPHY:  Yes, Your Honor.  As you might

22   expect, we have a very different view of the facts and the

23   implications of those facts.

24             But I do think, because this issue is at the

25   center of most of this case, Your Honor, this issue about

friability and how are you supposed to measure it according

to what is stated in the patent claims, and it will, in

fact, be the subject of a couple of other motions that both

sides have made that we will discuss after this one, so I

thought what I would do, just to help refresh your

recollection, because, of course, we have been dealing with

this day in and day out for the last couple of months to get

the pretrial order stuff together, but to just reorient Your

Honor to the claim construction in particular on this

limitation called the friability test, the claim has five

limitations.  It's pulverulent mannitol, that is powder

mannitol.  And there are four sub-requirements in Claim 1,

which is the only independent claim in the patent.

        The first limitation in the claim, and the one

over which there is great dispute, and that is at the center

of this lawsuit, is called friability within a range of

about 40 percent to about 80 percent.  That is the claimed

range for friability Test 1.  We presented claim

construction briefs.  And the dispute is:  What are you

supposed to do to run Test 1 properly within the literal

scope of the claim?

        Your Honor, we had this argument back in May, I

think it was.  And Your Honor's ruling was in June.  That

was an important ruling, because although this case has been

pending for quite some time, this was our first substantive

1    ruling on claim construction, which is always important.

2    And it clarified some things.  And it's important that Your

3    Honor at least understand our view of what was clarified.

4              In particular, the claim language talked about

5    running Test 1 for friability using an ERWEKA TAP model

6    friability machine.  They wrote it into the claim.  They

7    wrote it into the claim by way of an amendment during

8    prosecution after a 112 indefiniteness rejection, because

9    the original claim just said friability according to Test 1

10   between about 40 percent and about 80 percent.

11             That was the original aspect of that claim

12   presented.  The examiner rejected it, rejected it a couple

13   of times, which I am sure Your Honor is familiar with.  But

14   he rejected it for indefiniteness and he said, there is no

15   antecedent basis for the parameters of your Test 1 because

16   this is not an industry standard test.  This is a customized

17   test that they are using to try to distinguish their

18   invention from their own prior art, because pulverulent

19   mannitol was well known.  Testing friability they did

20   themselves with a very similar test in earlier patents.  And

21   the examiner said, hey, wait a minute.  This isn't new, nor

22   are you distinguishing your Test 1.  It is indefinite.

23             So they amended the claim, Your Honor, and they

24   added all of the limitations that now appear as part of the

25   Test 1 procedure.

1          It's essentially a three-step test.  It doesn't

2    matter.  The one we are arguing about is called subjecting

3    the powder to mechanical action in an ERWEKA TAP friability.

4          Your Honor ruled as a matter of claim

5    construction that that phrase is construed to mean, quote,

6    "mechanical action in the ERWEKA TAP model friability

7    testing machine."

8          That is it, period.

9          So we got that ruling.

10          What is happening, and what is at the center of

11    dispute in this motion and frankly most of the case, the

12    plaintiff, of course, has the burden on infringement.  They

13    have now acknowledged that they never made a claim under the

14    doctrine of equivalents for this limitation or, in fact, in

15    my view, any other limitation.  That is a different fight.

16          THE COURT:  It is a different fight.  Let's

17    focus on the fight at hand.

18          MR. B. MURPHY:  For this limitation, friability,

19    according to Limitation 1(a), there is no dispute, there is

20    no doctrine of equivalents assertion, there never has been.

21          Their expert did not use that model of machine

22    to test the friability of my client's accused products.

23          So our view is, well, you need to use that

24    machine if you are going to make a claim of literal

25    infringement or if you wanted to argue equivalence, you

1    should have raised the issue of equivalence, which they did

2    not.  So they are saying, okay --

3                THE COURT:  I am trying to understand what all

4    this has to do with the timeliness of the supplemental

5    report.  Don't go around Robin Hood's barn with me.  That is

6    not the way to approach it.  Let's get right to the point.

7                MR. B. MURPHY:  That was the dispute.  We got

8    their expert's test information.  Our expert filed a report.

9    Their expert filed a report.

10                We deposed their expert on August 8th, 2008, a

11    few days before the end of the expert discovery period.  For

12    the first time, when I deposed that expert, within the first

13    30 minutes of the examination, he identified that he had run

14    another test.  He ran the test using the so-called

15    friability test drum that my client has always used for the

16    test, and he got a noninfringing result that confirms our

17    client's noninfringement results.

18                That test was never in any of his expert

19    reports.  It was never identified in discovery.  And what he

20    said was, I just ran it a few days ago.  So I think it was

21    August 5th, 2008 was the date he ran the test.  August 8th

22    was the date of his deposition, which was a week or so

23    before the formal close of expert discovery.  So I asked if

24    he had any documents that related to the machine that he was

25    using to make the friability test, and he said, yes, I do.

1    And I said, do you have an instruction manual for the

2    machine?  He said yes.  I asked for it to be produced

3    because it had not been previously produced, even though

4    it's plaintiff's expert making a so-called infringement

5    test, if you will, on which they bear the burden and for

6    which we had discovery requests out.

7             So we never saw that document, the manual, which

8    becomes a significant piece of evidence.  And, of course,

9    because he had only run the test three days before his

10   deposition, we never knew about it.  They didn't tell us

11   about it before the deposition.  They did not supplement

12   their report.  They did not tell us at the deposition before

13   it began that morning, which they could have.

14            They also did not voluntarily give me the

15   two-page laboratory notebook entry that their expert made

16   documenting this test.  So he ran a new test three days

17   before his deposition.  They didn't tell us about that.

18   They didn't give us at least two significant documents that

19   are now on our trial exhibit list until I asked for them.

20   One of them was the two-page laboratory notebook entry of

21   this test I was given at that time of the deposition, and I

22   took an examination using it.

23            The manual came a month later, whatever it was.

24   It came sometime in September.  This is the manual that

25   their expert received with this machine that he is using.

```
 1              So we then thought about, well, we showed this
 2    information to our expert, information, the deposition
 3    testimony, the new notebook entry, and the new manual that
 4    had never been identified and never produced before that
 5    time period, which is now September 2008.
 6              THE COURT:  And you had interposed a request.
 7              MR. B. MURPHY:  We did.
 8              THE COURT:  At an appropriate time, in a timely
 9    fashion.
10              MR. B. MURPHY:  Absolutely, Your Honor.  Our
11    original --
12              THE COURT:  I got you.  Go ahead.
13              MR. B. MURPHY:  We conferred with our expert.
14    He determined, this was important evidence on two fronts.
15    The first front -- and it's the first aspect of his
16    supplemental report that was served in November 2008 -- was
17    that this is additional evidence of noninfringement.
18              THE COURT:  Most especially for purposes of this
19    motion, it had to do, his supplemental report had to do with
20    the issue of indefiniteness.
21              MR. B. MURPHY:  It did.
22              THE COURT:  Let's talk about that.
23              MR. B. MURPHY:  That was the second point.  And
24    he said this is also additional evidence of the
25    indefiniteness of the patent, because here you have an issue
```

1    where they claim to have always been using an abrasion test

2    drum, but the claim is for a friability test.  It's not for

3    an abrasion test.  They said, well, you should have known,

4    you should have known better.

5           But the fact is, it's in the deposition

6    testimony of their expert as well as our expert.  Neither

7    one of these experts was familiar with this particular model

8    of machine because it's not very commonly known and there is

9    nothing in the patent to describe it.

10          So we said, okay.  We would like our expert on

11   the indefiniteness issue to also opine with this new factual

12   information which underscores and further supports our

13   indefiniteness theory.  But, yes, they are correct.  We had

14   not articulated that specific basis for the indefiniteness

15   defense, because there is another problem, which we don't

16   need to get into this morning.

17          THE COURT:  Counsel, your reaction.

18          MR. RIGLER:  I think the first comment is,

19   nothing was withheld.  Our expert realized that they were

20   making a mistake.  He did perform another test shortly

21   before his deposition.  He revealed that immediately at the

22   deposition.  We gave them the laboratory notes at that

23   deposition.  And the manual, we did give it to them --

24          THE COURT:  Let me interrupt for a second,

25   counsel, and ask this question:  Given the timing of the

1    test, the additional test, which was close to the onset of

2    the end of discovery, do you think that it was improper, or

3    unreasonable for I guess it's Dr. Dave to look at the test

4    results, never mind submitting the opinion, and at least

5    look at the test results, confer with counsel, and offer his

6    view as to those results?  He is free to do that.  Right?

7              MR. RIGLER:  Let me think about that.

8              I don't think it was improper for him to confer

9    with counsel.  Do I think he had an excuse for his untimely,

10   very untimely supplemental report?  No, I do not.

11             THE COURT:  Wasn't the report in part, at least,

12   generated at the time that it was as a result of this

13   testing that the other side learned about, SPI learned

14   about, close to the end of discovery?  No?

15             MR. RIGLER:  I think that the thrust of this

16   supplemental report tries to address the question of two

17   drums.  He had known, if he had looked -- he is supposed to

18   be an expert.  That issue was before him from day one.  And

19   we asked repeatedly in the interrogatories throughout the

20   discovery process for their theory of invalidity.  And he

21   came forward on indefiniteness with this sieving argument.

22   He never said anything about the drum.  But it was right in

23   front of him the entire time, with a video of it.  And for

24   him to come along and say, I was surprised, no, I don't

25   think that is credible.  And then when you look further in

his report, where he said, so as an expert I conclude it's

indefinite, but, by the way, I also conclude that anyone of

ordinary skill in the art would immediately recognize this,

he has conflicting views.

THE COURT:  That aside.

MR. RIGLER:  All of this without the consent of

the Court or without consulting with us.  They just filed

it.

THE COURT:  Mr. Murphy.

MR. B. MURPHY:  Yes, Your Honor.

My response is all of that is fair game on

cross-examination and both sides will cross-examine their

experts on it.  Our point was, that supplemental report was

very limited, five pages.  And it was based on the test.

Their expert ran the test.  We didn't make him do it.  He

just did it.

I found out about it, and I emphasize, during

the deposition, because I asked him.  He put all this

testimony in the record for this motion.  I said, as I

always do, is there anything outside your expert report that

you may testify to at trial?  And the answer was, I don't

know, maybe.  It depends what I am asked at trial.  I said,

That's not what I am asking you.  I want to know if you are

aware of anything right now that's not in your expert

report.  And that's when he said, yes, I did this test.

1       THE COURT:  So the supplemental report, as I

2    understand it, counsel, is very limited.

3       MR. B. MURPHY:  Yes, it is.

4       THE COURT:  In the subject matter it addresses,

5    this very discrete area of indefiniteness.  Is that correct?

6       MR. RIGLER:  I am sorry, sir?

7       THE COURT:  It addresses a very discrete and

8    specific area, limited area of indefiniteness.

9       We are not going to spend much more time on this

10   because what I am going to do is order a supplemental

11   deposition.  Do you need additional time and would you like

12   an additional deposition of their expert to explore his

13   opinions expressed in the supplemental report?  Because if

14   you would, I will order it.

15      MR. RIGLER:  We have a very short period before

16   trial.  And I also might want to try to get more information

17   from the manufacturer.  This so called manual is just a

18   standard piece --

19      THE COURT:  Counsel, I am not going to

20   micromanage this.  The deposition effort and what you need

21   to effectively conduct the deposition, I will order counsel

22   cooperate in this regard.  You have sufficient time between

23   now and trial to do a limited deposition.  That is one of

24   the reasons I stage this process the way I do, so we can

25   deal in a just way, in a fair way, with these kinds of

1    issues.

2              For me to make a call on this would be fairly

3    arbitrary.  And I don't have the time to drill down as deep

4    as -- favorite patent words, drill down -- as far into this

5    as you would like so I could ultimately address who is right

6    and who is wrong.  And I am not sure who is right and wrong

7    here.

8              I think the answer is, so you have a fair

9    opportunity to prepare to cross-examine the doctor, that you

10   get an additional deposition, some additional deposition

11   time with him.

12             That is the Court's order.  I will leave it to

13   counsel to arrange this deposition at a time convenient to

14   both parties.

15             I won't tax costs to you.  They can pay for

16   whatever additional costs are associated.

17             That is the Court's ruling.

18             So I am going to deny your motion for purposes

19   of the record, consistent with what I have said already.

20             Any questions about that from the other side?

21             MR. B. MURPHY:  No, Your Honor.

22             THE COURT:  All right.  Let's jump across the

23   aisle to SPI Pharma's first motion in limine.

24             I want to explore a possible way to approach

25   this and other motions that seem to me to be related.

1    I have made a note to myself that perhaps we

2  should consider Pharma's No. 3, Motion in Limine No. 3,

3  along with this motion, as well as Plaintiff's No. 4 at the

4  same time.

5    By the way, this motion occurs -- and I should

6  have identified the docket item before, Ms. Walker, I am

7  sorry -- 233.  It's styled SPI Pharma's motion to preclude

8  any evidence or argument of infringement under DOE, under

9  the doctrine of equivalents with regard to the claims of

10  Roquette's '777 patent.

11    Does that seem to make sense to counsel, what I

12  have suggested?

13    MR. B. MURPHY:  I think it does, Your Honor.

14    MR. RIGLER:  It does.

15    MR. B. MURPHY:  I may need my colleague to jump

16  in on certain points.

17    THE COURT:  That is fine.  As I indicated, we

18  have dispensed with the formalities of the court.  This is a

19  discussion for purposes of trying to tee this matter up to

20  be tried to the jury in an efficient way, in a fair way.

21    Let me start out by just making an observation

22  here.

23    It comes from, counsel, your answer, No. 1 in

24  your answering brief at Page 1.  Roquette's answer at Page 1

25  to Pharma's Motion In Limine No. 1.  Let me just read into

1   the record the relevant passage.  Then I am going to see

2   where we go from there.  Under the argument section, I see,

3   "SPI contends in its motion that Roquette has waived

4   reliance on the doctrine of equivalents with respect to the

5   accused Mannogem EZ product.  Roquette disputes that

6   contention, but notes that it does not intend to assert at

7   trial that Mannogem EZ infringes any claim under the

8   doctrine of equivalents and, to that extent, SPI's motion is

9   moot."

10              Do you agree with that?

11              MR. B. MURPHY:  Yes, Your Honor.

12              THE COURT:  And you stand by that statement.

13              MR. SNAY:  Yes, Your Honor.

14              THE COURT:  Next paragraph:  "SPI next contends

15   in its motion that Roquette also has waived reliance on the

16   doctrine of equivalents with respect to Mannitol HS for

17   inadequately specifying its equivalents theory with respect

18   to the dissolution element of Claim 1.  Again, Roquette

19   disputes that contention, but states that it does not intend

20   to assert at trial that Mannitol HS meets the dissolution

21   element of Claim 1 under the doctrine of equivalents and, to

22   that extent, SPI's motion again is moot."

23              Do you concur in that view?

24              MR. B. MURPHY:  We do.

25              THE COURT:  And you stand by that?

```
 1                    MR. SNAY:  Yes, we do.

 2                    THE COURT:  Then we have, "SPI acknowledges in

 3     its motion that Roquette has alleged, and provided

 4     supporting testimony from its testing expert, Dr. Brittain,

 5     that the accused Mannitol HS product meets the pulverulent

 6     mannitol recitation of the claims under the doctrine of

 7     equivalents.  SPI does not challenge that evidence in the

 8     instant motion.  Instead, SPI states that its doctrine of

 9     equivalents arguments with respect to the pulverulent

10     mannitol element of the claims is provided separately in its

11     In Limine Motion No. 3.  Accordingly, SPI's blanket request

12     to preclude all evidence concerning the doctrine of

13     equivalents should be denied and its arguments concerning

14     the pulverulent mannitol recitation, which SPI reserved for

15     its Motion In Limine No. 3, should be decided on that

16     motion."

17                    Do you concur?

18                    MR. B. MURPHY:  I do not, Your Honor.  That is a

19     point of dispute.

20                    THE COURT:  You do not concur in the last

21     paragraph.

22                    MR. B. MURPHY:  Correct.  With regard to the

23     phrase pulverulent mannitol.

24                    THE COURT:  Why do you disagree?

25                    MR. B. MURPHY:  Your Honor, because pulverulent
```

1    mannitol is a two-word phrase that is in every phrase of the

2    patent, and they did not allege doctrine of equivalents for

3    that phrase ever, in any claim.  The only issue we teed up

4    in our motion that they tried to preserve under the doctrine

5    of equivalents was Dependent Claim 16.  And that's why, in

6    Exhibit 2 to our motion, we put their contention responses

7    in.

8                   THE COURT:  So essentially, it strikes me that

9    at least in one of your motions, maybe it's No. 3, you

10   essentially seem to me to be asserting that the plaintiff is

11   making an effort to skirt the Court's claim construction.

12                  MR. B. MURPHY:  Yes.

13                  THE COURT:  That is your basic and fundamental

14   assertion.

15                  MR. B. MURPHY:  Your Honor, may I --

16                  THE COURT:  No.  I am not going to get into

17   another --

18                  MR. B. MURPHY:  I am trying to deal exactly with

19   your issue.  I am trying to help.

20                  Dependent Claim 16 is the subject of our Motion

21   No. 3.  It does not deal with the phrase pulverulent

22   mannitol.  Our view is they injected that phrase in response

23   to our Motion No. 1, because they realized they never made a

24   doctrine of equivalents claim for pulverulent mannitol.

25                  THE COURT:  Do you concur in this view, counsel?

1    I guess you are going to handle this?

2                MR. SNAY:   I will, Your Honor.

3                THE COURT:   Remind me of your name.

4                MR. SNAY:   Jeffrey Snay, Your Honor.

5                THE COURT:   Do you concur in this view that you

6    never advanced that theory?

7                MR. SNAY:   No, we do not concur.

8                I think I can help to boil this down a bit

9    further than Your Honor has already boiled it down.

10               What Your Honor does not know regarding the In

11   Limine Motion No. 1 from SPI, we conferred with SPI

12   yesterday, and Roquette made the further representation that

13   the element in Claim 1 concerning percentage of particles

14   smaller than 75 microns, Roquette is not going to assert

15   infringement under the doctrine of equivalents as to that

16   element.   What that does, Your Honor, the only two elements

17   that were at issue in SPI's Motion No. 1 were what I just

18   described, the percentage of particles smaller than 75

19   microns, which is now off the table, and the pulverulent

20   mannitol element that we are discussing and is the subject

21   of SPI's Motion No. 3.

22               So in our view, SPI's Motion No. 1 is moot.   And

23   we can address these issues --

24               THE COURT:   I will concur in that view and so

25   rule.

1          MR. SNAY:  Yes.  Now if I can address the

2     pulverulent mannitol, if I can take just a moment to refresh

3     Your Honor's recollection from the claim construction.

4          THE COURT:  Sure.

5          MR. SNAY:  Claim 1 recites, begins, a

6     pulverulent mannitol comprising, followed by four listed

7     properties.  In the explicit text of Claim 1, as patented,

8     there was no reference to a mannitol richness, percentage of

9     mannitol present in the composition.  However, in Dependent

10    Claim 16, there was a mannitol richness element that was

11    added to further limit the composition of the product in

12    Claim 1.

13          So in Dependent Claim 16, as patented, the

14    explicit terms of the claim referred to a mannitol richness

15    that is greater than approximately 90 percent.  This was a

16    term that Your Honor construed during claim construction,

17    and also the term pulverulent mannitol, from the independent

18    Claim 1, was construed during claim construction.  And the

19    end result was this mannitol richness element that was

20    explicitly referred to in Dependent Claim 16, Your Honor

21    decided that that mannitol richness is implicitly recited in

22    Claim 1.

23          So SPI has not disputed Dr. Brittain -- and

24    also, in our infringement contentions, we clearly gave

25    notice of our assertion of doctrine of equivalents as to the

1    mannitol richness element which appeared in Dependent Claim

2    16.  Now, by operation of Your Honor's claim construction

3    ruling, that mannitol richness element is implicitly present

4    also in Claim 1 as the definition of pulverulent mannitol.

5              So our view, Your Honor, is we gave clear

6    notice, both through our infringement contentions and our

7    expert's report, of our doctrine of equivalents assertion

8    with respect to the mannitol richness element.  As Your

9    Honor knows, doctrine of equivalents applies to elements,

10   not to claims.

11             So in our view, Your Honor, our notice to SPI of

12   our doctrine of equivalents assertion as to mannitol

13   richness applies wherever that element is found throughout

14   the claims.

15             THE COURT:  Mr. Murphy.

16             MR. B. MURPHY:  Yes, Your Honor.  Two points,

17   one procedural, one substantive.

18             Procedurally, this issue about pulverulent

19   mannitol we attached as Exhibit 2 to our motion, which is

20   the plaintiff's last contention interrogatory response,

21   SPI's Pharma's Motion No. 1 --

22             THE COURT:  Go ahead.

23             MR. B. MURPHY:  In Exhibit 2, we attached the

24   complete -- this was the last supplement of the contention

25   interrogatories before we began the expert phase of

1    discovery.  So it's essentially at the end of fact discovery

2    and we are getting ready to do expert recovery.

3              Both sides supplemented.  They gave us this

4    claim chart.  So I am reading this, and I am saying, okay,

5    what do we got?

6              The first page of Claim 1, the first limitation

7    of the claim is pulverulent mannitol.  And all they said was

8    that our EZ product is pulverulent mannitol.  Okay.  Fine.

9    That is all they said.

10             If you jump to Page, this is the same document,

11   Page 8 and Page 9 of the response, Your Honor, the bottom of

12   Page 8...

13             THE COURT:  Of the exhibit.

14             MR. B. MURPHY:  Yes, Your Honor.

15             THE COURT:  Which is a chart.

16             MR. B. MURPHY:  Yes.  So we are focusing now on

17   Dependent Claim 16.  I am reading this, it carries over to

18   the next page.  And you can obviously read what it says.  So

19   the point is, the words pulverulent mannitol appear in every

20   claim.  And they never uttered the words doctrine of

21   equivalents except -- and I am going to get the page for

22   Your Honor in this document -- Page 17 of this response.

23   Again, now, this is Dependent Claim 16 applied to the second

24   accused product.

25             We have two products accused, EZ and HS.  Now,

1    this, as you saw with EZ, there was no assertion of

2    equivalence.  And I might add, there was no assertion in the

3    expert's infringement report, either, with regard to

4    pulverulent mannitol.  But in Dependent Claim 16, asserted

5    against the Mannitol HS product, they did give us notice.

6    And we acknowledged this.  We said, yes, you did give us

7    notice.  We think it's inadequate but, okay, you gave us

8    notice of doctrine of equivalents because Mannitol HS does

9    not have at least 90 percent mannitol richness.  The

10   disputed phrase is, because it's in Claim 16, what is the

11   mannitol richness requirement of pulverulent mannitol?  And

12   they recognized that the HS product is below the 90-percent

13   level.

14             So they said, well, that may be the case, but it

15   still would infringe under the doctrine of equivalents.

16             So our Motion No. 3 addressed that claim and

17   that point.  And we said, we understand your position,

18   except Chief Judge Sleet's claim construction said that

19   pulverulent mannitol must have a mannitol richness of at

20   least 90 percent.

21             So the legal issue that we raised in Motion No.

22   3 -- my colleague Dan Murphy will address the legal issue --

23   is that given Your Honor's claim construction, based on a

24   reading of the patent specification, because when we were

25   down here we went through the spec in detail, Your Honor

1    ruled that it was an essential limitation of the claimed

2    invention.

3                THE COURT:  Does this bring this into the realm

4    of a motion for summary judgment?

5                MR. B. MURPHY:  I think it does.

6                THE COURT:  I think it does.  And I am not going

7    to address it at this time.  I think you are right, it does.

8    You will have another chance to address it.  But not today,

9    not in the form of a stealth motion for summary judgment,

10   which is what I view No. 3 to be, and have from the time I

11   sat down and read it.

12               Counsel, with respect, I don't need to hear from

13   you.

14               The motion is denied.

15               Where does that leave us in the view of the

16   parties?  The essence of No. 4, that is Roquette's No. 4,

17   while it's related in some way to DOE, has to do with an

18   untimely assertion of the defense of prosecution history

19   estoppel.  That is really what I am concerned about as far

20   as that motion.  Not so much the legal -- it's a process

21   issue.  Do you want to go ahead and address this motion?

22               MR. SNAY:  Yes, Your Honor.  Thank you.  I think

23   I can present our position very briefly.

24               As we have just discussed, and as I understand

25   as a consequence of our discussions it's clear, the only

1    element that Roquette intends to assert doctrine of

2    equivalents, infringement under doctrine of equivalents, is

3    the mannitol richness and as a definition of pulverulent

4    mannitol.  Therefore, prosecution history estoppel has no

5    purpose as to any other issue than Roquette's doctrine of

6    equivalents assertion as to that element.

7         So that boils this rather convoluted briefing

8    down to that single issue, which I hope is helpful.

9         Our argument, Your Honor, really is merely that

10   SPI never asserted prosecution history estoppel with respect

11   to this mannitol richness element.  It could have done so by

12   approaching Your Honor with a request for motion for summary

13   judgment.  It did not.  And, in addition, the mannitol

14   richness element, as well as the pulverulent mannitol term,

15   which has the mannitol richness as its definition now,

16   neither of these terms were ever amended during prosecution.

17   These were terms existing in the original claims.

18        So by virtue of that alone, there simply cannot

19   be prosecution history estoppel to limit the scope of the

20   equivalence.

21        MR. B. MURPHY:  Your Honor, on this notion of

22   pulverulent mannitol, mannitol richness, we never alleged

23   prosecution history estoppel.  We don't know now.  There is

24   no prosecution history estoppel.  Our motion is based on

25   Your Honor's June 11th claim construction ruling.  So this

1    Motion No. 4 -- it is all confused, because we were saying,

2    look, if you preserve -- you never alleged doctrine of

3    equivalents, so we had nothing to respond to.  Now they are

4    alleging doctrine of equivalents, which we say is improper.

5    But for pulverulent mannitol, prosecution history estoppel

6    is not an issue.

7                MR. SNAY:  May I address that, Your Honor?

8                THE COURT:  Sure.

9                MR. SNAY:  If I understand Mr. Murphy's comment

10   correctly, he is informing us that SPI does not intend to

11   assert prosecution history estoppel as to the mannitol

12   richness, pulverulent mannitol elements.  Based on that

13   representation, I think there is nothing left to our Motion

14   No. 4 and would say that it is moot.

15               MR. B. MURPHY:  Your Honor, for the record, we

16   will preserve our objection to their asserting --

17               THE COURT:  Counsel, of course, you preserve

18   your position.

19               MR. B. MURPHY:  I just wanted to respond to the

20   comment.

21               THE COURT:  The motion is moot.

22               So this is SPI Pharma's No. 2.  I don't think we

23   have addressed that yet.

24               MR. B. MURPHY:  That's correct, Your Honor.

25               THE COURT:  That is your motion to preclude all

1    evidence of friability data taken by Roquette using non-TAP

2    model ERWEKA friability testing machine.

3              Counsel.

4              MR. B. MURPHY:  Yes, Your Honor.  This, I hark

5    back to my introductory comments this morning.  This motion,

6    again, comes about directly because of Your Honor's claim

7    construction ruling on June 11.  So, of course, the parties

8    didn't have that ruling until June 11.  Once we got the

9    ruling -- and again, this relates specifically to the

10   friability claim limitation, and Your Honor's ruling that

11   the Test 1 friability test, which includes the so-called

12   mechanical action in the ERWEKA TAP model friability

13   machine, that is the literal claim construction.  And there

14   is no dispute that Roquette never alleged doctrine of

15   equivalents for that limitation.  We have got that cleared

16   up this morning.  There is no dispute that their expert did

17   not use an ERWEKA TAP model friability testing machine, nor

18   did their technician, who also gave deposition testimony.

19   They each used a different model of machine.

20              And so because Your Honor ruled that it requires

21   the ERWEKA model -- excuse me, the ERWEKA TAP model

22   friability test machine, and because there is no doctrine of

23   equivalents allegation, we said the natural conclusion of

24   that ruling is that their expert's infringement test results

25   use the wrong model of machine and can't support a literal

1    infringement claim.

2            There might be an argument under doctrine of

3    equivalents, but they didn't make it, and they have

4    acknowledged that they are not going to assert it.

5            So our point was, well, wait a minute.  You

6    can't have it both ways.  If you are going to change the

7    machine, if you are going to change the so-called drum on

8    the machine, and do something that is different than what is

9    literally required by the claim, again, based on Your

10   Honor's ruling, that is unfairly prejudicial, because, as

11   counsel said, their test results using a different model of

12   machine in a different test drum comes out within the 40 to

13   80 percent friability claim limitation.  That is the point

14   of dispute.

15           Well, if you don't have an equivalence

16   assertion, and you don't literally meet the claim

17   construction, putting in front of the jury data points as to

18   say, weight, no, friability, these guys have friability 60

19   percent.  It is right smack dab in the middle of the claimed

20   range.  We say that is unfairly prejudicial.  That is the

21   essence of the motion.

22           THE COURT:  Okay.  Counsel.

23           MR. RIGLER:  We do meet the literal element in

24   the claim construction.

25           To refresh Your Honor's recollection further,

1    you construed this term, agreeing with Roquette because they

2    said it was indefinite and there was no such machine as an

3    ERWEKA TAP model.  That was their expert opinion.  You

4    said -- we showed you that there was a machine, they now

5    concede it, and you have adopted our definition.

6              We literally are going to prove that we meet

7    that definition.

8              The friability is a machine, the patent

9    specifies that basically it's a motor and it drives a shaft,

10   and it turns the shaft 25 revolutions per minute.  And you

11   attach a drum to it.  Any shaft will do that.

12             We have expert opinions saying, it meets the

13   terms of the patent.  We used the TA model.  The TA model is

14   just an upgrade.

15             The patent was applied for in the 1993-1994 time

16   period.  TAPs were obsolete or obsolescence made it hard to

17   come by.  It is very difficult to find one.

18             Let me give you just for a minute an example.

19   Suppose we talk about another patent where we are going to

20   make some chemical composition by adding boiling water to

21   three or four chemicals, and letting the water dissolve the

22   chemicals, then we have a new patented product.  And our

23   patent says, take a quart of water and heat it to boiling on

24   a General Electric Model 100 stove.  And time goes by and

25   General Electric changes the model each year.  And so we

1    take some water, a quart of water, and we heat it on a

2    General Electric model 200 stove, and we pour the boiling

3    water in.  These are product claims.  It all comes out the

4    same.  And our expert has opined to that effect.  And this,

5    I think, is similar to the Martek decision, in which the

6    Federal Circuit, as you know, sustained just that kind of

7    reasoning.  We literally are going to meet the claims

8    because the expert said the shaft rotates the same, it is

9    the same.  It should be a nonissue.

10         More importantly or equally importantly, it is a

11    motion for summary judgment.

12         THE COURT:  What is your reaction to counsel's

13    assertion that SPI will be prejudiced if I permit this or

14    deny the motion?

15         MR. RIGLER:  In what possible way?

16         THE COURT:  I don't know.  He has made the

17    argument.

18         MR. RIGLER:  I guess I don't have a reaction

19    because I don't see the prejudice.  It's a fact.  The expert

20    said if you turn it in the TA model instead of the TAP model

21    it's virtually the same.  The only difference, we gave you

22    some illustrations, is they put some digital controls on the

23    thing.  It's the same motor turning a shaft.  There is no

24    prejudice.

25         THE COURT:  Counsel.

1          MR. B. MURPHY:  Your Honor, several points that

2    we have to resolve before the trial on this important issue.

3          First, in our reply brief on this motion, SPI's

4    Motion No. 2, in Footnote No. 1, we quoted Roquette's

5    proposed claim construction, which Your Honor did not adopt

6    in its entirety in Your Honor's claim construction ruling.

7          Your Honor did conclude that the claim

8    construction was more limited.  You say, Appropriately so,

9    given the prosecution history, to be ERWEKA model TAP

10   friability machine.  That is not what they proposed.  So

11   their proposal, in our view, was an effort to capture

12   equivalence, which they never alleged or preserved.  Point

13   No. 1.

14          THE COURT:  Do they concede that?

15          MR. B. MURPHY:  Yes, in response to Motion No.

16   1, yes, they did.

17          So the logic of our position is, look, if you

18   don't have an equivalence claim, and you concede you never

19   made one, and you concede you are not going to allege

20   equivalence at trial, and now that your claim construction

21   proposal has not been accepted, at least not in its

22   entirety, Your Honor, as Your Honor will do, took part of it

23   and made your ruling, we think that is appropriate.  And

24   nobody knew what that ruling was going to be until June

25   11th.  But now having that ruling -- and again, with the

1    literal claim limitation requiring the ERWEKA TAP model,

2    which they wrote into the claim in response to a rejection,

3    so they wrote the limitation into the claim, Your Honor is

4    holding them to it.  And they have always said, we are going

5    to assert only literal infringement, but the only test data

6    that they have is from a different machine.  And the

7    statements that counsel has made, and in particular the

8    exhibit attached to their opposition brief on this motion,

9    there is no evidence in the record.  Their expert said none

10   of this in his expert report.  And he said nothing about it

11   in his deposition.  And it's their burden to prove

12   infringement.

13            What did they do?  They attached as Exhibit A to

14   their opposition to this motion a document.  I think it's in

15   the German language.  It doesn't matter.  It's a

16   publication, a technical publication, that identifies an

17   ERWEKA TAP.  What they are saying is, based on the Martek

18   case, this is, quote, circumstantial evidence of

19   infringement.  Well, one, it's not circumstantial evidence.

20   It's evidence to suggest that this different machine, what

21   counsel characterizes as an upgrade, for which there is no

22   evidence in the record, it's an attempt to suggest that it's

23   a machine that accomplishes substantially the same function,

24   in substantially the same way, to achieve substantially the

25   same result, which is a doctrine of equivalents argument.

1    It is not circumstantial evidence.

2              The reason the Martek case -- and I went back

3    and read that very carefully.  I understand it was Your

4    Honor's decision that was affirmed on appeal.  And I think

5    if Your Honor and chambers will look at the claim in that

6    case, it is a very different claim.  That is the difference.

7    Here, they wrote this test procedure into the claim.  And

8    they had to do it by way of amendment to get their claims

9    allowed.  Now that they have done it and Your Honor has

10   said, yeah, this is the procedure you claim, and it requires

11   this model of machine, they didn't have to do that if they

12   didn't want.  They could have argued it or tried different

13   claim language.  But they didn't.

14             So our point is, well, you can't come into court

15   now and take a different position on literal infringement.

16   That is unfairly prejudicial, because how is a jury -- how

17   is a jury really supposed to make that distinction?  Well,

18   this machine model, that machine model?

19             It is a technical matter of claim construction.

20   Once Your Honor clarified it in the claim construction

21   ruling, in my judgment, the outcome is clear.  They haven't

22   preserved the issue.  That's what is prejudicial.

23             THE COURT:  Okay.  I got you.

24             One last comment.

25             MR. RIGLER:  He is confusing literal

1    infringement, which we do allege, with the ability to prove

2    that by circumstantial evidence.  And our expert has

3    testified that the result would be the same by using any

4    shaft that would rotate at 25 rpm that would spin a drum

5    with that.  That is what is important in the patent.  And

6    circumstantial evidence should be sufficient to show that we

7    meet the element of the claim by using a machine that

8    performs exactly the same function as the TAP.  And if we

9    know that, this is nothing more than a summary judgment

10   motion.

11           But I think it's important, also, to understand

12   that we are not saying there is no literal infringement.  We

13   are saying, we are proving literal infringement through

14   circumstantial evidence.

15           THE COURT:  I will give you the last word.

16           MR. B. MURPHY:  Yes, Your Honor.

17           What they are saying, without trying to use the

18   words, is they used a different machine to achieve the same

19   function, in the same way, with the same result, which is

20   classic Graver Tank equivalence.

21           THE COURT:  I am going to reserve on this.  I

22   will get back to you.

23           MR. B. MURPHY:  Thank you, Your Honor.

24           THE COURT:  I have next, I think, two matters

25   that we can consider together.  Let's see.  I have grouped

1    Roquette's In Limine Motion No. 2 to exclude evidence

2    relating to willfulness with SPI's Motion In Limine No. 4 to

3    preclude Roquette from preventing any evidence or argument

4    concerning SPI Pharma's opinions of counsel.

5            It seems to me to make sense to consider those

6    two together.  Does anyone disagree with that?

7            MR. B. MURPHY:  No, Your Honor.  That makes

8    perfect sense.

9            THE COURT:  Bear with me a second.

10           I had made a note, and I didn't follow up by

11   highlighting the language that I wanted to get you to

12   comment on.  I can't find it.

13           Let me get, I will get Roquette to start off.  I

14   don't think there is disagreement over Knorr-Bremse and its

15   impact.

16           MR. B. MURPHY:  Your Honor, Dan Murphy will

17   respond.

18           MR. D. MURPHY:  Your Honor, I agree, Your Honor.

19   Our Motion No. 4, which asks Your Honor to preclude

20   reference to SPI's opinions of counsel at trial, was

21   effectively mooted when we received Roquette's Motion in

22   Limine No. 2, which basically asks for the same relief.  But

23   it asked for additional relief.

24           THE COURT:  I thought I saw a concession or a

25   point of potential agreement when I read the two motions.  I

 1    can't find the language.

 2              MR. D. MURPHY:  There is certainly very close

 3    agreement.  It is a question of what is Roquette seeking to

 4    exclude in addition to what is outlined in its motion.  What

 5    I understand is both parties don't want reference, evidence

 6    or argument, made with respect to the opinions of counsel.

 7    I don't think Roquette challenges that.

 8              THE COURT:  I think Roquette agrees with that.

 9    Right?  I think Roquette agrees with that statement.

10              MR. RIGLER:  We agree, to try to telescope it,

11    both sides seem to agree that the opinion of counsel doesn't

12    come in.  They have agreed to defer reference to any testing

13    or development because all of that allegedly occurred at the

14    direction of counsel.

15              There is one point of disagreement.

16              THE COURT:  Let's identify it, so we are clear

17    about what we are talking about.

18              MR. RIGLER:  It is an important one.  That is,

19    they want -- throughout the deposition process, their

20    witnesses kept saying, and we assured ourselves that there

21    was no infringement and after we confirmed, et cetera.

22              If you turn to our reply at Page 2, we gave you

23    a series of quotations from witnesses.  This is from the

24    Roquette's reply --

25              THE COURT:  It's No. 2?

1          MR. RIGLER:  To their opposition.

2          THE COURT:  Do you have it, counsel?

3          MR. D. MURPHY:  I am sorry.

4          MR. B. MURPHY:  I am sorry, Your Honor.

5          THE COURT:  We are talking about Roquette's

6     reply to their Motion in Limine No. 2.

7          MR. RIGLER:  What their witnesses said was the

8     team developed the product to be outside of that patent just

9     working with our attorneys.

10          We developed a product to be around the patent.

11          New quote:  We were aware the patent was there.

12     We developed the product to be outside the patent.

13          Another quote:  We developed the product to be

14     outside the patent.

15          Another quote:  We worked to get around it.  So

16     that's to work, to develop the product outside of the

17     patent.

18          When we said what did you do to avoid the

19     patent, they flatly refused to answer on grounds of

20     privilege.

21          So we think that the order should prohibit the

22     witnesses from saying we worked to get around the patent

23     when we say, well, what did you do?  Well, we can't tell you

24     that, we worked with our attorney to do it.  That gives the

25     jury a terribly prejudicial and misleading impression.

1              MR. D. MURPHY:  Your Honor, may I respond?

2              THE COURT:  Yes, please.

3              MR. D. MURPHY:  At the very beginning of the

4     development of Mannogem EZ, one of the accused products, SPI

5     Pharma obtained opinions of counsel and it tested its

6     development stage product at the instruction of counsel to

7     determine whether or not it was within the claimed range.

8     It listed and identified those documents on its privilege

9     log.  Never disclosed them.  It's not relying on them.  It's

10    not in our trial exhibit list.  And at deposition, of

11    course, we blocked inquiry into those tests.

12             And we have no intention at trial to inquire of

13    our witnesses about those tests.

14             The difficulty is, when Mr. Rigler points out

15    some of the questions that were asked at deposition and the

16    witnesses responded, and we worked to avoid the patent, Mr.

17    Rigler didn't mention that his question that elicited one of

18    those responses was, independent of any advice you received

19    from lawyers, can you direct any activities or response in

20    connection with Roquette's concern of patent infringement?

21             Our witness responded, I knew about the patent.

22    I attempted to not fall within it.  And I directed people to

23    avoid it.

24             I mean, if it was fair for them to inquire about

25    independent of counsel, what did you do, and he responded, I

1   intended to avoid the patent, if we want to ask our witness

2   at trial his intention from the get-go, independent of what

3   he found out about from his tests directed at counsel's

4   request, I think we should be allowed to do it.

5                  THE COURT:  I wouldn't see why you wouldn't be

6   allowed to do that.

7                  Mr. Rigler.

8                  And questions along those lines, without

9   reference to counsel.

10                  MR. D. MURPHY:  Absolutely.

11                  THE COURT:  You don't resist Pharma's --

12   independent of counsel's directives, a witness wants to say,

13   we tried to not infringe, that's not a difficulty, is it?

14                  MR. RIGLER:  The question, as I understand, in

15   the testimony, every single thing that SPI did was to get

16   around the patent at the direction or in conjunction with an

17   attorney.  Every single thing.

18                  THE COURT:  Where are you reading from?

19                  MR. RIGLER:  I am reading from Page 2 of the

20   reply.

21                  THE COURT:  But your opponent has pointed out a

22   question, I think propounded by Roquette's, one of your

23   lawyers, maybe you, independent of counsel, to a Pharma

24   witness, an SPI Pharma witness.  Why don't you continue on.

25                  MR. D. MURPHY:  Your Honor, we have PDTX-45, is

1    another example, this particular exhibit wasn't objected to

2    by Roquette.  It's on our trial exhibit list.  It's an

3    e-mail correspondence, from Colleen Blackney, who is an SPI

4    Pharma employee, with a representative of Roquette, and the

5    parties were conferring about possible infringement.  The

6    date of the e-mail chain is September 27th, 2004.  The

7    parties were conferring about the different results of each

8    to achieve for infringement.

9              Our client wrote back to Roquette, Roquette's

10   representative, "We confirm that we are still getting

11   results outside the patent parameters as was designed when

12   we developed the process."

13             And that was asked at deposition independent of

14   counsel's advice, what did you do.  And the president of the

15   company said we intended to avoid the patent and I directed

16   others to avoid it.  And in this instance, years later, when

17   Roquette required, the same answer was given.  And there was

18   no objection to this exhibit on that score.  So, again, we

19   think what was fair for Roquette to ask about intention we

20   should be able to if we decide to.

21             MR. RIGLER:  The question is, from the very

22   beginning, everything was done at the direction of counsel.

23   To the extent that we were asking about that, that's

24   perfectly fair for us to ask the question.  But then when

25   they make the objection, or when they put in an answer that

1    is favorable, they think, to themselves, and then cut off

2    all testimony, it's unfair to allow that part of the answer

3    in before the jury.  They can't say, we assured ourselves

4    but I can't tell you because we were working with counsel.

5             Once they said every single thing we did we

6    found out about the patent through counsel, we worked with

7    counsel, everything we did was through counsel, then --

8             THE COURT:  Mr. Rigler, forgive me, I have a

9    question.

10            Mr. Rigler complains that, I guess what he might

11   characterize as a conclusory assertion that your client did

12   certain things, independent of counsel, to avoid the patent,

13   he should be able to inquire, what are those things that you

14   did.  And he is saying that he wasn't permitted to do that,

15   I think, further, at deposition, and the basis for cutting

16   him off was privilege, an assertion of privilege by whoever

17   was representing SPI Pharma at the time.

18            MR. D. MURPHY:  Your Honor, Mr. Rigler at

19   deposition was blocked from inquiring into what did SPI

20   Pharma do during the development stage testing, it was a

21   very specific time period, and limited activities with

22   respect to testing the product to see if it fell within the

23   claim range of friability.

24            We absolutely are not going to inquire of our

25   witnesses whether or not they avoided the patent or

1  confirmed that they avoided the patent by referencing those

2  tests.  There is no disagreement on that.  The question,

3  again, is the scope of how much they are trying to exclude

4  by getting Your Honor to rule in favor of their motion.  SPI

5  Pharma, when it started to manufacture this product nine

6  years ago, during the manufacturing process, constantly

7  tested the product to make sure it fell outside the claimed

8  friability range.

9          Their motion is vague.  When they say, oh, every

10 test was done under advice of counsel, at least that's the

11 response of one of SPI's witnesses, I don't know if they are

12 now trying to make a stealth motion to exclude things that

13 were absolutely non-privileged and that they had enough --

14         THE COURT:  Fair enough.  Here is what I think

15 is the proper resolution of this.  That is to deny both

16 motions without prejudice, as are all evidentiary motions in

17 limine, to the extent that they involve evidence and are not

18 otherwise motions for summary judgment.  These are denied

19 without prejudice to your ability to renew them in realtime

20 by way of objection.  I may have a better view and a more

21 particularized and better focused ability to rule on the

22 objection.  You may have a better ability to articulate the

23 objection at the time.  And I trust that both of you will at

24 the appropriate time.

25         So I am going to deny both motions without

 1   prejudice.  You are free to bring them up again by way of

 2   objection.

 3              Yes, sir.

 4              MR. D. MURPHY:  Your Honor, you are denying our

 5   Motion No. 4, which we both agreed wouldn't reference

 6   opinions?

 7              THE COURT:  Fair enough.  No. 4, you agree upon.

 8   So I am going to grant No. 4.  Thank you for that

 9   correction, counsel.  I will deny No. 2, that is Roquette's

10   No. 2, without prejudice.  Both sides, you can certainly

11   raise objections at the time, if an inquiry is made that you

12   feel is objectionable in this regard as well.

13              MR. RIGLER:  But the representations SPI made in

14   connection with the motion that they do not intend to

15   introduce evidence regarding testing and development, that

16   will be --

17              THE COURT:  Everything that counsel says here, I

18   am going to hold you to it.  And I am sure you are going to

19   hold their feet to the fire at trial.  You are going to have

20   a transcription of this record.  So, for sure, you are

21   protected, I think, Mr. Rigler.

22              No. 4 is granted.  No. 2 is denied.

23              I think this is our last motion in limine.  This

24   is Roquette's No. 3, to exclude testimony of Douglas

25   Flanagan.  I think what I am about to say will sort of nip

1   this matter in the bud.  It relates to an issue that is

2   raised somewhere in the pretrial order.  It has to do with

3   how I am going to handle inequitable conduct.  I am going to

4   handle it.  We are not going to have an advisory jury or

5   anything.  The Court will take those issues.

6          So, you know, if you still want to advance this

7   motion, that is fine.  We can address it at a later time,

8   counsel.  I don't know.  What do you want to do?

9          MR. RIGLER:  It's your preference, Your Honor.

10  If you have read the motion...

11         THE COURT:  I have read it.  My view is, let him

12  testify.  You are trying it to the Court.  If I determine

13  that the evidence is improper, it won't be considered.

14         MR. RIGLER:  We understand that.  We accept your

15  disposition either way.  I think to save time we can

16  eliminate it because I don't think his testimony could

17  possibly be of any assistance to the trier of fact.

18         THE COURT:  It wasn't clear to me, as long as

19  Dr. Flanagan isn't being stood up as a patent expert,

20  so-called.

21         MR. B. MURPHY:  Absolutely not.

22         THE COURT:  I am probably inclined to say, let's

23  take the time, just go ahead and hear it.  How much time

24  will his testimony take?

25         MR. B. MURPHY:  My only question is when would

1    you like to do that?  Would it be after the jury verdict?

2                THE COURT:  Yes.

3                MR. B. MURPHY:  Only because the expert's

4    schedule and our schedule and your schedule --

5                THE COURT:  After the jury renders its verdict.

6                MR. B. MURPHY:  The next week or the next day,

7    we will just deal with it then?

8                THE COURT:  I don't know at this point.

9                MR. B. MURPHY:  Fair enough.

10                THE COURT:  I will deny the motion for the

11    record and we will hear him, maybe.

12                Okay.  I think that does it for the motions in

13    limine.  Why don't we take a stretch break.

14                (Recess taken.)

15                THE COURT:  Okay.  So, counsel, let's do it this

16    way.  We will just walk through the order.  Everybody has a

17    copy of the proposed order, pretrial order.  Let's just walk

18    through it.  If I miss something, call it to my attention:

19    Judge, you went past Page 2, there is an issue there.

20                MS. GRAHAM:  Your Honor, I want to make sure

21    that the Court is aware, we filed a corrected exhibit list

22    yesterday.  There had been a mistake in what was originally

23    submitted.  We didn't want to resubmit the whole order to

24    you.  We filed that separately.

25                THE COURT:  That is fine.  Since you raised

1    exhibits and since we have been talking about evidence, I

2    think you probably are all aware, because you all have good

3    Delaware counsel, that I am about to, and will now,

4    summarily overrule your objections to exhibits.  But it's

5    not as bad as it sounds.  It really isn't, because that's

6    without prejudice.  You know what you have submitted.  There

7    is no way as a practical matter that anybody can sit down

8    and deal with all of those various objections.  I know that

9    you are preserving your positions for the record.  That is

10   fine.  That's what you should do.  But on that subject -- so

11   everything is in.  That which you don't want in, you have

12   got to call back to my attention.  You can't wait until the

13   jury is in that box to do that.  So I set some time aside.

14            MR. B. MURPHY:  That is exactly what I intended

15   to ask Your Honor.  I understand you didn't want to

16   interrupt the jury process.

17            THE COURT:  Let me tell you what my process is.

18   You will need to follow it.  It does require some

19   pre-planning, some conversation, some communication.  And

20   you have been doing that, so you will continue to do that.

21   You have arrived at treaties as to when you are going to

22   notify one another, I am sure it's in this pretrial order

23   somewhere, when you are going to notify one another of the

24   day's witness list and when you are going to exchange

25   witness lists and demonstratives and all that kind of thing.

1    So you will know at least the evening before the next day's

2    session as to whether there are evidentiary matters we need

3    to discuss.

4              What I do is, on the first day for sure, we are

5    going to meet at 8:30, on the morning of jury selection.  We

6    will have some time -- unless there are no issues.  And that

7    will be a first, in a patent case.

8              The jury, you can expect, will get up, the

9    venire, the panel, around 9:30, between 9:30 and 10 is

10   approximately a good approximation for the time it takes for

11   Mr. Trickey and his colleagues to do what they do with the

12   panel.  So we will have some time together to discuss

13   evidentiary matters and other things that we may need to

14   discuss.

15             We will proceed in that way, on that day, and we

16   will let the jury go at 4:30.  I will stay, if there are

17   matters in anticipation of the next day's testimony that you

18   already know -- Judge, we have got some evidence or some

19   housekeeping matters, or whatever the case may be, that we

20   need to prepare ourselves for so that when the jury comes

21   back at 9:00 and they are in there, and they do come on time

22   and I want us to be on time, that we don't waste their time.

23             That is the way I proceed.  It just goes that

24   way.  I will plan on meeting with you at 8:30 on the morning

25   of the subsequent days, unless you tell me, Judge, we don't

1    need you.  That is fine.

2              I am fine with that.

3              That is the way, on exhibit matters that we need

4    to re-address, we will do that.  Any questions about that?

5              MR. B. MURPHY:  No, Your Honor.

6              THE COURT:  Let's go through.  Obviously, you

7    will tell me if these are not issues and you were just

8    preserving a position and we don't need to discuss them.

9              I am at Page 6.  That is the first place I see

10   bold language that announces an objection.  This is

11   Roquette's objection to SPI's refusal, alleged, to specify

12   the subject matter for each of its expert witnesses.  Is

13   that still a live issue?

14             MR. RIGLER:  Yes.

15             THE COURT:  It is.

16             MR. RIGLER:  As we understand the rule here,

17   only one expert witness on each subject per party will be

18   permitted to testify absent good cause shown.  If more than

19   one expert is listed, the subject matter should be

20   specified.  We fail to see any good cause to have double

21   witnesses on the same point.

22             As I mentioned at the beginning, there are 27

23   product claims.  We have an expert who will address all

24   issues relating to those 27 product claims.  They have a

25   primary expert.  That's Dr. Dave.  We have been talking

1    about him.  He is going to present their defenses regarding

2    invalidity and obviousness.  Each side has a separate

3    witness for the process claim.  That's fine.  And we

4    understand that.  We don't have any overlap on ours.  But

5    they say each of their witnesses may testify with respect to

6    the claims that the other witness is going to address.

7              First, Your Honor, we raised the objection.  We

8    did try to reach some accommodation.  And they specified a

9    little more.  But it still overlaps on obviousness, and we

10   still don't see any necessity.  We don't see any good cause

11   whatsoever to have two witnesses address the same subject.

12   Since that seems to be the Court's rule, we would like, on

13   good cause and failure to specify both, we think that you

14   should confine them to that.  We don't see any prejudice,

15   either.

16             THE COURT:  Counsel.

17             MR. B. MURPHY:  Your Honor, it is our rule, too.

18   What I thought we said in our addendum, because they

19   objected to it and we redrafted it, we actually gave them, I

20   think, a fair amount of detail.  We are not going to overlap

21   on anything.  There may be, just so Your Honor understands

22   this technology, there are some aspects of a claim that

23   might relate to a process point.  There are other aspects of

24   the claim that are more technical, testing, use this

25   equipment, do it this way.  Those are two different

1     witnesses.  They are not going to opine on the same things,

2     I understand that.

3                THE COURT:  So with that understanding, are you

4     comfortable, counsel?  Let's do it this way:  You will

5     exchange witnesses.  You will know who is testifying.  If

6     you identify someone in advance, we can discuss that, that

7     you think is duplicative or cumulative, you are right,

8     absent good cause, I am not going to permit that.

9                MR. RIGLER:  I am not comfortable with it.  When

10    they say each one -- I think we just had an example.  Each

11    one is going to talk about obviousness in a claim.  I don't

12    understand the overlap.  And I think as a practical matter

13    it's going to be impossible for them not to overlap.

14                THE COURT:  Well, let's get a further reaction.

15                MR. B. MURPHY:  I guess I disagree.  They are

16    going to talk about different aspects, different references,

17    for example.  There might be one expert who talks about

18    certain references.  Another expert might talk about a

19    different reference.  It all relates to obviousness.  But

20    it's not the same point.  It's a different technical point.

21    I am not going to ask two different experts the same thing

22    at all with respect to any of these claims.

23                THE COURT:  It is typically the case in these

24    types of matters that we see, let's take obviousness, we see

25    one witness that is called to discuss the subject.  I

1    won't -- I have learned not to say never or that it has

2    never happened that I have had, in the time I have been

3    doing this I have "never" permitted that approach, but it's

4    not one of which I am very fond.  It seems to me that the

5    experts engaged should be able to discuss, in this instance,

6    obviousness.  And why would we need multiple experts on that

7    subject?

8              MR. B. MURPHY:  Only to address two different

9    technical points.  Very limited.

10             THE COURT:  One witness should be able to

11   address both technical points.

12             MR. B. MURPHY:  Let me raise this issue then,

13   Your Honor.  Then their response and part of their cross

14   might be, this expert isn't competent to give that

15   testimony.  He is not qualified.

16             THE COURT:  If that happens, then I am -- that

17   is a different issue.  Mr. Rigler, you would agree with

18   that.  If that attack is made, then I will permit a

19   response.

20             MR. B. MURPHY:  Fair enough.  Thank you.

21             THE COURT:  Okay.  Satisfied?

22             MR. RIGLER:  Yes.

23             THE COURT:  Next page, I see big bold type,

24   Objection.  Let's see what this is about.  This is a

25   statement of qualifications of experts.

1          Now, these statements are not going to be placed

2    in the hands of the jury or read to the jury, the expert's

3    qualifications.

4          Does that --

5          MR. B. MURPHY:  Your Honor, may I ask a

6    clarification?

7          THE COURT:  Yes.

8          MR. B. MURPHY:  We understood that the

9    procedure, I think counsel and I both understood that when

10   we call an expert these statements would be read to the

11   jury.  If that is not the case, that is fine.  That is not

12   what we understood.

13         THE COURT:  No.  You will qualify your witnesses

14   through your own, I will call it voir dire, your opening

15   questions.

16         MR. RIGLER:  Mr. Murphy is correct.  I think we

17   both had a misunderstanding.  We thought it was a

18   substitution to speed things along.  We thought that the

19   statement was somewhat loaded.  But if we are going to have

20   sort of mini-voir dires as we start, that is fine.

21         THE COURT:  You have agreement, then.

22         Deposition designations and objections.  I don't

23   do deposition designations and objections, counsel.  I leave

24   you to work that out on your own.  I don't have the time to

25   engage in that kind of activity.

1          At Page 9, that is where I am, I have already

2     addressed the issue that is raised at Page 9.  That is how

3     we are going to handle equitable matters.

4               Anything else on that page?

5               MR. RIGLER:  Indefiniteness, will that also be

6     addressed by the Court?

7               THE COURT:  Indefiniteness is a legal issue.

8               MR. RIGLER:  It's a question of law.  We had

9     cited Honeywell, 2010 decision.  I know -- I am quite aware

10    that many district courts allow or have allowed that to be

11    tried to the jury.  It seems to me the circuit now is --

12              THE COURT:  Isn't it still the case where there

13    are disputes of fact that those can be left for the jury to

14    resolve?  Right?  And ultimately, you are right, it is a

15    question of law for the Court.  But we have a fact-finder.

16    I would suggest on other than inequitable conduct that we

17    permit the jury to exercise its function.

18              MR. B. MURPHY:  Yes, Your Honor.

19              THE COURT:  Settlement negotiations.  Are there

20    discussions ongoing between the parties to try to amicably

21    resolve this?  Or are you at an impasse?  Or did you ever

22    even talk?

23              MR. RIGLER:  There is no current discussion,

24    Your Honor.  The subject came up again a month or two ago

25    after the claim construction.  Nothing happened.  So there

 1    are no ongoing discussions.

 2              THE COURT:  Okay.  Do you concur?

 3              MR. B. MURPHY:  Yes, Your Honor.

 4              THE COURT:  I see there were discussions.

 5              MR. B. MURPHY:  There have been over the course

 6    of time, yes.

 7              THE COURT:  Is there a difference of view as to

 8    whether discovery is complete?

 9              MR. B. MURPHY:  I don't think so, Your Honor.

10              THE COURT:  I am on Page 11.  I am assuming

11    nobody sees anything else before that.

12              My practice is to have the Court and the parties

13    select eight jurors.  All will deliberate.  Everyone will

14    deliberate.  I don't use alternates in civil juries.

15              We have set aside five days, I think that is

16    correct, to handle this.

17              It will be a timed trial.  Absent objection, I

18    see no reason to not divide the time equally.  So it will

19    be.  I see no objection.  So it will be divided equally.

20    Here is your multiplier.  It's five and a half hours a day.

21    We try to get in six.  As a practical matter, it ends up

22    being more like five and a half.  So five and a half over

23    five days, whatever the multiplier is, divided in half.  You

24    keep track of one another's time, I will task you with that.

25    You will keep their time, they will keep yours.  Ms. Walker

1      will back you up, and you can do a time check at the end of

2      each day.

3              Please, counsel, keep in mind that I will hold

4      you to the time limitations.  Incredibly enough, I have had

5      it happen not that long ago in a patent case, as

6      well-staffed and as good as you folks are, I had a plaintiff

7      run out of time.  And that's it.  So don't let that happen

8      to you.

9              Anything else?  I didn't see anything else in

10     the actual 12 pages of the pretrial order.  Have we

11     basically covered everything there?

12             Okay.  I have dealt with exhibits.  Depositions

13     and counter-depositions.

14             Let's go to the preliminary instructions.

15     That's at Tab 3.  There is an objection at Page 3 by SPI

16     Pharma.  Pharma objects to Roquette's inclusion of a

17     definition for the legal standard for willful infringement.

18     Do you want to address this, counsel?

19             MR. CASTELLANO:  Yes, Your Honor.  It is the

20     sentence at the very end of the paragraph that begins with

21     Roquette owns a United States patent, on Page 2.

22             THE COURT:  Yes.

23             MR. CASTELLANO:  Just the last sentence, that

24     sets forth the willful infringement standard.  That is a

25     departure from the form instructions.  It's dealt with later

1    in the instructions.

2            THE COURT:  Why do we need to talk about

3    willfulness at this point?

4            MR. RIGLER:  It seems instructive, Your Honor.

5    I think you will return to it later.

6            THE COURT:  I will.  I don't think it's

7    necessary to call out willfulness in the initial

8    instructions.  I agree with you.  I will sustain that

9    objection.

10            We have already talked about equitable defenses.

11    We know that will be handled by the Court.  That is moot at

12    this point.

13            MR. CASTELLANO:  Yes.

14            THE COURT:  Anything else in there, counsel?

15            MR. CASTELLANO:  There is a similar standard for

16    invalidity, at Page 3.  The paragraph begins, Persons or

17    companies, second sentence, Invalidity must be prove by...,

18    again, that is dealt with later.

19            THE COURT:  I don't know why we are calling out

20    these specific --

21            MR. SNAY:  I am sorry, Your Honor.  We couldn't

22    really hear Mr. Castellano.

23            THE COURT:  It is Page 3, the first full

24    paragraph.  The discussion about invalidity.

25            MS. GRAHAM:  I think that is fine, Your Honor.

```
 1    I don't think we need to specially call out one thing or

 2    another.  You will return to it.

 3              THE COURT:  We will return to it.  Yes.

 4    Anything else in that footnote?

 5              MR. CASTELLANO:  That's all, Your Honor.

 6              THE COURT:  I agree with you.  I will sustain

 7    that objection.

 8              Let's see.  So then the next dispute is at Page

 9    11.  As I see it, I think we might have dealt with this,

10    largely, let's see.

11              MR. CASTELLANO:  It is also having to do with

12    the equitable defenses.

13              THE COURT:  That is mooted out, yes.

14              MR. CASTELLANO:  The other issue is the

15    presumption of validity.  The two instructions, the

16    presumption of validity and the clear and convincing

17    evidence standard, it sounds like two sides of the same

18    point.  The clear and convincing evidence instruction is

19    sufficient.  We don't need to mention the presumption of

20    validity.  That is our position.

21              THE COURT:  There is a statutory presumption.

22              MR. CASTELLANO:  Yes, Your Honor.  I understand

23    that.  I know, I think that is actually from the form.

24              THE COURT:  I generally am willing to give the

25    presumption.  I understand the debate that's out there in
```

```
1    the land over this.

2                MR. CASTELLANO:  Okay.

3                THE COURT:  I cut you off.

4                MR. CASTELLANO:  That is just, you know, when it

5    is presented to the jury, the clear and convincing evidence

6    standard takes into account the presumption.  That is why it

7    is higher.

8                THE COURT:  I understand that.  Let me find the

9    actual language.

10               MR. CASTELLANO:  It's "In this case," the

11   paragraph on Page 10.

12               THE COURT:  Okay.

13               I will leave it the way it is.

14               MR. CASTELLANO:  Thank you, Your Honor.

15               THE COURT:  There is a difference of view at

16   Page 13.  What I would propose to do to resolve this, unless

17   there is objection, why don't we -- let's state what the

18   issue is.  This section deals with an overview of what a

19   patent is and how one is obtained.

20               I would suggest to you, counsel, that the video

21   does a very nice job of handling this.  We could eliminate

22   this section altogether, unless there is objection to the

23   video.  Are you familiar with the video I am talking about?

24               MR. B. MURPHY:  Yes, Your Honor.

25               THE COURT:  Is that acceptable?
```

```
 1                    MR. RIGLER:  That is acceptable.

 2                    MR. B. MURPHY:  Yes, Your Honor.

 3                    THE COURT:  We will eliminate this narrative

 4      section, that starts at Page 13 and runs through Page 18, I

 5      think, or the top of Page 19.

 6                    Is there agreement as to the summary -- wait a

 7      minute.  Let's see.  It appears there is agreement on

 8      summary of the patent issues that the jury will address.  So

 9      we can leave that in.

10                    MR. CASTELLANO:  Your Honor, are you talking

11      about in that same instruction?  Or is this -- on which

12      page?

13                    THE COURT:  Do we summarize for the jury

14      somewhere?

15                    MR. CASTELLANO:  Yes, this is something that is

16      specific to the case.

17                    THE COURT:  That is what I was thinking, yes.

18                    MR. CASTELLANO:  I think the only difference

19      between our proposal and Roquette's is the inclusion in ours

20      of the equitable issues.

21                    THE COURT:  So we leave those out, yes.

22                    MR. RIGLER:  Taking out 4 and 5.

23                    THE COURT:  Yes.  Agreed, counsel, 4 and 5 come

24      out.

25                    MR. CASTELLANO:  Actually, 5 --
```

```
 1                    MS. GRAHAM:  It's just part of 5.  The reference

 2     to equitable estoppel does not apply.

 3                    MR. CASTELLANO:  This part also deals with

 4     damages.

 5                    THE COURT:  So that stays.

 6                    MR. CASTELLANO:  We will work that out.

 7                    THE COURT:  Fine.  Everything else seems to be

 8     agreed upon.

 9                    There is some difference of view as to the

10     glossary, I think.  Are these matters you think you can work

11     out on your own?

12                    MR. CASTELLANO:  I think so, Your Honor.

13                    THE COURT:  I will leave it to counsel to work

14     those out.

15                    We are not going to do final instructions today.

16     Along the way, we will have a chance to do that.  What I

17     will task you with doing -- I know you probably haven't

18     turned your minds to the final instructions at this stage --

19     but I am going to now require that you begin to do that.

20     And I am sure somebody is being tasked with negotiating

21     these issues between the parties.  That process needs to be

22     engaged in earnest now.

23                    To the extent you can agree, I would like you

24     to.  To the extent you can't, we will tee these matters up

25     and get a chance to discuss them along the way.  Then we
```

1    will have a final conference after the evidence is concluded

2    to make sure that the instructions conform in a way that is

3    appropriate to the evidence that has been adduced at trial.

4              Verdict form, do we have -- is it one proposal

5    or two?  I think it's one.  Right?  Am I wrong?  Yes.

6              MR. CASTELLANO:  We have separate verdict forms,

7    G-5 and G-6.

8              THE COURT:  Yes.  I haven't looked at these at

9    all.  Counsel can discuss them.  We will look at this later.

10              Let's go to G-7, your jointly proposed voir

11    dire.

12              There are only a few, actually, three questions

13    that I wanted to discuss with you and decide whether I am

14    going to propound them or not to the jury.  That is No. 12:

15    Do you or does any member of your immediate family have a

16    law degree or other legal training?

17              I am not going to do that.  Unless there is some

18    real angst that I am causing out there in the world, I just

19    don't see a need for that.

20              19:  Have you ever felt that you were mistreated

21    or that a member of your immediate family was mistreated,

22    misled or harmed by a corporation or business?

23              It strikes me as an awfully broad and vague

24    question.  I am going to excise it.

25              21:  Have you or has any member of your

1    immediate family ever owned a business or otherwise been

2    self-employed?

3              What are we trying to do this?

4              Okay.  I am taking that out as well.

5              The rest remain.

6              The process for jury selection here is fairly

7    well known, I think.  We use the struck jury method.  You

8    have got the script already.  I will e-mail this along to

9    you, Ms. Walker will, in its final form.  And you will have

10   it coming in, so you will know what is required of you in

11   terms of addressing yourselves to the jury, introducing

12   yourselves, whomever else you want to introduce, identifying

13   by a reading of a list of prospective witnesses.  And then I

14   will do the general instruction and general questions.

15             Then we will adjourn to sidebar, turn on the

16   white-noise machine, and call each putative juror up

17   individually.  I will start the questioning off of those who

18   have responded affirmatively to any of the general

19   questions, then alternate between the parties, pass off and

20   let you conduct some additional examination on your own.

21             After the questioning of the individual venire

22   person is done, then they will go back to the well of the

23   court.  I will entertain any motions, any challenges for

24   cause.  It will inevitably be the case from time to time

25   that the Court will sua sponte dismiss someone.  I will give

1   you a chance to object to that.  But it will be most often

2   in obvious situations, child care problems, about to lose a

3   job if you have to come here and sit on this trial, that

4   kind of thing.

5            We will get through the panel that way.  And

6   then we will give you your three preempts a side.  You will

7   pass the pad.  Ms. Walker will give you the opportunity to

8   exercise your peremptory challenges.

9            Any questions about that?

10           Let's talk for a moment about how you want to

11  handle, how I am going to instruct you to handle your

12  exhibits that you want in the jurors' hands, in the form of

13  notebooks.  I know we are going to have presentation

14  equipment brought in here.  That is fine, and I think

15  helpful.  It helps enliven the process and keeps the jury's

16  interest, not to mention mine.

17           I think that the flashing of overheads of

18  exhibits with which you want the jurors to become facile is

19  unwise without having them in their possession.  You are

20  going to have to meet and confer and agree on what goes into

21  one another's books, and where there are disputes we will

22  resolve them together.

23           Each side should prepare eight juror notebooks.

24           Continuing on the subject of notebooks, witness

25  notebooks, it is typically the case in cases of this type

1   that I see counsel wisely preparing both direct and cross

2   binders.  Just make sure you prepare enough for me and my

3   clerk, three extras in addition to the witness and the other

4   side.

5            MR. B. MURPHY:  Your Honor, one question on that

6   particular procedure.  What I have done, with agreement of

7   counsel, particularly for experts, if there is a notebook

8   with a series of technical information in it, or a thick --

9   like the prosecution history, for example, I have agreed

10  with counsel to tag the important pages with a flag so the

11  expert is not fumbling around looking for stuff.  I have

12  agreed, though not always, to allow just yellow highlighting

13  on paragraphs that you want to focus people on.  I am not

14  saying we need to do it.  I am saying I have done it, only

15  by agreement.  Sometimes it's useful.  But certainly for

16  thick documents, I find it helpful to tag the pages that you

17  are going to focus on.

18           THE COURT:  I have no objection to that.

19  Whatever counsel can work out in that regard is fine with

20  me.

21           MS. GRAHAM:  Your Honor, we are willing to talk

22  with them about any things that would expedite the trial.

23           THE COURT:  I am comfortable with that.  You

24  have already used the operative word, agreed.  Where counsel

25  agree, I am fine.

1          I really don't want to unduly manage this.  You

2     know your cases and you know what you need to do to

3     prosecute your claims and defend them.  So I would rather

4     not inappropriately interfere.

5          MR. RIGLER:  We will work with counsel and we

6     will work, obviously, with the Court to make things as easy

7     as possible for the jury.  I don't want to commit right now

8     to any particular procedure.

9          THE COURT:  Just so you know, my focus is

10    entirely on my jury.  And I do use the word "my jury"

11    intentionally.  Keep that in mind.  It's my jury.

12         They will very much feel that way, I guarantee

13    you.  Act appropriately.

14         In that regard, in terms of addressing the jury,

15    in your closing speeches, that podium will be back in the

16    middle along with a bunch of other stuff, I am sure.  The

17    podium moves around, you can move it to face the witness or

18    the jury box.  You are not pinned to the podium.  But the

19    podium must serve as your base of operations when you are

20    questioning.  You don't question from a seated position in

21    my courtroom.

22         Keep a respectful distance from the jury box.

23    That middle pedestal at plaintiff's counsel's table is a

24    good distance to keep, I think, from the jury.  That is in

25    your interest, not to encroach unnecessarily on the jury's

```
 1    space, as people like to say these days, and you will be

 2    fine with me.

 3              To the extent that any one of you, or hopefully

 4    it won't be the case with any counsel, but it does occur

 5    sometimes with witnesses, sometimes with counsel, we need to

 6    mike you up, we will.  We have a couple of portable

 7    microphones.  And this is all to aid in the jury's

 8    comprehension, they need to hear to be able to comprehend.

 9    So we will do that.

10              Also, in the interests of jury comprehension, I

11    encourage, I permit and encourage transition statements.  It

12    could be from witness to witness, from subject matter to

13    subject matter.  But they have to be vetted between the

14    parties before you make them.  I am not encouraging

15    arguments or speeches.  This is by way of information that

16    you feel will help the jury comprehend the subject matter of

17    this trial.  Any questions about that?

18              Mr. Rigler?  Okay.  It looks like you might have

19    a question or concern.

20              MR. RIGLER:  No, sir.  I was just following Your

21    Honor.

22              THE COURT:  You don't have to use them.  It's up

23    to you.  I think they can be useful.

24              I run a rather formal courtroom.  It is a

25    federal court, after all.  And it should be a formal place.
```

1             When you address the Court, obviously, you rise.

2    When you want to move about the courtroom, you ask for

3    permission.  When you have an objection, rise, state the

4    objection.  Don't make an argument.  Objection, hearsay.

5    Don't get off into rule numbers and that kind of thing.  I

6    never remember them, as long as I have been doing this.  I

7    think a better record is made when you state in succinct

8    terms the substance of the objection, the basis of the

9    objection, a word or two.

10            If you are dissatisfied with my ruling on it,

11    and it may well come to pass that you are dissatisfied, and

12    you really think you need to try to change my mind, or you

13    want to make an additional point for purposes of appeal, ask

14    for a sidebar.  I don't prohibit sidebars.  I don't

15    encourage them.  I am not a fan of them.  Juries hate them.

16    But it's fine.  You got to get me to sidebar.  Sometimes I

17    get irascible.  But you got to get me to sidebar.  That's

18    your job.  We will go to sidebar.  I always encourage

19    lawyers, you know, in trials there is sometimes things that

20    you can anticipate.  If you have got authority for a

21    position that you could anticipate is going to be

22    contentious, bring it with you to sidebar.  Judges like to

23    have authority to follow.  Certainly, in terms of process,

24    you need Third Circuit authority.  In terms of substantive

25    patent issues, you need Federal Circuit authority.  It never

 1    hurts to cite Judge Sleet from time to time.

 2              That aside, just some thoughts.

 3              You will have access to the list of potential

 4    jurors the Thursday before the Monday of trial.  You can

 5    come over and get it on the third floor from Mr. Trickey's

 6    shop.  That is not going to be the final list, though.  So

 7    you will check in first thing in the morning.  And my chief

 8    deputy or someone will provide you with the most recent

 9    list, as well as those who are not here.

10              The list provides relatively minimal

11    information.  It provides a name, obviously, of the location

12    in the state.  It doesn't have an address.  Probably has the

13    town, city or development, whatever.  Occupation, marital

14    status, and age.  You will have a sense of which one of the

15    three counties in Delaware the jurors are haling from,

16    whether they are upstate, downstate.  Your Delaware counsel

17    will be able to give you some expert advice in that regard.

18              We do have the ability to accommodate a juror

19    that is coming from downstate a long distance overnight, in

20    overnight circumstances, but that will be discussed during

21    the individual portion of the voir dire.  It's a feature

22    that we are able to offer because we only sit here in

23    Wilmington.

24              Okay.  Let me open the floor.  Beginning with

25    you, Mr. Rigler, anything on your mind that you want to

1   discuss with me?  Any questions you have?

2           MR. RIGLER:  One question.  There may not be a

3   fixed answer.  But if we have a witness, do you prefer to

4   call that witness back for --

5           THE COURT:  One of their witnesses you want to

6   call in your case?

7           MR. RIGLER:  Yes.

8           THE COURT:  Work that out.  I prefer we use the

9   time more efficiently than calling the witness back.  I can

10  understand differences of view on that.  I don't seek to

11  impose my will in that regard.

12          MR. RIGLER:  We will have some witnesses who

13  will be coming from France and staying through the week.

14          THE COURT:  To accommodate those who have to

15  travel, that kind of distance, yes.  Counsel can work out

16  conditions in terms of calling somebody out of turn.  I am

17  not going to comment further on that.  I am comfortable with

18  what you work out.

19          MR. B. MURPHY:  One question on that.  Will the

20  French-speaking witnesses require translation?

21          MR. RIGLER:  No.  That's not to say that English

22  is their native language, and they are not going to be

23  perfect.  But I think the trial will move more efficiently

24  and the communication with the jury will be okay with their

25  level of English.

```
 1                    THE COURT:  So their answer is no.

 2                    Anything else from the plaintiff's point of

 3       view?

 4                    MS. GRAHAM:  I don't think so.

 5                    THE COURT:  Defendants, anything on your mind?

 6                    MR. B. MURPHY:  Yes, Your Honor.  Just a couple

 7       of things.

 8                    One, with respect to the jury, does Your Honor

 9       have a practice or preference as to whether they can take

10       notes?

11                    THE COURT:  Yes.  They take notes.  They take

12       notes.  I have a note-taking instruction.  It should be in

13       the preliminary instruction.

14                    I have a more recent instruction having to do

15       with social networking as well that I will probably include,

16       that language.  I don't think that is reflected in this form

17       and I don't know that I have put it up on the website yet.

18       It would account for you not including it.  I will talk

19       about Facebook and Tweeter and that kind of thing, just to

20       discourage any communication in that way.

21                    MR. B. MURPHY:  There was one other issue that I

22       have already broached with counsel.  We will try to work it

23       out.  I wanted to try to raise it with Your Honor.  That one

24       of our accused products, the details of the process for

25       making it and the exact final composition our client
```

1    believes are trade secrets.  They are reflected in I think

2    there is two or three exhibits, I have to identify the

3    specific pages for counsel.  We will discuss it.  It might

4    be necessary to take limited testimony in camera, which I

5    know can be disruptive.

6              THE COURT:  It can be.  But to the extent that

7    we need to accommodate industrial secrets or trade secrets,

8    we can discuss that.  I am willing to make the necessary

9    arrangements to protect commercial secrets.

10             MR. RIGLER:  We will try to work with counsel on

11   that.  We are sensitive to the point.  However, we have

12   disagreed during the discovery process as to whether this

13   information is confidential.  We contend most of it is in an

14   existing patent owned by SPI and hardly qualifies as

15   confidential.  But we will try to work and see if we can

16   narrow that difference.

17             THE COURT:  Don't hesitate to tell us if you

18   don't need to meet on any given morning.  I don't mind.  I

19   will be there.

20             MS. GRAHAM:  Your Honor, in that regard, is

21   there -- can we call over?  Is there some time when one of

22   your staff is in chambers at 8:00 in the morning or whatever

23   that we could call so we are not necessarily coming over

24   here ourselves?

25             THE COURT:  Or you can just leave a message if

1     nobody is here.  Why don't you call Ms. Walker's direct

2     line.  (Court announces phone number.)  She has voice mail.

3                  Sequestration.  I am assuming you are going to

4     want fact witnesses sequestered.  Agreed?

5                  MR. B. MURPHY:  We hadn't discussed it.

6                  THE COURT:  I am going to order fact

7     sequestration witnesses.  Obviously, experts can stay in the

8     courtroom.  Unless -- let me put it this way:  If you agree,

9     if you agree that a fact witness can be in here, if that is

10    your agreement, that is fine.  But don't complain about it

11    later on.  I will leave that to your discretion.

12                  The general request of counsel is to sequester

13    fact witnesses.

14                  Does SPI have anything else?

15                  MR. B. MURPHY:  No, Your Honor.

16                  THE COURT:  All right.  Thanks for your time.

17    We will see you along the way.  Take care.

18                  (Conference concluded at 12:40 p.m.)

19

20                           -   -   -

21    Reporter:  Kevin Maurer

22

23

24

25